IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SAGENT TECHNOLOGY, INC * CIVIL ACTION JFM-02-2505
Plaintiff
*
vs. Baltimore, Maryland
*
MICROS SYSTEMS, INC.
Defendant * January 22, 2003
* * * * *

Deposition of PETER ROGERS, JR., a witness of lawful age, taken on behalf of the Plaintiff in the above-entitled cause, pending in the District Court of the United States for the District of Maryland, before Dawn L. Venker, a Notary Public in and for Baltimore County, Maryland, at 7031 Columbia Gateway Drive, Columbia, Maryland 21046, on the 22 day of January, 2003.

* * * * *

APPEARANCES:

SCOTT H. PHILLIPS, Esquire
For the Plaintiff

MICHAEL H. TOW, Esquire
For the Defendant

Reported By: Dawn L. Venker

EXHIBIT B

desire, interest, and intent to help us find customers to tell them through.

Q Who said those statements?

A Gene Garrett, Dan VanVeelen also, as well as Mr. DeGennaro.

Q Let me make sure I understand. All three of these individuals at some point during the June 6th, 2000 meeting indicated to you that if MICROS could not resell or otherwise use the licenses that were contemplated in this transaction, that they could be returned to Sagent for a full refund and that Sagent would try to resell the licenses?

A That's correct.

Q When Mr. Garrett called you later that day, was that notion again expressed in that telephone call?

A Yes. Because he offered a substantial discount to go to five, ten, or fifty, and I expressed my concern how could I consume all that given at the time I had only sold I believe two or three licenses. So five licenses seemed somewhat relevant, but they express interest, "Here's an offer for ten and fifty.

Substantial discounts." I expressed, "How can I handle those if I don't have customers?" They said, "We'll work with you. We'll help you get rid of them." Really language in terms of take them.

Because we had met back in May, and we had bright -- we had optimism that product would take hold. We were going to deploy it on the USi platform offered via the Web. It was a lot of speculation -- speculation is not the right word -- industry buzz about a lot of software systems moving to the Web.

So it was in that vein that we acquired -- we needed a license to get our USi product going and really was just wondering how many customers. It was really difficult only having three how many were really going to sell, but I was struck by the extent of the numbers they were offering, plus the discounts.

Q Among Mr. Garrett, Mr. VanVeelen, and DeGennaro, which of those three indicated to you the notion that Sagent would take the product back and fully credit your account if you couldn't use them?

A Mr. Garrett.

Q Did the other two say anything along those lines?

A There was -- in the conversation in the morning, language was used. In the afternoon conversation, it was just between myself and Mr. Garrett. He said we'll take them if needed.

Q I meant to refer to the morning meeting -- I apologize -- when everyone was there.

A Mr. Garrett expressed that with backup. It is difficult with three people talking the exact language, but Mr. Garrett was the key salesperson.

Q And he is the one that made that specific comment to you?

A That's correct, but at the same time during the conversation, he was supported by Dan -- Mr. VanVeelen as well as Mr. DeGennaro.

Q In what way did those two gentlemen support that comment?

A Terms -- comment about the partnership, and that they want to work with us to sell through. And they looked at us as a key sales partner with the

product.

Q Did either of them express the specific comment that Sagent would accept for a full refund the product back if you couldn't use it?

A They would say -- the language was that we'll help you sell through, and take back if needed. I can't remember specifically full refund.

Q We'll talk in a little while about some notes. I don't know whether they are your notes yet, but there are some notes that have been produced. In that context, let me ask you this. Did you record in the handwritten notes that you took from either the morning meeting or the afternoon telephone call from Mr. Garrett this notion about return of the product and full refund?

A No.

Q Is there any reason you did not?

A No. I would write numbers down generally. Specific numbers so I didn't misquote them. I take notes, but I don't exactly write down everything in a conversation.

Q When you say "specific numbers," do I understand that to be the number of licenses and the exact discount that Sagent was offering you, those sorts of things?
A Yes.
Q Did you consider the representation that Sagent had made regarding return of the product for a full refund an important statement made by the company at that time?
A Yes.
Q Let me hand you, Mr. Rogers, what we'll mark as Exhibit Number 1.
(Rogers Deposition Exhibit Number 1 was marked by the reporter.)
Q I'll ask you if you can identify that, sir?
A This is a memo that I generated to Dan VanVeelen providing a purchase order for MICROS to Sagent to acquire the data access package and analytical calculator.
Q That is your signature at the bottom of the first page there?

