1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2
    SAGENT TECHNOLOGY, INC      *    CIVIL ACTION JFM-02-2505
 3                 Plaintiff
                                *
 4        vs.                         Baltimore, Maryland
                                *
 5  MICROS SYSTEMS, INC.
                   Defendant   *    January 22, 2003
 6              *       *       *       *       *
```

 7              Deposition of SCOTT CALLNIN, a witness of

 8  lawful age, taken on behalf of the Plaintiff in the

 9  above-entitled cause, pending in the District Court of

10  the United States for the District of Maryland, before

11  Dawn L. Venker, a Notary Public in and for Baltimore

12  County, Maryland, at 7031 Columbia Gateway Drive,

13  Columbia, Maryland 21046, on the 22nd day of January,

14  2003.

15              *       *       *       *       *

16  APPEARANCES:

17              SCOTT H. PHILLIPS, Esquire
                   For the Plaintiff
18
                MICHAEL H. TOW, Esquire
19                 For the Defendant

20  ALSO PRESENT:  PETER ROGERS, JR.

21  Reported By:  Dawn L. Venker

GORE BROTHERS Reporting & Video Co., Inc.           Towson
410-837-3027

EXHIBIT
C

26

1 rest of the technology and hospitality companies into
2 downward trends. Certainly not as deep as most
3 companies were feeling it, but in the way of some of
4 the financial positions, cash available, and that sort
5 of thing, I don't know what the standing was at that
6 time.
7    Q    Was there any discussion about concessions
8 that Sagent might be able to make to make this
9 transaction more attractive to MICROS?
10    A    There would definitely be fairly deep
11 discounting involved off of their regular retail
12 pricing.
13    Q    Anything else along those lines?
14    A    That Sagent would assist us in selling had
15 been the understanding of the relationship going back
16 for a number of years. That we were 50-50 partners on
17 this project, and that they put in their equal time on
18 helping us to sell to various clients as well.
19    Q    You say that went back a number of years.
20 Was that specifically discussed at this June 6th
21 meeting?

27

1    A    Yes. Yes. The idea that Sagent would help
2 to sell the product was discussed.
3    Q    And tell me who was involved in that
4 conversation and who said what?
5    A    Primarily that would have been Dan
6 VanVeelen, as he was the main contact as far as the
7 product was concerned, and he would have the feel for
8 what leads they'd have. And he would have an opinion
9 as well that he did put into the conversation about
10 future client activity. The numbers that we might
11 expect to -- projects we might expect to go into as
12 well.
13    Q    Is it your contention that MICROS has paid
14 to Sagent any portion of the $136,000 reflected on both
15 the purchase order as well as the price quote provided
16 earlier to MICROS by Sagent?
17        MR. TOW: Objection as to form.
18    Q    Did you understand the question?
19    A    Yes. I understand, and I do not believe
20 that any portion of this amount has been paid.
21    Q    Let me hand you the next document which

28

1 we'll mark as Number 2, please.
2        (Callnin Deposition Exhibit Number 2 was
3 marked by the reporter.)
4        MR. PHILLIPS: For the record, Exhibit
5 Number 2 reflects MICROS Bates Numbers 5 through 10.
6    Q    If you would take a moment to look through
7 that, if you would, sir, MICROS Bates number 5 through
8 10.
9        Mr. Callnin, feel free to look at all of
10 that. I can tell that most of my questions will be on
11 page 9, but feel free to look at all of it.
12        MR. TOW: You should just look at all of it
13 to understand what you are looking at.
14    Q    Ready to proceed? As I said, let me ask
15 you turn to page 9, which I think you have already
16 done. Let me ask you to look at the bottom e-mail
17 there. It's a February 8th, 2001 e-mail from you to
18 Mr. VanVeelen. Do you see that one?
19    A    Yes.
20    Q    And I think -- correct me if I'm wrong --
21 this reflects what we were talking about a little bit

29

1 earlier with regard to deletion of the maintenance
2 support aspect of the initial invoice as well as the
3 reconfiguration of the mix of product. Is that your
4 understanding?
5    A    That's right.
6    Q    And if you look at the e-mail above that,
7 which is Mr. VanVeelen's reply to that of that same
8 date, it appears that Sagent is amenable to those
9 changes. Is that your understanding?
10    A    Yes.
11    Q    And those changes would in turn reduce the
12 amount of the invoice from the initial 136,000 down to
13 112,000. Is that your understanding?
