1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
 2
    SAGENT TECHNOLOGY, INC     *    CIVIL ACTION JFM-02-2505
 3           Plaintiff
                               *
 4      vs.                         Baltimore, Maryland
                               *
 5  MICROS SYSTEMS, INC.
             Defendant         *    January 22, 2003
 6         *     *     *     *     *

 7            Deposition of PETER ROGERS, JR., a witness

 8  of lawful age, taken on behalf of the Plaintiff in the

 9  above-entitled cause, pending in the District Court of

10  the United States for the District of Maryland, before

11  Dawn L. Venker, a Notary Public in and for Baltimore

12  County, Maryland, at 7031 Columbia Gateway Drive,

13  Columbia, Maryland 21046, on the 22 day of January,

14  2003.

15            *     *     *     *     *

16  APPEARANCES:

17         SCOTT H. PHILLIPS, Esquire
              For the Plaintiff
18
           MICHAEL H. TOW, Esquire
19            For the Defendant

20

21  Reported By:  Dawn L. Venker
```

EXHIBIT A

### 10

1 the morning of June 6th, or thereabouts -- it was on
2 June 6th.
3    Q    2000?
4    A    2000. We were visited by Vincent
5 DeGennaro, Gene Garrett, and Dan VanVeelen. Purpose of
6 the meeting -- they requested the meeting. I believe
7 Vince was -- Mr. DeGennaro was traveling with Gene
8 assessing prospects as a corporate relationship at the
9 same time really feeling out, assessing with MICROS,
10 purchases of additional licenses.
11        At the meeting, they expressed that they
12 were going to give us an offer for all licenses. They
13 left. Later that afternoon I received a call from Mr.
14 Garrett where he gave me verbally over the phone an
15 offer. I believe five licenses, ten licenses, and
16 fifty licenses.
17    Q    You said "we" a couple of times. Was there
18 any other MICROS representative present at that June
19 6th meeting?
20    A    Scott Callnin was in the meeting along with
21 myself.

### 11

1    Q    So it was you and Mr. Callnin,
2 Mr. VanVeelen, Vincent DeGennaro, and Gene Garrett?
3    A    Correct.
4    Q    Did you take any notes during that June 6th
5 meeting?
6    A    Yes.
7    Q    And that meeting was held here?
8    A    Yes.
9    Q    And when Mr. Garrett called you later that
10 same day, did you take any notes on that telephone
11 call?
12    A    Yes.
13    Q    Have you produced either of those sets of
14 notes to Mr. Tow in that case?
15    A    Yes.
16    Q    What, if anything, followed on the
17 telephone call from Mr. Garrett once he had offered you
18 the several licenses?
19    A    There were several phone calls. I cannot
20 tell exactly how many, but at least two from Gene
21 Garrett -- Mr. Garrett, as well as at least one from

### 12

1 Dan VanVeelen assessing if we were going to accept the
2 offer of purchasing licenses.
3    Q    And these calls came in subsequent days I
4 assume?
5    A    Yes, sir.
6    Q    Did you take any notes on those subsequent
7 telephone calls?
8    A    No.
9    Q    Did there come a time when you called
10 Mr. Garrett back or Mr. VanVeelen to advise him of a
11 decision the company had made in that regard?
12    A    The decision was made on the 30th of June.
13        Little background. The calls from Gene on
14 the 6th. He was quite concerned about his quarter --
15 his standing at the company. They had missed numbers,
16 i.e., financial results. It was a lot of pressure, and
17 we had met prior -- a month ago and developed a pretty
18 good rapport as Mr. Callnin expressed just in the
19 relationship meeting back in early May. He had gone to
20 Wake Forest. So we talked about ACC basketball. He
21 had run track for Wake Forest. I had run track for

### 13

1 Penn. So developed a good rapport and clearly wasn't a
2 term of partnership.
3        So we built upon that. Didn't feel
4 negative. We are partners. We need to make numbers.
5 If we don't make numbers, may not be here. That was on
6 June 6th.
7    Q    That was Mr. Garrett on June 6th?
8    A    Mr. Garrett. Now, they expressed in that
9 meeting that morning that they were going to give us an
10 offer, and that they would work with us. And it would
11 be substantial in terms of licenses.
12    Q    Did they elaborate any on the notion that
13 we'll work with you?
14    A    Yes. They expressed that they will work
15 with us.
16    Q    Did they get more specific in terms of how
17 they would work with you?
18    A    That they would resell it. They talked a
19 large quantity, and that they would refund if
20 necessary. But they clearly preferred to resell it or
21 work through the channel. But they expressed their

18

1  Q   When you say "specific numbers," do I
2  understand that to be the number of licenses and the
3  exact discount that Sagent was offering you, those
