```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND

SAGENT TECHNOLOGY, INC      *    CIVIL ACTION JFM-02-2505
          Plaintiff
                            *
    vs.                          Baltimore, Maryland
                            *
MICROS SYSTEMS, INC.
          Defendant         *    January 22, 2003
     *       *       *      *       *
```

   Deposition of SCOTT CALLNIN, a witness of lawful age, taken on behalf of the Plaintiff in the above-entitled cause, pending in the District Court of the United States for the District of Maryland, before Dawn L. Venker, a Notary Public in and for Baltimore County, Maryland, at 7031 Columbia Gateway Drive, Columbia, Maryland 21046, on the 22nd day of January, 2003.

                *    *    *    *    *

APPEARANCES:

    SCOTT H. PHILLIPS, Esquire
      For the Plaintiff

    MICHAEL H. TOW, Esquire
      For the Defendant

ALSO PRESENT:  PETER ROGERS, JR.

Reported By:  Dawn L. Venker

**Page 74**

1  Q  And I think I asked you earlier whether you
2  took any notes at the meeting. Did you?
3  A  I do not believe I did.
4  Q  Was there a written agenda prepared in
5  anticipation of the meeting?
6  A  No.
7  Q  We talked a little bit earlier about some
8  deep discounting that you recall Sagent making at the
9  meeting, correct?
10  A  Correct.
11  Q  Who do you recall talking about that issue?
12  A  Primarily Gene.
13  Q  Gene Garrett?
14  A  That's right.
15  Q  Do you recall any discussion at the meeting
16  about the notion that Sagent and MICROS would work
17  together to service mutual customers?
18  A  Once again?
19  Q  Do you recall any discussion at that June
20  6th, 2000 meeting about the notion that Sagent and
21  MICROS would work together to serve mutual customers?

**Page 75**

1  A  I think that was the understanding before
2  the meeting -- going into the meeting. Perhaps
3  reiterated, but that was not anything new during the
4  meeting.
5  Q  Do you have a specific recollection of it
6  being reiterated at the meeting?
7  A  Yes. Uh-huh.
8  Q  Who said that?
9  A  I believe it would have been Dan VanVeelen
10  primarily talking about -- I think offer up again maybe
11  one lead at that time who I believe was Shoney's.
12  Perhaps some inquiries on our part if that had gone
13  anywhere, and just response that they were still trying
14  to follow up with that contact.
15  Q  So Shoney's was the Sagent lead?
16  A  Right.
17  Q  And the inquiries regarding the status of
18  that lead came from the MICROS folks there?
19  A  Uh-huh.
20  Q  Did MICROS talk about any specific leads it
21  had at that time at the meeting?

**Page 76**

1  A  Yes. We would have gone over some
2  potential lead prospects. I'm not sure in the time
3  frame of summer of 2000 who we would have offered up at
4  the time, but at that point, we had been working with
5  AmeriKing. So it probably would have been, again, some
6  of the notions that other Burger Kings could have
7  followed suit.
8  Q  Did anyone from Sagent at that meeting say
9  that MICROS could return the software and the
10  analytical calculator to Sagent if MICROS couldn't
11  resell or relicense it for a full refund?
12  A  I don't think that was said in exactly that
13  manner. It was more in -- I might not have the exact
14  quote, but "We'll help you get rid of it."
15  Q  Who said that?
16  A  Would have been Gene.
17  Q  And what was your understanding of what he
18  meant by that statement? I'm not holding you to those
19  words because you indicated you are not sure if that is
20  his exact quote, but what was your understanding as of
21  that time what he was trying to convey?

**Page 77**

1  A  That they would help us find clients
2  either -- first and foremost clients for Insight
3  product who would buy this product, and thus the
4  software, or even barring perhaps an Insight client,
5  that they would be able to identify someone who may
6  just want to buy the software from as an OEM even
7  perhaps outside the context of Insight.
8  Q  What is OEM?
9  A  Software reseller agreement.
10  Q  What do those letters stand for, if
11  anything?
12  A  I don't recall.
13  Q  Apart from the notion that you recall
14  Mr. Garrett expressing that Sagent would work with
15  MICROS to identify mutual customers, do you recall him
16  or any other Sagent employee at that meeting indicating
17  that if that effort were ultimately unsuccessful that
18  MICROS could return the software to Sagent for a full
19  refund?
20  A  I don't recall language to that extent.
21  Specifically full refund I don't recall.

