IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SAGENT TECHNOLOGY, INC        *      CIVIL ACTION JFM-02-2505
    Plaintiff
                                 *

   vs.                                   Baltimore, Maryland
                                 *

MICROS SYSTEMS, INC.
       Defendant             *      January 22, 2003
       *        *        *        *        *

       Deposition of SCOTT CALLNIN, a witness of

lawful age, taken on behalf of the Plaintiff in the

above-entitled cause, pending in the District Court of

the United States for the District of Maryland, before

Dawn L. Venker, a Notary Public in and for Baltimore

County, Maryland, at 7031 Columbia Gateway Drive,

Columbia, Maryland 21046, on the 22nd day of January,

2003.

           *        *        *        *        *


APPEARANCES:

        SCOTT H. PHILLIPS, Esquire
           For the Plaintiff

        MICHAEL H. TOW, Esquire
           For the Defendant

ALSO PRESENT:  PETER ROGERS, JR.

Reported By:  Dawn L. Venker

GORE BROTHERS Reporting & Video Co., Inc.    Towson Re[porting]
410-837-3027

EXHIBIT B

**Page 22**

1 quarter.
2   Q   In what time frame did these initial talks
3 with Mr. Comstock or Mr. VanVeelen take place with you?
4   A   This would have been late May or early
5 June.
6   Q   Of 2000?
7   A   That's right.
8   Q   And at some point did you serve as a
9 liaison between Mr. Rogers who was executive designated
10 on behalf of MICROS and the individuals at Sagent with
11 regard to this purchase?
12   A   Only to the extent I just described, to put
13 the two together and then afterwards to follow up on
14 some of the correspondence between the companies.
15   Q   Did you have any role in the negotiation,
16 for lack of a better word, between the two companies
17 with regard to this purchase?
18   A   I sat in on a meeting in which the idea was
19 first discussed, and my input was asked for in terms of
20 what kind of future prospects there might be. The
21 ability to sell the product and some sort of a forecast

**Page 23**

1 roughly that we might expect. But not -- I was not
2 involved at all in the negotiations as far as the
3 outcome of the final decision which resulted in the
4 paperwork that is here in front of us.
5   Q   So was the meeting between MICROS personnel
6 only, or were there Sagent personnel included in that
7 meeting?
8   A   There were Sagent personnel.
9   Q   Can you give me an idea of who was at the
10 meeting?
11   A   That would have been --
12   Q   Yourself obviously?
13   A   -- myself, Peter Rogers, Dan VanVeelen,
14 Gene --
15   Q   Garrett?
16   A   -- Garrett -- that's correct -- and a
17 Vince. I can't recall his last name.
18   Q   DeGennarow?
19   A   I think that's roughly right.
20   Q   Anyone else that you can recall?
21   A   I don't recall anybody else in the meeting.

**Page 24**

1   Q   Where was that meeting held?
2   A   Here at MICROS.
3   Q   What time frame?
4   A   Early June. I believe perhaps the 6th.
5   Q   Did you take any notes at that meeting?
6   A   I did not.
7   Q   And describe for me again -- you indicated
8 earlier that someone had asked your input about, among
9 other things, the ability of MICROS to resell the
10 license; is that correct?
11   A   That's right.
12   Q   Were there any other areas of input that
13 you were asked to provide at the meeting?
14   A   No. Basically just future prospects. The
15 nature of that meeting was a lot of relationship talk.
16 We really hadn't hashed out any real specifics other
17 than to get the idea of what might be coming our way.
18 Both MICROS and Sagent partners going into this project
19 in the future.
20   Q   Do you recall any questions or comments
21 made by Mr. Rogers at the meeting?