A Yes.
MR. PHILLIPS: For the record, Exhibit 1 is comprised of a two-page document bearing Sagent Bates numbers 32 and 33.
Q What was your understanding as of June 30th, 2000 as to who Mr. VanVeelen was?
A Mr. VanVeelen was the regional manager who was the direct sales contact and technical contact to MICROS from Sagent.
Q Did you actually type this letter on your computer?
A Yes.
Q And you read it before you signed it obviously?
A Yes.
Q And on page 2 of this document, which is S33, can you identify that for me?
A This is the quote provided from Sagent to myself that I was to attach to the letter authorizing the acquisition of the product.
Q Now, I think that the -- I'll admit that

the print on this is somewhat fuzzy because it has been copied a number of times, but it looks like the date on this price quote is June 20th, 2000. Do you see that in upper right?
A 6-20.
Q Does that sound about right in terms of when you received this price quote from Sagent?
A I don't remember, but quite conceivably.
Q Let me ask you to look down in the box there. There is an item for technical support and upgrades. Do you see that?
A Yes.
Q And to the right of that there's a printed number that has been stricken through, and then it looks like someone wrote 24,000 in place of that. Do you see that?
A Yes.
Q Do you know who did that?
A No.
Q Do you know why that would have been done?
A I think the far right -- I believe that the

license fee number was different than the total. This was a matter of matching up.
Q And is that your signature at the bottom of this page?
A Yes.
Q How about the handwriting above and below it which reads, "Approved June 30, 2000. VP business development."
A That is my handwriting.
Q Now, does the purchase order that you issued on June 30th, 2000 reflect the same product mix and price that is seen in the quote received from Sagent?
A Yes. As far as my knowledge. My cover letter designated the software number and the technical support number.
Q Is it your contention that MICROS has paid to Sagent any portion of the $136,000 reflected on both the quote and your purchase order?
A I have no contention. I'm not aware of us paying them.

Q Pay them any money?
A As related to transaction?
Q Correct.
A Answer to that. I don't believe we have paid them anything related to this transaction.
Q Do you understand that subsequently there was an agreement between the parties that the $24,000 line item for technical support and upgrades was eliminated from the transaction?
A I was not aware of that.
Q Have you become aware of that at some point?
A Yes.
Q When was the first time you became aware of that.
A This morning.
Q And that was in the process of Mr. Callnin's deposition?
A Yes.
Q Did you at any time become aware that there was a subsequent agreement between the parties to

reconfigure the product mix that is reflected in the quote received from Sagent?
A You have to repeat that question. I didn't understand it properly.
Q If you take a look at S33, which is the quote, in that box there is a certain product mix. Specifically it talks about one data access server, design studio with report and analysis, administration, and I don't know what else. The line below that reads, "Analytical calculator." Do you see all that?
A Yes.
Q Did you at some point become aware of an agreement between the parties that that product mix would be changed?
A Yes.
Q When did you first learn that?
A This morning.
Q Did you at some point become aware that there was an agreement among the parties that this amount of $136,000 would be amended to reflect $112,000?

A Yes.
Q When did you first learn that?
A This morning.
Q And again that was in the context of Mr. Callnin's deposition?
A Yes.
Q Is it your understanding that at some point Sagent ultimately provided MICROS with an amended invoice for this particular transaction reflecting $112,000 as the amount due and owing?
A Yes.
Q When did you first learn that?
A This morning.
Q Let me hand you what we are going to mark as Exhibit Number 2. This is the Sagent Bates number 60.
(Rogers Deposition Exhibit Number 2 was marked by the reporter.)
Q This is an e-mail from Mr. Tow dated November 26th, 2001 which indicates that you were copied on it. Do you recall receiving that?