14    A    That's right.
15    Q    Is it your contention that MICROS has paid
16 to Sagent any portion of that 112,000?
17    A    I do not believe any portion of that has
18 been paid.
19    Q    Let me ask you to take a look at -- it is
20 in that same document. If you'd turn to page 6. If
21 you look a little more than halfway down at the close

54

1    Q    Let me hand you what we are going to mark
2 as Exhibit Number 5 which bears MICROS Bates number 11
3 and 12.
4        MR. PHILLIPS:  And I will point out,
5 Michael, that my copy was poor.  We can confirm that
6 this is actually another 1 that is the following
7 number.
8        MR. TOW:  That's fine.
9        (Callnin Deposition Exhibit Number 5 was
10 marked by the reporter.)
11    A    Okay.
12    Q    Mr. Callnin, this purports to be an e-mail
13 that Tiffany Nguyen -- N-G-U-Y-E-N -- that Sagent sent
14 to you on October 18, 2001 in which she attaches a
15 "revised invoice for the initial sales," and again, let
16 me ask you if you recall receiving this e-mail and the
17 attachment?
18    A    This one, yes.  I recall receiving this.
19    Q    Both pages?
20    A    Yes.
21    Q    An did you read it when you received it?

55

1    A    Yes.
2    Q    Does the second page, which is page 12, is
3 that the corrected invoice that you were referring to
4 earlier that you said arrived sometime in late 2001?
5    A    Yes.  There is the corrected invoice.
6    Q    Let me shift gears a little bit and ask you
7 about the answers to interrogatories that MICROS has
8 provided in this case.  Did you have any role in
9 preparing those answers to interrogatories?  Let me
10 first ask you whether you have ever seen them?
11    A    I've seen them within the last couple of
12 weeks.
13    Q    And that probably answers my next question.
14 Did you have any role in preparing them?
15    A    No.
16    Q    Were you asked to review them, once they
17 had been completed, for accuracy or completeness?
18    A    No.
19    Q    There is a reference in the answers to
20 interrogatories to an address at Beltsville, 12000
21 Baltimore Avenue.  Can you tell me what is there?

56

1    A    That's the old headquarters of MICROS
2 Systems.
3    Q    And what is currently housed there?
4    A    Just the original office building, and I'm
5 not sure if we still have a receiving department there
6 or not.  We may have completely vacated the area.
7    Q    What was there as of June 30th, 2000?
8    A    At that point, there was a receiving area
9 there.
10    Q    And is it your understanding that the
11 software and analytical calculator that Sagent shipped
12 to MICROS was actually delivered to that address as
13 opposed to this address?
14    A    That might be accurate.  I'm not certain,
15 but that would be about right.
16    Q    Let me ask you.  I think it might be
17 reflected on Exhibit Number 1.  Does that refresh your
18 recollection in responding to that previous question?
19    A    Yes.  It appears that they have that as
20 their ship to address.  So it was likely the location
21 where their software arrived.

57

1    Q    And it's not your contention, is it,
2 Mr. Callnin, that Sagent failed to deliver either
3 that -- the software or analytical calculator that is
4 reflected and contemplated in Exhibit Number 1, is it?
5    A    No.
6    Q    Do you have an understanding of who would
7 have re -- who physically would have received the
8 software from Sagent at the Beltsville address as of
9 the June, July 2000 time frame?
10    A    I don't know.
11    Q    You mentioned a receiving department
12 earlier; is that correct?
13    A    Uh-huh.
14    Q    That was there at the time?
15    A    Yes.
16    Q    How many people worked in that department?
17    A    I don't know.
18    Q    Do you know who the head of it was back in
19 the June, July 2000 time frame?
20    A    No.
21    Q    Do you know the names of any of the people

---

**58**

1 who worked in the receiving department during that time
2 frame?

3   A   No.

4   Q   Did you ever personally see the software
5 that Sagent delivered to MICROS?

6   A   Yes.

7   Q   When did you see it?

8   A   I can't recall even very closely when it
9 did arrive. It was, as best I can recall, sometime in
10 the fall of 2000.

11   Q   And at that time was your office in
12 Beltsville?

13   A   I believe we moved -- two years ago, no.
14 Three years ago. Yes, I believe. No. I believe we
15 were here in this location. Fall of 2000 we were here
16 at this location.