4  sorts of things?
5  A   Yes.
6  Q   Did you consider the representation that
7  Sagent had made regarding return of the product for a
8  full refund an important statement made by the company
9  at that time?
10 A   Yes.
11 Q   Let me hand you, Mr. Rogers, what we'll
12 mark as Exhibit Number 1.
13     (Rogers Deposition Exhibit Number 1 was
14 marked by the reporter.)
15 Q   I'll ask you if you can identify that, sir?
16 A   This is a memo that I generated to Dan
17 VanVeelen providing a purchase order for MICROS to
18 Sagent to acquire the data access package and
19 analytical calculator.
20 Q   That is your signature at the bottom of the
21 first page there?

19

1  A   Yes.
2      MR. PHILLIPS: For the record, Exhibit 1 is
3  comprised of a two-page document bearing Sagent Bates
4  numbers 32 and 33.
5  Q   What was your understanding as of June
6  30th, 2000 as to who Mr. VanVeelen was?
7  A   Mr. VanVeelen was the regional manager who
8  was the direct sales contact and technical contact to
9  MICROS from Sagent.
10 Q   Did you actually type this letter on your
11 computer?
12 A   Yes.
13 Q   And you read it before you signed it
14 obviously?
15 A   Yes.
16 Q   And on page 2 of this document, which is
17 S33, can you identify that for me?
18 A   This is the quote provided from Sagent to
19 myself that I was to attach to the letter authorizing
20 the acquisition of the product.
21 Q   Now, I think that the -- I'll admit that

20

1  the print on this is somewhat fuzzy because it has been
2  copied a number of times, but it looks like the date on
3  this price quote is June 20th, 2000. Do you see that
4  in upper right?
5  A   6-20.
6  Q   Does that sound about right in terms of
7  when you received this price quote from Sagent?
8  A   I don't remember, but quite conceivably.
9  Q   Let me ask you to look down in the box
10 there. There is an item for technical support and
11 upgrades. Do you see that?
12 A   Yes.
13 Q   And to the right of that there's a printed
14 number that has been stricken through, and then it
15 looks like someone wrote 24,000 in place of that. Do
16 you see that?
17 A   Yes.
18 Q   Do you know who did that?
19 A   No.
20 Q   Do you know why that would have been done?
21 A   I think the far right -- I believe that the

21

1  license fee number was different than the total. This
2  was a matter of matching up.
3  Q   And is that your signature at the bottom of
4  this page?
5  A   Yes.
6  Q   How about the handwriting above and below
7  it which reads, "Approved June 30, 2000. VP business
8  development."
9  A   That is my handwriting.
10 Q   Now, does the purchase order that you
11 issued on June 30th, 2000 reflect the same product mix
12 and price that is seen in the quote received from
13 Sagent?
14 A   Yes. As far as my knowledge. My cover
15 letter designated the software number and the technical
16 support number.
17 Q   Is it your contention that MICROS has paid
18 to Sagent any portion of the $136,000 reflected on both
19 the quote and your purchase order?
20 A   I have no contention. I'm not aware of us
21 paying them.

**Page 22**

1  Q  Pay them any money?
2  A  As related to transaction?
3  Q  Correct.
4  A  Answer to that. I don't believe we have
5  paid them anything related to this transaction.
6  Q  Do you understand that subsequently there
7  was an agreement between the parties that the $24,000
8  line item for technical support and upgrades was
9  eliminated from the transaction?
10 A  I was not aware of that.
11 Q  Have you become aware of that at some
12 point?
13 A  Yes.
14 Q  When was the first time you became aware of
15 that.
16 A  This morning.
17 Q  And that was in the process of
18 Mr. Callnin's deposition?
19 A  Yes.
20 Q  Did you at any time become aware that there
21 was a subsequent agreement between the parties to

**Page 23**

1  reconfigure the product mix that is reflected in the
2  quote received from Sagent?
3  A  You have to repeat that question. I didn't
4  understand it properly.
5  Q  If you take a look at S33, which is the
6  quote, in that box there is a certain product mix.
7  Specifically it talks about one data access server,
8  design studio with report and analysis, administration,
9  and I don't know what else. The line below that reads,
10 "Analytical calculator." Do you see all that?
11 A  Yes.
12 Q  Did you at some point become aware of an
13 agreement between the parties that that product mix
14 would be changed?
15 A  Yes.
16 Q  When did you first learn that?
17 A  This morning.
18 Q  Did you at some point become aware that
19 there was an agreement among the parties that this
20 amount of $136,000 would be amended to reflect
21 $112,000?

**Page 24**

1  A  Yes.
2  Q  When did you first learn that?
3  A  This morning.
4  Q  And again that was in the context of
5  Mr. Callnin's deposition?