78

1  Q  Do you recall language about the notion
2  that the software would be returned to Sagent?
3  A  I don't think we had discussions about the
4  possibility of needing to return it strictly because of
5  the upbeat nature of going forward with the project and
6  being able to find some clients eventually for this.
7  Q  Let me ask you about another meeting that
8  the documents produced to date reflect occurred. That
9  was on May 10, 2000. Do you recall attending a meeting
10 on that date with regard to this particular software
11 package?
12 A  No. I don't recall a May 10 meeting. I
13 recall specifically one meeting which I'm quite certain
14 was the June 6th. I heard some reference here to May
15 10, but I don't recall that at least in the context of
16 this software agreement.
17 Q  Do you recall any discussion at any time --
18 any statement at any time from a Sagent representative
19 which indicated that Sagent would resell any licenses
20 that MICROS was unable to sell?
21 A  Once again.

79

1  Q  Can you recall any statement made by any
2  Sagent representative at any time which indicated that
3  Sagent had agreed to resell any licenses that MICROS
4  was not able to sell?
5  A  No. I don't think it was that they would
6  resell. It was that they would help us resell those
7  licences that we were talking about prepurchasing.
8  Q  And again did that come from Mr. Garrett?
9  A  Yes. It would have been.
10 Q  Was that the May 6th meeting -- June 6th
11 meeting?
12 A  Yeah. That was from the one meeting I
13 attended which I'm pretty sure was the June 6th and not
14 the other date that's brought up.
15 Q  Apart from the June 6th meeting, did you
16 attend any other meeting where Sagent personnel were
17 present and indicated that MICROS could return the
18 software and the calculator to Sagent for a full refund
19 if MICROS couldn't resell it or relicense it?
20 A  I was not involved with additional meetings
21 beyond that on.

80

1  Q  One of the allegations in MICROS
2  counter-claim is that MICROS elected to license the
3  Sagent software directly from Sagent based in
4  substantial part on representations made by Sagent
5  personnel. Is that your understanding?
6  A  Can you restate the claim again?
7  Q  The allegation is that MICROS elected to
8  license this particular software directly from Sagent
9  based in substantial part on representations made by
10 Sagent personnel.
11 A  Representations that they would help us
12 resell it. That they would act on their, as I said,
13 prior agreements to be a 50-50 partner.
14 Q  Specifically the allegation says that
15 decision was based "in substantial part on those
16 representations." Do you have an understanding that
17 there were other factors that went into MICROS'
18 decision to license the software directly from Sagent?
19 A  Once against with the statement.
20 Q  The allegation indicates that MICROS
21 decided to license the software directly from Sagent in

81

1 substantial part based on the representations made by
2 Sagent. That leads me to believe that there may have
3 been other factors that went into that decision, and
4 I'm asking you if you are aware of any other factors in
5 that regard?
6  A  That substantial basis was probably, you
7 know, a reference to again their comments that they
8 would help to sell the product.
9     If there were other issues, it would be in
10 regard to my frustrations that I had been expressing to
11 my superiors about having to do -- spending so much
12 time on doing the billings, not having the invoices
13 correct, just general accounting errors that we had to
14 continually follow up on, and also I had expressed a
15 concern of them not following up on, again, the idea of
16 50-50 partnership when it came to development work.
17 Nonclient paying projects. It was very evident that
18 they were not willing to put anybody on typical R&D
19 type stuff unless it was a fully paying client who was
20 going to pay them for their time.
21 Q  One of the other allegations in the counter

21 (Pages 78 to 81)

Scott Callnin - 1/22/03

### Page 86

1 account internally?
2    A    No. There are a couple of folks that are
3 in charge of the marketing -- the marketing of all the
4 product, and then there are folks in the sales
5 department who would more specifically be involved with
6 Insight. No one would have been specifically named
7 either an Insight marketing manager or sales manager.
8    Q    Who were some of the folks in the
9 department responsible for marketing the Insight
10 products?
11    A    It would be, for example, Elizabeth Woods,
12 and Louise Casamento.
13    Q    Spell her name.
14    A    C-A-S-A-M-E-N-T-O.
15    Q    At the trade slows, did MICROS market any
16 other products beside Insight?
17    A    Yes.
18    Q    Would that be true of all of these, I think
19 you said at least six trade shows you went to?
20    A    That's right. At all of them there would
21 have been multiple products represented.