**Page 25**

1   A   Rough recollection of various pieces of the
2 conversation. Some of it merely on a personal level.
3 Relationship type things. A lot of talk about Gene and
4 Peter being on track teams for their respective
5 schools, and then Peter was involved with kind of
6 bringing out the questions about what we would have in
7 the way of future projects and what we might expect and
8 what might be reasonable as far as our possible
9 transactions at that time given the financial shape
10 that we were in as well.
11       So there was talk about just getting closer
12 to the right number with Sagent maybe talking dozens or
13 a hundred licenses, and Peter saying it certainly
14 wouldn't be that. So the talk moved towards lower
15 numbers. May be perhaps ten or a few licenses, but
16 again no promises at that point.
17   Q   You mentioned MICROS' financial condition
18 at that point. Describe for me generally what the
19 financial condition of the company was at that time?
20   A   Certainly not as strong as it had been a
21 couple years prior. At that point, we had followed the

**26**

1 rest of the technology and hospitality companies into
2 downward trends. Certainly not as deep as most
3 companies were feeling it, but in the way of some of
4 the financial positions, cash available, and that sort
5 of thing, I don't know what the standing was at that
6 time.
7     Q    Was there any discussion about concessions
8 that Sagent might be able to make to make this
9 transaction more attractive to MICROS?
10    A    There would definitely be fairly deep
11 discounting involved off of their regular retail
12 pricing.
13    Q    Anything else along those lines?
14    A    That Sagent would assist us in selling had
15 been the understanding of the relationship going back
16 for a number of years. That we were 50-50 partners on
17 this project, and that they put in their equal time on
18 helping us to sell to various clients as well.
19    Q    You say that went back a number of years.
20 Was that specifically discussed at this June 6th
21 meeting?

**27**

1     A    Yes. Yes. The idea that Sagent would help
2 to sell the product was discussed.
3     Q    And tell me who was involved in that
4 conversation and who said what?
5     A    Primarily that would have been Dan
6 VanVeelen, as he was the main contact as far as the
7 product was concerned, and he would have the feel for
8 what leads they'd have. And he would have an opinion
9 as well that he did put into the conversation about
10 future client activity. The numbers that we might
11 expect to -- projects we might expect to go into as
12 well.
13    Q    Is it your contention that MICROS has paid
14 to Sagent any portion of the $136,000 reflected on both
15 the purchase order as well as the price quote provided
16 earlier to MICROS by Sagent?
17        MR. TOW: Objection as to form.
18    Q    Did you understand the question?
19    A    Yes. I understand, and I do not believe
20 that any portion of this amount has been paid.
21    Q    Let me hand you the next document which

**28**

1 we'll mark as Number 2, please.
2        (Callnin Deposition Exhibit Number 2 was
3 marked by the reporter.)
4        MR. PHILLIPS: For the record, Exhibit
5 Number 2 reflects MICROS Bates Numbers 5 through 10.
6     Q    If you would take a moment to look through
7 that, if you would, sir, MICROS Bates number 5 through
8 10.
9        Mr. Callnin, feel free to look at all of
10 that. I can tell that most of my questions will be on
11 page 9, but feel free to look at all of it.
12        MR. TOW: You should just look at all of it
13 to understand what you are looking at.
14    Q    Ready to proceed? As I said, let me ask
15 you turn to page 9, which I think you have already
16 done. Let me ask you to look at the bottom e-mail
17 there. It's a February 8th, 2001 e-mail from you to
18 Mr. VanVeelen. Do you see that one?
19    A    Yes.
20    Q    And I think -- correct me if I'm wrong --
21 this reflects what we were talking about a little bit

**29**

1 earlier with regard to deletion of the maintenance
2 support aspect of the initial invoice as well as the
3 reconfiguration of the mix of product. Is that your
4 understanding?
5     A    That's right.
6     Q    And if you look at the e-mail above that,
7 which is Mr. VanVeelen's reply to that of that same
8 date, it appears that Sagent is amenable to those
9 changes. Is that your understanding?
10    A    Yes.
11    Q    And those changes would in turn reduce the
12 amount of the invoice from the initial 136,000 down to
13 112,000. Is that your understanding?
14    A    That's right.
15    Q    Is it your contention that MICROS has paid
16 to Sagent any portion of that 112,000?
17    A    I do not believe any portion of that has
18 been paid.
19    Q    Let me ask you to take a look at -- it is
20 in that same document. If you'd turn to page 6. If
21 you look a little more than halfway down at the close