A Yes.
Q Does it sound correct that you would have received it on or about that date?
A Yes.
Q And Mr. Tom Patz was general counsel for MICROS as of that date?
A Yes.
Q Do you have any idea why Mr. Tow copied Mr. Patz on this e-mail?
A I would have to assume, since Mr. Tow reports directly to Mr. Patz, that he copies him as a matter of course.
Q Have you seen previous instances in which the general counsel for the company has been copied on a billing matter with a vendor?
A No.
Q The second --
A Could be, but I've not been involved in any billing problems where it would have been necessary to put them on that.
Q Second paragraph of this e-mail beginning

received this e-mail sixteen, seventeen months later?
A I had a discussion earlier in the year with Mr. Callnin about why weren't we selling this product. Understand, my role is business development, was to oversee, not formally buy product lines, and I would analyze products lines quarterly. So I could see what revenue -- is being sold by a product line. I was alarmed that we had not sold anything, or very little, through the data warehouse product line. And so we met earlier in 2001 really assessing where I was with this product and the lack of sales thereof.
Q When you saw that lack of sales, did you follow up with anyone on your team here at MICROS?
A Spoke with a person, Ed Rothenburg, who was in the restaurant product line, and head of major accounts, Alan Heyman, to say, "We got this product. It doesn't seem to be selling," i.e., the product -- our data warehouse product. And really try to push them where are we going with this product, but nothing came of that. Just understand this is a small product after a lot of different products that I look at.

Q At any point, did you say to anyone here at MICROS or Sagent, "Look, pursuant to our earlier agreement and understanding, we are giving this back to you, and we expect a full refund because we just can't move it"?
A I did not do that. I had really -- I had no contact that I remember from Sagent past my conversation with Mr. VanVeelen in the end of June 2000. I told Scott it was his responsibility in terms of the product. I had many other things to do. Really move the product along or do what has to be done in terms of evaluating this product. He was responsible with the sales force.
Q Apart from any conversation you may have had with Sagent personnel, did you ever talk to anyone at MICROS, including Mr. Callnin, expressing the idea that, "Look, we need to -- it's time to send this product back to Sagent and request a full refund because my quarterly numbers show we are not moving it"?
A At this time frame in November 2001 when I

was engaged in discussion as to whether to send it back if we haven't had a customer, we have no purpose of holding it. Let's send it back. It was unopened. We didn't use it. No purpose for it.
Q But in the context and in that conversation, did you also add on to that to make sure we get at full refund?
A Yes. Returning the product would be full refund.
Q This was to who? Mr. Callnin?
A Mr. Tow.
Q Mr. Tow. And again this was in the November 2001 time frame?
A Yes.
Q Are you aware if anyone at MICROS ever expressed in writing, by handwritten note, e-mail, or correspondence, the notion that this product should be returned to Sagent because, again, we are not moving it, and we are entitled to a full refund?
A No.
Q Mr. Rogers, I did not make a copy of this,

and I'm happy to do that and mark it if you want. I don't think it would be necessary. These are I believe the answer to interrogatories that MICROS has provided in this case, and feel free to look through them. Do they look familiar to you?
A Yes.
Q Let me ask you. This is the last page and feel free to look through this. Is that your signature on those answers to interrogatories?
A Yes.
MR. PHILLIPS: Do you have any objection to not marking those?
MR. TOW: No. That is fine. Not the basis of the questions asked.
Q Did you review these answers to interrogatories in order to ensure their accuracy and completeness?
A Yes.
Q I understand -- and it's certainly not an issue, but I just want to make sure I understand what -- that initially these were signed on your behalf

believe that is escalating.
Q That's a component of damages that you are alleging in this case?
A I'm not sure how to answer that.
Q Have you been asked to provide any information with regard to the damages that are alleged and are prayed for in the counter-claim?
A No.
Q I think that's all I have for you on that one. Thank you.
MR. TOW: Should we mark that now and copy it later?
MR. PHILLIPS: Well, at the end of the deposition as Exhibit Number 3 the answers to interrogatories which Mr. Rogers has been asked about and has spoken to this morning -- this afternoon.
(Rogers Deposition Exhibit Number 3 was marked by the reporter.)
Q You heard Mr. Callnin speak this morning about the 12000 Baltimore Avenue address in Beltsville, correct?