17   Q   Were you physically here when you saw the
18 software for the first time?

19   A   Yes.

20   Q   Can you describe for me what it looked
21 like? Was it open? Was it in packaging?

---

**59**

1   A   It was delivered actually to me in my
2 office. I opened the mailing box, and the software
3 manuals and disks were shrink wrapped, and I put that
4 on my shelf in my office.

5   Q   So it was initially delivered to MICROS,
6 Beltsville, correct?

7   A   That's right.

8   Q   And then there is some sort of internal
9 delivery procedure within the company whereby it made
10 its way from Beltsville to Columbia?

11   A   Correct.

12   Q   You mentioned multiple disks. How many
13 were there?

14   A   I don't recall. It may have been one
15 because I knew it's their practice to put all the
16 various software on one disk and just provide a
17 different key for what they wanted to unlock on the
18 disk. Though there may have been documentation disks
19 or tutorial discs as well, or perhaps portions of what
20 was delivered might have been on a second disk. I
21 can't remember. It might have been one. It might have

---

**60**

1 been multiple.

2   Q   I think you said that the disk, or disks
3 were shrink wrapped at that time, right?

4   A   Yes.

5   Q   And you took them out of not the shrink
6 wrap, but the mailing package?

7   A   Correct.

8   Q   And put them on a shelf in your office?

9   A   That's right.

10   Q   Did you or anyone else at your direction
11 make copies of either the disk or disks that were
12 contained therein?

13   A   No. They were never removed from the
14 shrink wrap.

15   Q   How long did they stay on the shelf in your
16 office?

17   A   Probably about fourteen months. Again, I
18 don't have a good recollection of exactly when I
19 received them or when I turned them over.

20   Q   And to whom did you turn them over
21 ultimately?

---

**61**

1   A   To Michael Tow.

2   Q   And that was approximately fourteen months
3 after they arrived in your office in the fall -- did
4 you say the fall of 2000? Yeah.

5   A   That would be about right.

6   Q   Did you turn all of that material over to
7 Mr. Tow at one time?

8   A   Yes. That's right.

9   Q   Did he return to you some months later and
10 retrieve from you additional materials provided by
11 Sagent?

12   A   I don't recall if he did.

13   Q   Do you have an understanding of what
14 Mr. Tow did with the materials he retrieved from you?

15   A   I believe he returned them to Sagent.

16   Q   Do you have an understanding as to why?

17   A   I believe that was to show them -- to
18 return it in the form it came. Was to show them that
19 we hadn't ever used the software.

20   Q   But I mean why was it returned at all?

21   A   At the time that it was asked from me and I

---

16 (Pages 58 to 61)

66

1 between the two companies where you say -- you talk
2 about what the products mix will be, what the delivery
3 terms will be, what the price will be? That sort of
4 back and forth?
5    A    Yes. I had experience in that regard again
6 with Sagent, but more on the lines of the consultant --
7 the services we would agree to purchase from them on
8 various projects.
9    Q.    I read some of e-mails about a gentleman
10 who worked for Sagent by the name Sanjay?
11    A    Sanjay, yes.
12    Q    He did some consulting work for MICROS with
13 regard to I think the AmeriKing project; is that right?
14    A    That's right.
15    Q    And at some point the number of days were
16 beyond budget, and MICROS asked Sagent to basically
17 make a concession on the number of days that Sanjay had
18 spent on that consulting work, right?
19    A    We did.
20    Q    And ultimately there was an agreement on
21 the number of days that would be credited back to

67

1 MICROS, correct?
2    A    Correct.
3    Q    If MICROS was to receive a written price
4 quote from a vendor and you didn't agree with all of
5 the terms as set forth in that quote, how would you
6 convey your disagreement and request the changes back
7 to that vendor?
8    A    That would have been through direct contact
9 with either Dan VanVeelen or Matt Comstock.
10    Q    Would that have been in writing?
11    A    More often than not it was at least
12 preceded by a phone call with an agreement to -- the
13 idea that was put forth, and in probably most
14 situations but not all, follow-up with a formal e-mail.
15    Q    At any time did you write to either
16 Mr. Comstock or Mr. VanVeelen expressing the notion
17 that, "Wait a minute, guys, there is something that is
18 not reflected here, and that is your agreement to
19 accept for a full refund the software package in return
20 if we, MICROS, couldn't resell or relicense it"?