6  A  Yes.
7  Q  Is it your understanding that at some point
8  Sagent ultimately provided MICROS with an amended
9  invoice for this particular transaction reflecting
10 $112,000 as the amount due and owing?
11 A  Yes.
12 Q  When did you first learn that?
13 A  This morning.
14 Q  Let me hand you what we are going to mark
15 as Exhibit Number 2. This is the Sagent Bates number
16 60.
17    (Rogers Deposition Exhibit Number 2 was
18 marked by the reporter.)
19 Q  This is an e-mail from Mr. Tow dated
20 November 26th, 2001 which indicates that you were
21 copied on it. Do you recall receiving that?

**Page 25**

1  A  Yes.
2  Q  Does it sound correct that you would have
3  received it on or about that date?
4  A  Yes.
5  Q  And Mr. Tom Patz was general counsel for
6  MICROS as of that date?
7  A  Yes.
8  Q  Do you have any idea why Mr. Tow copied
9  Mr. Patz on this e-mail?
10 A  I would have to assume, since Mr. Tow
11 reports directly to Mr. Patz, that he copies him as a
12 matter of course.
13 Q  Have you seen previous instances in which
14 the general counsel for the company has been copied on
15 a billing matter with a vendor?
16 A  No.
17 Q  The second --
18 A  Could be, but I've not been involved in any
19 billing problems where it would have been necessary to
20 put them on that.
21 Q  Second paragraph of this e-mail beginning

42

1 believe that is escalating.
2   Q   That's a component of damages that you are
3 alleging in this case?
4   A   I'm not sure how to answer that.
5   Q   Have you been asked to provide any
6 information with regard to the damages that are alleged
7 and are prayed for in the counter-claim?
8   A   No.
9   Q   I think that's all I have for you on that
10 one. Thank you.
11      MR. TOW: Should we mark that now and copy
12 it later?
13      MR. PHILLIPS: Well, at the end of the
14 deposition as Exhibit Number 3 the answers to
15 interrogatories which Mr. Rogers has been asked about
16 and has spoken to this morning -- this afternoon.
17      (Rogers Deposition Exhibit Number 3 was
18 marked by the reporter.)
19   Q   You heard Mr. Callnin speak this morning
20 about the 12000 Baltimore Avenue address in Beltsville,
21 correct?

43

1   A   Yes.
2   Q   And he also testified I believe that at
3 least as of the fall 2000 time frame the receiving
4 department was at that address?
5   A   Yes.
6   Q   Do you know who worked in the receiving
7 department in Beltsville as of that time?
8   A   Specifically, no. I may know of some
9 people that were in shipping or receiving. Sort of a
10 general term.
11   Q   Do you know who received the Sagent
12 software that was received at that address in the fall
13 2000 time frame?
14   A   No.
15   Q   Do you know -- would you agree with Mr.
16 Callnin that the Sagent software was, in fact, received
17 at the Beltsville location in fall 2000 time frame?
18   A   I'll say it was received at the Beltsville
19 location. I don't know the exact date.
20   Q   You don't -- you are not contending that
21 the Sagent was never shipped to MICROS by Sagent?

44

1   A   I'm not contending that at all.
2   Q   That would have included the analytical
3 calculator? Are you contending that Sagent never
4 shipped that?
5   A   I'm not contending that they didn't. I
6 just know that I placed an order for software.
7   Q   Did you receive confirmation from anyone at
8 MICROS that the totality of that order had, in fact,
9 been received from Sagent at some point?
10   A   I received indication that a package was
11 delivered. Specific contents -- I actually physically
12 received the package from the people in Beltsville. So
13 I physically received a box, and I, in turn, then
14 turned it over to Mr. Callnin. I did not open it. I
15 do not know the date of receipt.
16   Q   You heard Mr. Callnin talk this morning
17 about what he in turn did with that box, namely put it
18 on the shelf, right?
19   A   Yes.
20   Q   Is that -- is your understanding consistent
21 with that testimony?

45

1   A   I have no reason to dispute that.
2   Q   Do you know if MICROS made any copies of
3 software at any time?
4   A   I do not know. We have a corporate policy
5 against copying software illegally.
6   Q   Is it your understanding that at some point
7 the software was returned to Sagent?
8   A   Yes.
9   Q   Do you know when?
10   A   Approximately December 2001.
11   Q   Do you have an understanding as to whether
12 the return of the software to Sagent occurred in one
13 mailing or two mailings or more?
14   A   I don't know.
15   Q   You heard Mr. Callnin talk this morning
16 about how the software was treated for tax purposes
17 while it was physically here at MICROS. Do you recall
18 that testimony?
19   A   I do not.
20   Q   You don't recall that testimony?
21   A   No, I do not.

12 (Pages 42 to 45)