### Page 87

1    Q    Do you know if the costs for you all to
2 attend that trade show and put up your display would
3 have been then prorated among all of the products that
4 were displayed at the particular trade show?
5    A    I'm not sure if the actual practice of
6 breaking that expense out was done, but perhaps.
7    Q    Have you seen that done in the past here at
8 MICROS?
9    A    I have not seen any kind of breakdown on
10 allocation, no.
11    Q    Let me hand you Number 7. This bears
12 MICROS Bates number 351 through 65.
13        (Callnin Deposition Exhibit Number 7 was
14 marked by the reporter.)
15    Q    Feel free to look at it. I have one or two
16 questions that are probably on the first page there.
17 Mr. Callnin, I'm not going to ask you anything
18 substantive about this draft at all. I'm going to ask
19 you about some of the handwriting, but if you would
20 like to read through it, you let me know. You are free
21 to do that.

### Page 88

1    A    Okay.
2    Q    Let me ask you to look at the first page.
3 You'll see at the top right corner there is some
4 handwritten notes which I think read, "Notes from 12"
5 something "'98 meeting with" someone "Smith." I'm not
6 going to guess at the date, and I'm not going to guess
7 at the first name there. My question to you is do you
8 know whose handwriting that is?
9    A    I don't.
10    Q    Do you recall attending a meeting in
11 December of '98 which discussed drafts to this joint
12 intellectual property agreement?
13    A    I don't recall a meeting about the drafts
14 of the document, no.
15    Q    Let me hand you our last exhibit which
16 bears Sagent Bates numbers 12 and 13.
17        (Callnin Deposition Exhibit Number 8 was
18 marked by the reporter.)
19    A    Okay.
20    Q    My question is on the first page. If you
21 go down to I guess it's the third or fourth paragraph

### Page 89

1 beginning, "Our intent is to" --
2    A    Uh-huh.
3    Q    The last sentence in that paragraph talks
4 about the notion that Sagent is being "accommodative to
5 MICROS." Do you see that?
6    A    Uh-huh.
7    Q    I know that e-mail is not from you. It is
8 from Mr. Rogers to Mr. VanVeelen. Do you have an
9 understanding in what regard Sagent was being
10 accommodative to MICROS in the April 26th, 2000 time
11 frame?
12    A    I just would gather from the content of
13 this e-mail that it was an appreciation for the idea of
14 looking at the possibility of rearranging the
15 relationship.
16    Q    That's my next question because that
17 reference appears in the following paragraph. The
18 second sentence which begins with "putting the licenses
19 up at USi." Do you see that?
20    A    Okay.
21    Q    Do you have an understanding of what

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2
     SAGENT TECHNOLOGY, INC     *    CIVIL ACTION JFM-02-2505
 3              Plaintiff
                                *
 4       vs.                         Baltimore, Maryland
                                *
 5   MICROS SYSTEMS, INC.
                Defendant       *    January 22, 2003
 6       *        *        *         *         *

 7           Deposition of PETER ROGERS, JR., a witness

 8   of lawful age, taken on behalf of the Plaintiff in the

 9   above-entitled cause, pending in the District Court of

10   the United States for the District of Maryland, before

11   Dawn L. Venker, a Notary Public in and for Baltimore

12   County, Maryland, at 7031 Columbia Gateway Drive,

13   Columbia, Maryland 21046, on the 22 day of January,

14   2003.

15           *        *        *        *        *

16   APPEARANCES:

17           SCOTT H. PHILLIPS, Esquire
                For the Plaintiff
18
             MICHAEL H. TOW, Esquire
19              For the Defendant