A Yes.
Q And he also testified I believe that at least as of the fall 2000 time frame the receiving department was at that address?
A Yes.
Q Do you know who worked in the receiving department in Beltsville as of that time?
A Specifically, no. I may know of some people that were in shipping or receiving. Sort of a general term.
Q Do you know who received the Sagent software that was received at that address in the fall 2000 time frame?
A No.
Q Do you know -- would you agree with Mr. Callnin that the Sagent software was, in fact, received at the Beltsville location in fall 2000 time frame?
A I'll say it was received at the Beltsville location. I don't know the exact date.
Q You don't -- you are not contending that the Sagent was never shipped to MICROS by Sagent?

A I'm not contending that at all.
Q That would have included the analytical calculator? Are you contending that Sagent never shipped that?
A I'm not contending that they didn't. I just know that I placed an order for software.
Q Did you receive confirmation from anyone at MICROS that the totality of that order had, in fact, been received from Sagent at some point?
A I received indication that a package was delivered. Specific contents -- I actually physically received the package from the people in Beltsville. So I physically received a box, and I, in turn, then turned it over to Mr. Callnin. I did not open it. I do not know the date of receipt.
Q You heard Mr. Callnin talk this morning about what he in turn did with that box, namely put it on the shelf, right?
A Yes.
Q Is that -- is your understanding consistent with that testimony?

A I have no reason to dispute that.
Q Do you know if MICROS made any copies of software at any time?
A I do not know. We have a corporate policy against copying software illegally.
Q Is it your understanding that at some point the software was returned to Sagent?
A Yes.
Q Do you know when?
A Approximately December 2001.
Q Do you have an understanding as to whether the return of the software to Sagent occurred in one mailing or two mailings or more?
A I don't know.
Q You heard Mr. Callnin talk this morning about how the software was treated for tax purposes while it was physically here at MICROS. Do you recall that testimony?
A I do not.
Q You don't recall that testimony?
A No, I do not.

Q You may have been out of the room. Do you have an understanding as to how MICROS treated the software for tax purposes while it was here?
A I don't know specifically.
Q Do you know generally?
A Treated as an asset because it was no sale for that at that point in time. That's how I would treat, it knowing, accounting. I bought an asset, because there no sale behind it at that point. This was done in advance of expected hope for future sales.
Q And you have your MBA, correct?
A Yes, sir.
Q Would the treatment of the software as an asset by MICROS be reflected in the corporate tax returns of the company?
A It would be reflected if treated as a asset in the asset side.
Q Would I be able to find a line item somewhere -- I assume that the asset side ultimately comes down to one number, correct?
MR. TOW: Objection as to form.

Q I assume that the asset side of the ledger sheet would ultimately be reflected in one number. Would that be correct?
A Yes.
Q And that number in turn would be derived from a series of line items above it, correct?
A Correct.
Q Would I be able to identify as a line item on the asset side of the ledger sheet this particular software from Sagent?
A Theoretically assuming if recorded properly, yes.
Q Have you at any time while you have been employed by MICROS negotiated with vendors regarding the terms of any price quote that they have provided to you?
A Yes.
Q Have you on any of those occasions had disagreements with any of the terms reflected in that written price quote?
A I'm not sure disagreement. I would have

discussion, or I would object to something, would no accept it.
Q How would you express that disagreement or objection back do that vendor?
A Either verbally or in writing. Nowadays generally by e-mail, but generally could be in writing or e-mail.
Q Is it your typical practice to reflect somewhere in writing, whether it is an e-mail or a letter, the terms of a collateral agreement that MICROS had reached with that particular vendor regarding a particular transaction?
A Not always. Very specific on the numbers to what we have to pay. Focus on the numbers and/or payment terms.
Q Earlier you indicated that the representations that were made at the June 6th meeting and in the June 6th telephone call by Sagent were important to you in this transaction, correct?
A Yes.
Q Something that is elevated to that level,

would you typically confirm that in writing?
A For something of magnitude of buying fifty licenses, yes.
Q I don't necessarily mean the fifty licenses. I mean would you confirm back to Sagent in writing the notion that they had said, "Look, we'll take this stuff back if you can't move it, and we'll give you a full refund"?
A I may in the past. I don't remember specifically.
Q But you certainly didn't do it in this specific instance?
A No.
Q Are you aware -- I'm going to ask the flip side of that question. Are you aware of any documentation from Sagent to MICROS which set forth their agreement to accept for a full refund the software if you couldn't move it?
A No.
Q Are you aware of any documents to or from either MICROS or Sagent which reflects the notion that