21    A    The question one more time.

68

1    Q    At any point during this transaction, did
2 you write, in either a letter or e-mail, to
3 Mr. Comstock, Mr. VanVeelen, or anybody else at Sagent
4 expressing the idea that there was an agreement here
5 that was not expressed previously in writing, and that
6 agreement was that Sagent would accept the software
7 package and the analytical calculator in return for a
8 full refund to MICROS if MICROS couldn't relicense or
9 resell that?
10    A    I never sent any e-mails that -- to that
11 extent in that language.
12    Q    Did you send any e-mails or correspondence
13 that had similar language to it? I don't mean to box
14 you in with my specific verbiage.
15    A    No. With regard to the returning of the
16 software, I don't think that I had any correspondence
17 with Matt or with Dan.
18    Q    The software, the records will reflect, I
19 think, was returned in December of 2001, and the date
20 of Exhibit Number 1 is June 30th, 2000. So we are
21 talking about an eighteen-month gap there. I mean from

69

1 any time, let's say from May 2000 forward, did you
2 express in writing the sentiment that there are -- had
3 yet to be reflected in writing the agreement between
4 MICROS and Sagent that Sagent would accept the software
5 in return for a full credit back to MICROS if MICROS
6 couldn't relicense or resell its software?
7        MR. TOW: Objection. Asked and answered.
8 Answer it again.
9        MR. PHILLIPS: I don't think it has been
10 answered, but it has been asked.
11    A    No. I didn't send any correspondence with
12 any language to that extent.
13    Q    Are you aware of anyone within MICROS who
14 did send such a correspondence or e-mail?
15    A    I am not aware of. I don't remember seeing
16 such a correspondence or being perhaps copied on
17 correspondence with that request, but I would only
18 speculate that that was done.
19    Q    As the initial contact on the MICROS end
20 for this transaction, would you typically be copied on
21 any such correspondence if it existed?

70

1    A    In the earlier part of the talks about this
2 transaction, yes, but not necessarily the sixteen,
3 eighteen months later when it wrapped up.
4    Q    The earlier part would include the June
5 6th, 2000 time frame when you attended the meeting,
6 right?
7    A    Uh-huh.
8    Q    So if there was any correspondence going
9 back from anyone at MICROS to Sagent expressing the
10 notion that you and I are talking about now, in that
11 early part of the deal, you typically would have been
12 copied on that, right?
13    A    Likely.
14    Q    Are you aware of any documents either to or
15 from Sagent which reflects that it was Sagent's
16 understanding that its sale of this software package
17 and analytical calculator to MICROS was conditional
18 upon anything?
19    A    Am I aware of any correspondences to that
20 extent?
21    Q    Any document, and I mean to include

71

1 document, correspondence, e-mails, or handwritten notes
2 that were provided to Sagent.
3    A    I'm not aware of anything in writing to
4 that extent.
5    Q    Again, let me just ask for your sort of
6 technical expertise in this area. We talked about the
7 concept of data warehousing, and you may have answered
8 this. I may have already previously asked you. Can
9 you give me an idea of what that is, and is that what
10 you mentioned early on about collecting point of sale
11 information and analyzing or providing it in raw data?
12    MR. TOW: Objection as to form. You can
13 answer.
14    Q    It is a poorly formed question. I'm trying
15 to learn what data warehousing is.
16    A    But I think your summary was correct.
17    Q    Do I understand that the Insight product
18 was a jointly developed product between Sagent and
19 MICROS?
20    A    That's right.
21    Q    Do I understand correctly that the

72

1 Insight -- that part and parcel the Insight product was
2 the software package that is the issue of this
3 particular transaction?
4    A    Part of the original invoice in question is
5 involved with it. The data movement is absolutely
6 necessary to that product as it existed. The reporting
7 aspect of it would be an option, not necessarily
8 automatically included in it.
9    Q    Let me hand you the next exhibit, and we
10 are up to 6.
11    (Callnin Deposition Exhibit Number 6 was
12 marked by the reporter.)
13    MR. PHILLIPS: This bears MICROS Bates
14 numbers 161 through 163. Let's go off the record.
15    (A recess was taken.)