20

21   Reported By:  Dawn L. Venker
```

GORE BROTHERS Reporting & Video Co., Inc.        Towson Reporting Company
410-837-3027                                            410-828-4148

**Page 10**

1 the morning of June 6th, or thereabouts -- it was on
2 June 6th.
3   Q   2000?
4   A   2000. We were visited by Vincent
5 DeGennaro, Gene Garrett, and Dan VanVeelen. Purpose of
6 the meeting -- they requested the meeting. I believe
7 Vince was -- Mr. DeGennaro was traveling with Gene
8 assessing prospects as a corporate relationship at the
9 same time really feeling out, assessing with MICROS,
10 purchases of additional licenses.
11      At the meeting, they expressed that they
12 were going to give us an offer for all licenses. They
13 left. Later that afternoon I received a call from Mr.
14 Garrett where he gave me verbally over the phone an
15 offer. I believe five licenses, ten licenses, and
16 fifty licenses.
17   Q   You said "we" a couple of times. Was there
18 any other MICROS representative present at that June
19 6th meeting?
20   A   Scott Callnin was in the meeting along with
21 myself.

**Page 11**

1   Q   So it was you and Mr. Callnin,
2 Mr. VanVeelen, Vincent DeGennaro, and Gene Garrett?
3   A   Correct.
4   Q   Did you take any notes during that June 6th
5 meeting?
6   A   Yes.
7   Q   And that meeting was held here?
8   A   Yes.
9   Q   And when Mr. Garrett called you later that
10 same day, did you take any notes on that telephone
11 call?
12  A   Yes.
13  Q   Have you produced either of those sets of
14 notes to Mr. Tow in that case?
15  A   Yes.
16  Q   What, if anything, followed on the
17 telephone call from Mr. Garrett once he had offered you
18 the several licenses?
19  A   There were several phone calls. I cannot
20 tell exactly how many, but at least two from Gene
21 Garrett -- Mr. Garrett, as well as at least one from



**Page 12**

1 Dan VanVeelen assessing if we were going to accept the
2 offer of purchasing licenses.
3   Q   And these calls came in subsequent days I
4 assume?
5   A   Yes, sir.
6   Q   Did you take any notes on those subsequent
7 telephone calls?
8   A   No.
9   Q   Did there come a time when you called
10 Mr. Garrett back or Mr. VanVeelen to advise him of a
11 decision the company had made in that regard?
12  A   The decision was made on the 30th of June.
13      Little background. The calls from Gene on
14 the 6th. He was quite concerned about his quarter --
15 his standing at the company. They had missed numbers,
16 i.e., financial results. It was a lot of pressure, and
17 we had met prior -- a month ago and developed a pretty
18 good rapport as Mr. Callnin expressed just in the
19 relationship meeting back in early May. He had gone to
20 Wake Forest. So we talked about ACC basketball. He
21 had run track for Wake Forest. I had run track for

**Page 13**

1 Penn. So developed a good rapport and clearly wasn't a
2 term of partnership.
3      So we built upon that. Didn't feel
4 negative. We are partners. We need to make numbers.
5 If we don't make numbers, may not be here. That was on
6 June 6th.
7   Q   That was Mr. Garrett on June 6th?
8   A   Mr. Garrett. Now, they expressed in that
9 meeting that morning that they were going to give us an
10 offer, and that they would work with us. And it would
11 be substantial in terms of licenses.
12  Q   Did they elaborate any on the notion that
13 we'll work with you?
14  A   Yes. They expressed that they will work
15 with us.
16  Q   Did they get more specific in terms of how
17 they would work with you?
18  A   That they would resell it. They talked a
19 large quantity, and that they would refund if
20 necessary. But they clearly preferred to resell it or
21 work through the channel. But they expressed their



14

1  desire, interest, and intent to help us find customers
2  to tell them through.
3     Q    Who said those statements?
4     A    Gene Garrett, Dan VanVeelen also, as well
5  as Mr. DeGennaro.
6     Q    Let me make sure I understand. All three
7  of these individuals at some point during the June 6th,
8  2000 meeting indicated to you that if MICROS could not
9  resell or otherwise use the licenses that were
10 contemplated in this transaction, that they could be
11 returned to Sagent for a full refund and that Sagent
12 would try to resell the licenses?
13    A    That's correct.
14    Q    When Mr. Garrett called you later that day,
15 was that notion again expressed in that telephone call?
16    A    Yes. Because he offered a substantial
17 discount to go to five, ten, or fifty, and I expressed
18 my concern how could I consume all that given at the
19 time I had only sold I believe two or three licenses.
20 So five licenses seemed somewhat relevant, but they
21 express interest, "Here's an offer for ten and fifty.

15

1  Substantial discounts." I expressed, "How can I handle
2  those if I don't have customers?" They said, "We'll
3  work with you. We'll help you get rid of them."