the contemplated transaction in Exhibit Number 1 was conditional upon anything at all?
A It was implied because we had a partnership arrangement with Sagent, and then we purchased -- however we define it -- acquired a package with expectations that we had prospects coming up in the fall. And we purchased that or acquired it because it was a requirement to get the product on the Sagent -- USi data warehouse. So we had to get a demo package going in order to sell it to customers.
So I purchased, acquired one package to get the minimum required for the project to succeed. To get up and have a demo package. After that, my involvement really ended. I was just involved for a two-month period looking at the business relation. Actual execution I had no role in.
Q And that two-month period was early on in the May to June 2000 time frame?
A Correct.
Q Mr. Rogers, let me hand you what will be marked as Exhibit Number 4.

(Rogers Deposition Exhibit Number 4 was marked by the reporter.)
Q Have you at any time prior to today seen that document?
A No.
Q Let me hand you Exhibit Number 5.
(Rogers Deposition Exhibit Number 5 was marked by the reporter.)
MR. PHILLIPS: For the record, this bears documents MICROS Bates number 161 through 163.
Q Do you recognize any of the handwriting here?
A Yes.
Q Do you recognize all of the handwriting?
A Yes.
Q Whose handwriting is it?
A Mine.
Q And can you tell me what this reflects?
A The first page 000161 reflects my notes from a meeting I believe dated 5-10-00. I didn't put '00 in, but May 10th.

Q 2000?
A Correct. With Gene Garrett and Dan VanVeelen.
Q It was just the three of you in this meeting?
A Scott Callnin was in the meeting also.
Q Is there any reason his name would not be reflected as an attendee.
A No. Just he's a MICROS person. I put down people generally outside. NonMICROS.
Q And where did that meeting occur?
A Here in the Columbia office building.
Q And one of the issues addressed during that meeting was the transaction contemplated in Exhibit Number 1, the 63000 purchase order?
A No. This meeting related to the current agreement that we had with Sagent that was a partnership. When I got involved in the project in April and learned more about the economics, I was somewhat alarmed that we would sell the product and we had to share it 50-50 with Sagent. At the same time,

we had to buy software from Sagent and sell it, and, you know, fifty percent of the profit and the sales would be going back to Sagent. So we can make very little on the intellectual property. Do all the sales effort, and any type of consulting, then again we had to pay Sagent. We'd split 50-50. I thought that this product under current relationship was uneconomical for MICROS.
Q You were referring to the joint intellectual property agreement?
A If that's how it is recorded. I would say the business relationship. When we enter into a deal with an end user, that fifty percent of the proceeds would go to Sagent.
Q Did the June 30, 2000 purchase order come up in this May 10, 2000 meeting at all?
A No.
Q I can read -- if I could, ask you to flip back. I can read a lot of this, but some of it I can't. Particularly the --
A My handwriting isn't very good.

Q -- the fifth line down. The one below "Insight agreement." The line below that. Something "platform"?

A We had discussed -- I had discussed with Dan VanVeelen I believe in April -- I was put in touch with him via Scott, and I was asked to really intercede in that program back in April by Mr. Rovani because the first product we were going to bring up was the Insight product on the USi. John had no knowledge about that.

So I worked with Scott's group and Tony Seville. What's this business look like? And then I found out about the economics of the deal, and as a corporate officer somewhat alarmed. This is a large company. Certain projects get sort of lost at times.

So I was involved really looking at that. How do we improve the economics? Are we going to sell it? How do we get this coming up? And I was concerned literally about the economics.

So I believe that I spoke with Dan in April and asked him how else can we restructure this, and so this meeting I believe was prompted by Dan to really

talk about moving us off of a shared 50-50 to an OEM agreement, i.e., my comment down below, "Formulate an OEM," which means original equipment manufacturer agreement. That we would buy the product and then resell it.

Q Can you read for me the last two paragraphs?

A "Goal to enter an OEM agreement. Multi-year. Three-year. Formulate an OEM."

Q And the paragraph below?