16    Q    Easy question. Is it your handwriting?
17    A    No, it is not.
18    Q    On none of these three pages?
19    A    Correct.
20    Q    Do you recognize whose handwriting it is?
21    A    I do not.

73

1    Q    Let me ask you a little bit more about the
2 June 6th, 2000 meeting that we talked about earlier.
3 Do you know who called that meeting?
4    A    I was the contact on putting it together
5 through Dan VanVeelen. I believe may have had Gene
6 Garrett contact Peter Rogers at that point, and that
7 was called between Gene and Peter.
8    Q    And I think earlier you testified that
9 generally the purpose of the meeting was to discuss
10 future prospect for this product, what the two
11 companies could do with it; isn't that right?
12    A    Uh-huh. That's right.
13    Q    Were there other items on the agenda, if
14 you will?
15    A    No. I think that was the sole purpose of
16 that visit. They were -- Sagent, that is, particularly
17 Gene, was very concerned with missing some numbers in
18 there at the end of the quarter, and the primary, if
19 not sole, concern of that meeting was to get some
20 prepurchased software on the records by the end of the
21 quarter.

78

1    Q    Do you recall language about the notion
2 that the software would be returned to Sagent?
3    A    I don't think we had discussions about the
4 possibility of needing to return it strictly because of
5 the upbeat nature of going forward with the project and
6 being able to find some clients eventually for this.
7    Q    Let me ask you about another meeting that
8 the documents produced to date reflect occurred. That
9 was on May 10, 2000. Do you recall attending a meeting
10 on that date with regard to this particular software
11 package?
12    A    No. I don't recall a May 10 meeting. I
13 recall specifically one meeting which I'm quite certain
14 was the June 6th. I heard some reference here to May
15 10, but I don't recall that at least in the context of
16 this software agreement.
17    Q    Do you recall any discussion at any time --
18 any statement at any time from a Sagent representative
19 which indicated that Sagent would resell any licenses
20 that MICROS was unable to sell?
21    A    Once again.

79

1    Q    Can you recall any statement made by any
2 Sagent representative at any time which indicated that
3 Sagent had agreed to resell any licenses that MICROS
4 was not able to sell?
5    A    No. I don't think it was that they would
6 resell. It was that they would help us resell those
7 licences that we were talking about prepurchasing.
8    Q    And again did that come from Mr. Garrett?
9    A    Yes. It would have been.
10    Q    Was that the May 6th meeting -- June 6th
11 meeting?
12    A    Yeah. That was from the one meeting I
13 attended which I'm pretty sure was the June 6th and not
14 the other date that's brought up.
15    Q    Apart from the June 6th meeting, did you
16 attend any other meeting where Sagent personnel were
17 present and indicated that MICROS could return the
18 software and the calculator to Sagent for a full refund
19 if MICROS couldn't resell it or relicense it?
20    A    I was not involved with additional meetings
21 beyond that on.

80

1    Q    One of the allegations in MICROS
2 counter-claim is that MICROS elected to license the
3 Sagent software directly from Sagent based in
4 substantial part on representations made by Sagent
5 personnel. Is that your understanding?
6    A    Can you restate the claim again?
7    Q    The allegation is that MICROS elected to
8 license this particular software directly from Sagent
9 based in substantial part on representations made by
10 Sagent personnel.
11    A    Representations that they would help us
12 resell it. That they would act on their, as I said,
13 prior agreements to be a 50-50 partner.
14    Q    Specifically the allegation says that
15 decision was based "in substantial part on those
16 representations." Do you have an understanding that
17 there were other factors that went into MICROS'
18 decision to license the software directly from Sagent?
19    A    Once against with the statement.
20    Q    The allegation indicates that MICROS
21 decided to license the software directly from Sagent in

81

1 substantial part based on the representations made by
2 Sagent. That leads me to believe that there may have
3 been other factors that went into that decision, and
4 I'm asking you if you are aware of any other factors in
5 that regard?
6    A    That substantial basis was probably, you
7 know, a reference to again their comments that they
8 would help to sell the product.
9         If there were other issues, it would be in
10 regard to my frustrations that I had been expressing to
11 my superiors about having to do -- spending so much
12 time on doing the billings, not having the invoices
13 correct, just general accounting errors that we had to
14 continually follow up on, and also I had expressed a
15 concern of them not following up on, again, the idea of
16 50-50 partnership when it came to development work.
17 Nonclient paying projects. It was very evident that
18 they were not willing to put anybody on typical R&D
19 type stuff unless it was a fully paying client who was
20 going to pay them for their time.
21    Q    One of the other allegations in the counter

21 (Pages 78 to 81)