4  Really language in terms of take them.
5         Because we had met back in May, and we had
6  bright -- we had optimism that product would take hold.
7  We were going to deploy it on the USi platform offered
8  via the Web. It was a lot of speculation --
9  speculation is not the right word -- industry buzz
10 about a lot of software systems moving to the Web.
11        So it was in that vein that we acquired --
12 we needed a license to get our USi product going and
13 really was just wondering how many customers. It was
14 really difficult only having three how many were really
15 going to sell, but I was struck by the extent of the
16 numbers they were offering, plus the discounts.
17    Q    Among Mr. Garrett, Mr. VanVeelen, and
18 DeGennaro, which of those three indicated to you the
19 notion that Sagent would take the product back and
20 fully credit your account if you couldn't use them?
21    A    Mr. Garrett.

16

1     Q    Did the other two say anything along those
2  lines?
3     A    There was -- in the conversation in the
4  morning, language was used. In the afternoon
5  conversation, it was just between myself and
6  Mr. Garrett. He said we'll take them if needed.
7     Q    I meant to refer to the morning meeting --
8  I apologize -- when everyone was there.
9     A    Mr. Garrett expressed that with backup. It
10 is difficult with three people talking the exact
11 language, but Mr. Garrett was the key salesperson.
12    Q    And he is the one that made that specific
13 comment to you?
14    A    That's correct, but at the same time during
15 the conversation, he was supported by Dan --
16 Mr. VanVeelen as well as Mr. DeGennaro.
17    Q    In what way did those two gentlemen support
18 that comment?
19    A    Terms -- comment about the partnership, and
20 that they want to work with us to sell through. And
21 they looked at us as a key sales partner with the

17

1  product.
2     Q    Did either of them express the specific
3  comment that Sagent would accept for a full refund the
4  product back if you couldn't use it?
5     A    They would say -- the language was that
6  we'll help you sell through, and take back if needed.
7  I can't remember specifically full refund.
8     Q    We'll talk in a little while about some
9  notes. I don't know whether they are your notes yet,
10 but there are some notes that have been produced. In
11 that context, let me ask you this. Did you record in
12 the handwritten notes that you took from either the
13 morning meeting or the afternoon telephone call from
14 Mr. Garrett this notion about return of the product and
15 full refund?
16    A    No.
17    Q    Is there any reason you did not?
18    A    No. I would write numbers down generally.
19 Specific numbers so I didn't misquote them. I take
20 notes, but I don't exactly write down everything in a
21 conversation.

58

1 would sit down and discuss the upcoming preparation of
2 the MICROS 10K. No relationship to Sagent.
3    Q    And that takes us down to -- is it POA2?
4    A    Part two.
5    Q    Does that have anything to do with the
6 Sagent transaction?
7    A    No.
8    Q    And then we are down to January 8th?
9    A    Uh-huh.
10   Q    And "Mike Weintraub." Does that block of
11 handwriting through the bottom of the page have
12 anything to do with this case?
13   A    No.
14   Q    We've talked about the fact that page 161
15 reflects your notes on a May 10th, 2000 meeting,
16 correct?
17   A    Yes.
18   Q    That had nothing to do with this particular
19 case, right?
20   A    In terms of the specific product purchased,
21 no, but I would say that they are somewhat connected

59

1 just because they were Sagent.
2    Q    Let me ask you this. That is fair enough.
3 During the May 10th, 2000 meeting, did any Sagent
4 representative express at that time the notion that the
5 product contemplated in the purchase order could be
6 returned for full credit if you all couldn't use it?
7    A    No.
8    Q    One of the allegations in the counter-claim
9 is that MICROS selected to license this software
10 directly with Sagent based in substantial part on the
11 representations made by Sagent personnel, and my
12 question to you is about that phrase "in substantial
13 part." That leads me to believe that there were other
14 factors that led to that decision by MICROS. Are you
15 aware of yours?
16   A    I don't understand the definition "in
17 substantial part."
18   Q    Do you have an understanding as to why
19 MICROS ultimately elected to license this software
20 directly with Sagent?
21   A    Because we had back in I believe the 1998

60



1 time frame when we started working this product
2 somewhat MICROS selected Sagent software. In turn we
3 were dealing with a company called Talus. Talus was
4 bought by Sagent. So deal with Talus. We dealt with
5 Sagent. Historical relationship.
6    Q    Did the direct licensing of the software