A "Maintenance fee per customer. Ease to administer for an annual fee. Adjustable annually. For install base."

Q Again, this had nothing specifically to do with the two data load or the analytical calculator that are contemplated in the June 30 purchase order?

A That's correct.

Q Let's turn to the next two pages. I assume these next two reflect your notes from June 6th, 2000 meeting?

A Yes.

Q We have spoken at some length already about that meeting, correct?

A Yes.

Q And, of course, this meeting did have to do with the software package that we are talking about in this case, right?

A Yes.

Q The third block down there below "discussion," can you read that one for me?

A "Prepurchase of software-possibility. Give us a price for five and ten licenses."

Q And how about the next line below that?

A I would have had a phone call with a person called Ms. Sherry Maye. So I would have logged that call in after that meeting. So the line going down below, "Scheduled me. Cofounder." The comments, "Start up Internet company. Broadvision." Had nothing to do with Sagent. Just my notes on the page.

Q Did the Sherry Maye call have anything to do with Sagent?

A No.

Q And then the Gene Garrett reference with a telephone number, correct?

A Correct.

Q And below that, "Five packages. Ten packages. Fifty packages" and the corresponding dollar amount next to each, correct?

A Yes.

Q And the first line of page 163?

A I wrote down comments. "Payment terms." Told me when we could pay. "One-third. One-third. One-third." I can only -- forget what the one-third, one-third, one-third meant. And "per package fifty percent. $100,000." I forget what that referred to.

Q The next gentleman with a telephone number and "security consultant." Does that have anything to do with this case?

A No.

Q And below that June 7 I believe?

A Correct.

Q What is that?

A That looks as though that is comments. We

would sit down and discuss the upcoming preparation of the MICROS 10K. No relationship to Sagent.

Q And that takes us down to -- is it POA2?

A Part two.

Q Does that have anything to do with the Sagent transaction?

A No.

Q And then we are down to January 8th?

A Uh-huh.

Q And "Mike Weintraub." Does that block of handwriting through the bottom of the page have anything to do with this case?

A No.

Q We've talked about the fact that page 161 reflects your notes on a May 10th, 2000 meeting, correct?

A Yes.

Q That had nothing to do with this particular case, right?

A In terms of the specific product purchased, no, but I would say that they are somewhat connected



just because they were Sagent.

Q Let me ask you this. That is fair enough. During the May 10th, 2000 meeting, did any Sagent representative express at that time the notion that the product contemplated in the purchase order could be returned for full credit if you all couldn't use it?

A No.

Q One of the allegations in the counter-claim is that MICROS selected to license this software directly with Sagent based in substantial part on the representations made by Sagent personnel, and my question to you is about that phrase "in substantial part." That leads me to believe that there were other factors that led to that decision by MICROS. Are you aware of yours?

A I don't understand the definition "in substantial part."

Q Do you have an understanding as to why MICROS ultimately elected to license this software directly with Sagent?

A Because we had back in I believe the 1998



time frame when we started working this product somewhat MICROS selected Sagent software. In turn we were dealing with a company called Talus. Talus was bought by Sagent. So deal with Talus. We dealt with Sagent. Historical relationship.

Q Did the direct licensing of the software with Sagent have anything to do with affirmative representations made by Sagent personnel?

A Historically?

Q Well, specifically. There was a decision the company made to license this product directly with Sagent, correct?

A Yes.

Q And what I'm trying to get at is what the basis is for that decision made by MICROS was?

A I was not part of that. So I couldn't relate to it.

Q Do you have an understanding of the amount of money that MICROS has attributed to marketing costs for the Insight product?

A No.



Q Is there some person or group within MICROS that would track those dollars?

A Specifically for a project directly, no.

Q You seem to be indicating that there might be a more general reflection of those numbers somewhere?

A I think specifically if someone was asked to come up with numbers, would have to go back and look at invoices. It would be a specific data research and analysis of direct dollars and of evaluation of time.

Q Let me hand you what I'll mark as Exhibit Number 6.

(Rogers Deposition Exhibit Number 6 was marked by the reporter.)

Q You are free to review the whole thing. I have very limited questions. It is on the first page.

A I would just like to look at the whole document.

Q Absolutely.

A I'm ready to answer.

Q You'll see some handwriting on the top