7 with Sagent have anything to do with affirmative
8 representations made by Sagent personnel?
9    A    Historically?
10   Q    Well, specifically. There was a decision
11 the company made to license this product directly with
12 Sagent, correct?
13   A    Yes.
14   Q    And what I'm trying to get at is what the
15 basis is for that decision made by MICROS was?
16   A    I was not part of that. So I couldn't
17 relate to it.
18   Q    Do you have an understanding of the amount
19 of money that MICROS has attributed to marketing costs
20 for the Insight product?
21   A    No.

61

1    Q    Is there some person or group within MICROS
2 that would track those dollars?
3    A    Specifically for a project directly, no.
4    Q    You seem to be indicating that there might
5 be a more general reflection of those numbers
6 somewhere?
7    A    I think specifically if someone was asked
8 to come up with numbers, would have to go back and look
9 at invoices. It would be a specific data research and
10 analysis of direct dollars and of evaluation of time.
11   Q    Let me hand you what I'll mark as Exhibit
12 Number 6.
13        (Rogers Deposition Exhibit Number 6 was
14 marked by the reporter.)
15   Q    You are free to review the whole thing. I
16 have very limited questions. It is on the first page.
17   A    I would just like to look at the whole
18 document.
19   Q    Absolutely.
20   A    I'm ready to answer.
21   Q    You'll see some handwriting on the top



**62**

1 right corner of this document, and for the record, this
2 document bears MICROS Bates numbers 51 through 65. Do
3 you see that handwriting?
4   A   I see it.
5   Q   Do you recognize the handwriting?
6   A   No.
7   Q   Did you have any input in the drafting or
8 revision of this joint intellectual property agreement?
9   A   No.
10  Q   Do you recall attending any meetings with a
11 Mr. or Ms. Smith in the December 1998 time frame
12 regarding this agreement?
13  A   No.
14  Q   Let me hand yo what we are going to have
15 marked as Exhibit Number 8 (sic).
16      (Rogers Deposition Exhibit Number 7 was
17 marked by the reporter.)
18  Q   Ready?
19  A   Uh-huh.
20      MR. PHILLIPS: For the record, this bears
21 Sagent Bates numbers S12 and 13.

**63**

1   Q   My question, Mr. Rogers, goes to the third
2 paragraph down beginning with "Our intent is to
3 continue." Do you see that?
4   A   Yes.
5   Q   And the second sentence there reads, "I
6 appreciate your promptness in getting back to me and
7 understand what you are trying to accomplish for Sagent
8 while being accommodative to MICROS." Do you recall
9 drafting and sending this e-mail to Mr. VanVeelen on
10 April 26th, 2000?
11  A   Yes.
12  Q   And can you describe to me in what way
13 Sagent was accommodating MICROS at that time?
14  A   Accommodating in terms of restructuring the
15 agreement to move from a 50-50 to a different financial
16 agreement. They could say no.
17  Q   But they were working with you at this
18 time?
19  A   Yes.
20  Q   And is that what you refer to in the very
21 next paragraph when you talk about seeking a new

**64**

1 business arrangement between the parties?
2   A   Yes.
3   Q   And did you -- did the parties ultimately
4 come to a new agreement on the revenue split?
5   A   Not that I'm aware of.
6       MR. PHILLIPS: Mr. Rogers, I think that is
7 all I have for you this morning.
8       MR. TOW: No questions.
9       (Examination concluded at 2:45 p.m.)

**65**

1 STATE OF MARYLAND)
2 COUNTY OF BALTIMORE)
3       I, Dawn L. Venker, a Notary Public duly
4 commissioned and qualified in and for the State of
5 Maryland, County of Baltimore, do hereby certify that
6 there came before me on the 22nd day of January, 2003,
7 at 1:30 p.m., at 7031 Columbia Gateway Drive, Columbia,
8 Maryland 21046 the following named person, to wit:
9 PETER ROGERS, JR., who was by me duly sworn to testify
10 to the truth and nothing but the truth of his knowledge
11 touching and concerning the matters in controversy in
12 the cause; that he was thereupon carefully examined
13 upon his oath and his examination reduced to writing
14 under my supervision; that the deposition is a true
15 record of the testimony given by the witness; and that
16 the said witness read the same and subscribed her/his
17 name thereto.
18      I further certify that I am neither
19 attorney nor counsel for, nor related to or employed
20 by, any of the parties to the action in which this
21 deposition is taken, and further that I am not a



# SAGENT VS. MICROS

# DEPOSITION OF DAN VAN VEELEN

PREPARED BY

ART MILLER AND ASSOCIATES
111 S. CALVERT STREET
SUITE 2700
BALTIMORE, MD 21202
Phone: 410-367-3838
FAX: 410-367-3883

Page 13

1   A   Tiffany doesn't have any actual knowledge of
2   the transaction other than to help do collections.
3   Q   No. 8, Karina Thich?
4   A   Don't know.
5   Q   No. 9, Staci Cosby?
6   A   Don't know.
7   Q   No. 10, Ken Bendix?
8   A   Don't know.
9   Q   No. 11, Mike Venerable?
10  A   Do not know.
11      (Whereupon Deposition Exhibit No. 3 was
12  marked.)
13  Q   Okay. Before we turn to the document that I
14  have just handed you, do you own stock in Sagent?
15  A   Yes.
16  Q   When did you first acquire stock in Sagent?
17  A   At the onset of my employment. And, so, in
18  1998 or thereabouts.
19  Q   Stock options?
20  A   That's right.
21  Q   And did you ever convert those into actual

Page 14

1   ownership of shares?
2   A   I have made one transaction.
3   Q   Do you currently own any shares of Sagent?
4   A   Yes.
5   Q   As a shareholder of Sagent, I presume you've
6   followed the stock price of the company over the years?
7   A   Of course.
8   Q   And as the company's fortunes have waxed and
9   waned, the stock price has comparably waxed and waned?
10  A   Correct.
11  Q   In fact it hit what seems to be an all time
12  high in the mid forties in January or March of 2000,
13  that time period?
14  A   The number sounds right. The time period I
15  wouldn't be able to tell.
16  Q   By the end of 2000 it was less than five
17  dollars a share?
18  A   Again -- I presume that you're correct.
19  Q   And currently it's trading around 25 cents a
20  share, plus or minus?
21  A   That's correct.

Page 15

1   Q   How is the company doing in the first half of
2   calendar 2000?
3   A   It's a tough question because I have been
4   through so many quarters that specifying a couple of
5   quarters out of those is a bit difficult. Personally my
6   territory is doing quite well.
7   Q   Presumably as a -- in the sales field there is
8   always pressure to get more sales. Is that a fair
9   statement?
10  A   Yes.
11  Q   During the first half of calendar 2000, did you
12  experience any particular or unusual or extraordinary
13  pressure to get new sales?
14  A   In the first half of 2000 I had exceeded my
15  quota by several hundred thousand dollars. And being
16  the top rep at the time, I was asked to produce more.
17  Q   Exceeded your quota for the quarter -- for
18  which period did you exceed your quota in the first half
19  of calendar 2000?
20  A   Both the first and the second quarters.
21  Q   Do you have records of the commissions that you

Page 16

1   received during calendar 2000?
2   A   In the form of a W-2.
3   Q   Were there any other statements or information
4   provided to you by the company in respect of commissions
5   that you had earned or entitled to?
6   A   The company produced electronic versions which
7   I would have to check to see if I have a record of. I'm
8   sure the company would have a record of that.
9   Q   Of commissions paid during calendar 2000?
10  A   It's an assumption.
11  Q   Would these statements be sent on a quarterly
12  basis or on some other basis?
13  A   At the time I can't recall.
14  Q   How is it done currently?
15  A   It's currently done on a monthly basis.
16  Q   And when you receive a monthly statement for
17  March of 2000, what commissionable transaction is going
18  to be shown on that statement?
19      MR. PHILLIPS: Object for relevance, but you
20  can answer.
21  A   Any transactions that occurred during the month

4 (Pages 13 to 16)

Page 37

1  Q  Turning your attention to May 10th, 2000, do
2  you recall having a meeting here in this building with
3  yourself and Micros personnel in attendance?
4  A  Yes.
5  Q  Who called that meeting?
6  A  I don't recall.
7  Q  Who attended that meeting?
8  A  Myself, Gene Garrett, Peter Rogers, and Scott
9  Callnin.
10  Q  Was there a written agenda for that meeting?
11  A  I don't recall.
12  Q  Did you make any notes of what was discussed at
13  that meeting?
14  A  No.
15  Q  What was the purpose of that meeting?
16  A  The purpose was to discuss the points that
17  Peter had laid out in his e-mail.
18  Q  And by Peter's e-mail, you are referring to
19  this exchange that we have seen from April?
20  A  Yes.
21  Q  And just so the record is clean, the April

Page 38

1  e-mails relate to Sagent licenses at USI in respect --
2  in support of the InSight data warehouse product?
3  A  Correct.
4  Q  And the May 10th meeting was in follow-up to
5  that?
6  A  Correct.
7  Q  Did you have any meetings or discussions with
8  Gene Garrett before attending the May 10th, 2000 meeting
9  to plan for the May 10th, 2000 meeting?
10  A  I'm sure we did.
11  Q  Do you have any written record of those
12  planning sessions?
13  A  No.
14  Q  E-mails?
15  A  Not that I'm aware of.
16  Q  Why was Gene Garrett in attendance at this
17  meeting?
18  A  Gene was my direct supervisor.
19  Q  Okay.
20  A  It was common for him to attend meetings.
21  Q  Would he routinely attend sales meetings that

Page 39

1  you had with actual or potential customers?
2  A  Yes.
3  Q  Is that an -- when would he not attend a
4  meeting -- bad question. If you're the primary sales
5  person, why is your manager coming with you on every
6  sales meeting?
7  A  He doesn't come with me on every sales
8  meetings.
9  Q  Which sales meetings does he come with you --
10  at that time in the first half of calendar 2000, which
11  sales meetings was he coming with you to?
12  A  Gene was managing the Southeast territory which
13  encompassed all of the Southern states from Maryland
14  south to Florida and west to Louisiana. In accordance
15  with that, there were several reps that managed those
16  territories. I being one of them.
17     Gene, when he was in my town or my area, would
18  attend meetings with me as a matter of the course of his
19  duties.
20  Q  So, it happened that in May of 2000 he was in
21  Maryland or Virginia and you had a meeting scheduled, so

Page 40

1  he came with you?
2  A  I'm sure that I asked him or we coordinated his
3  schedule so that he could attend this meeting.
4  Q  What was the benefit of having him at this
5  meeting?
6  A  The benefit was more for Gene so that he could
7  be actively involved in the transaction.
8  Q  Why was it helpful for Sagent to have Gene
9  actively involved in the transaction?
10  A  Because we considered this a high profile
11  transaction.
12  Q  Why?
13  A  Because based on the sales forecast and based
14  on what we had been told, this would be a very large
15  transaction.
16  Q  Define very large.
17  A  Anything larger than half a million dollars.
18  Q  Did the status have any particular importance
19  in the May 2000 timeframe?
20  A  It always has. Not just that timeframe. A
21  transaction that size is significant to our company

10 (Pages 37 to 40)

Page 41

1  regardless of timeframe.
2  Q  Who was the primary voice for Sagent at that
3  meeting?
4  A  Gene Garrett.
5  Q  What was your role at that meeting?
6  A  I don't recall. In terms -- if you can
7  rephrase and put it in terms that I can understand.
8  Q  Sure. Gene Garrett, I think you just said that
9  again Garrett was the primary spokesperson, salesman for
10 Sagent at that meeting. My question is: What was your
11 role since you were not the primary spokesperson,
12 salesman at that meeting?
13 A  I would have been there in a support role in
14 maintaining -- because I maintained the relationship
15 with the customer. I believe that would have been
16 Gene's first meeting. We would have been introducing
17 him into the account. And Gene was -- Gene was the type
18 of sales manager that would like to take the lead when
19 he was present.
20 Q  I take it from the way you said that, that Gene
21 Garrett is no longer in that position; is that correct?

Page 42

1  Let me rephrase it. Do you currently report to Gene
2  Garrett?
3  A  No.
4  Q  Is Gene Garrett employed by Sagent Technology
5  today?
6  A  No.
7  Q  When did he cease being employed by Sagent
8  Technology?
9  A  I believe in 2000 -- in October of 2001.
10 Q  Do you have any information or knowledge about
11 the circumstances under which his employment with Sagent
12 Technology ceased?
13 A  Gene had received an offer from another company
14 in Southern California, and he determined that was too
15 lucrative to pass up.
16 Q  And, so, his employment ceased because he
17 resigned to take another offer?
18 A  Correct.
19 Q  Was October 2001 when John Siegman stepped into
20 that position?
21 A  No.

Page 43

1  Q  That was sometime afterward?
2  A  Yes.
3  Q  But by January of 2002, John Siegman was in
4  that position; wasn't he?
5  A  Yes.
6  Q  Turning back to the May 10th, 2000 meeting,
7  what was discussed at the May 10th -- you look like you
8  want to say something.
9  A  If I can take you back. The date on Gene's
10 departure was 2000.
11 Q  October 2000?
12 A  Yes.
13 Q  That's an important clarification. Nothing
14 else about the circumstances?
15 A  No.
16 Q  You're not changing anything else that you told
17 us about the circumstances of his departure --
18 A  No.
19 Q  -- other than the timing?
20 A  The timing, I believe the timing was 2000, not
21 2001.

Page 44

1  Q  Okay. Turning your attention back to the May
2  2000 meeting, I'm sorry, I don't want to interrupt if
3  you are still --
4  A  I'm trying to get the dates, the years straight
5  in my mind. So, you can continue.
6  Q  Sticking with October 2000?
7  A  At this point.
8  Q  Fair enough. What was discussed at the May
9  2000 meeting here at Micros?
10 A  The May 2000 meeting encompassed the -- what
11 Micros sought to do and we were asked to determine what
12 we could do to accommodate that request. So, they
13 wanted to host and develop the InSight solution at USI,
14 and we were asked to partner with them in that regard.
15 Q  Were any agreements reached at that meeting in
16 respect of what Sagent would do towards that partnership
17 relating to the InSight data warehouse at USI?
18 A  Not that I recall.
19 Q  Did Sagent extend any offers or proposals at
20 that meeting?
21 A  Not that I recall.