IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SAGENT TECHNOLOGY, INC.** | * | |
|     Plaintiff | * | |
|     v. | * | Case No. JFM-02-2505 |
| **MICROS SYSTEMS, INC.** | * | |
|     Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

MICROS Systems, Inc. ("MICROS"), by counsel, files this Opposition to the Motion for Summary Judgment filed by Sagent Technology, Inc. ("Sagent").

### Relevant Facts

During the first half of calendar 2000, Sagent, who was facing a serious decline in business, *see* Rogers Dep. at 12, and was thereby eager to generate additional sales, attempted to encourage MICROS to make a large purchase of software licenses, *see* Van Veelen Dep. at 40-41, 49. As part of its efforts to encourage MICROS to make that purchase, Sagent made certain promises, including that it would refund MICROS's money if MICROS was unable to find a customer for the software license being acquired from Sagent, *see* Callnin Dep. at 74-77; Rogers Dep. at 13-14, it having been clear at all times that MICROS was not acquiring the software license for its own use (rather, for the use of end user customers), see Van Veelen Dep. at 76, and that Sagent would provide assistance to MICROS in identifying a suitable customer if MICROS was unsuccessful in doing so itself, *see* Callnin Dep. at 74-77; Rogers Dep. at 13-14. In reliance on those promises, which were made on June 6, 2000 and

repeated in subsequent conversations that occurred before June 30, 2000, *see* Rogers Dep. at 11-12 and Rogers Affidavit, attached, MICROS sent the Conditional Purchase Order (e.g., Exhibit 1 to the Rogers Deposition, a copy of which is attached). Thereafter, when MICROS requested that Sagent fulfill its promises, Sagent declined to do so. This litigation ensued.

Summary of Arguments

Sagent ignores the pre-June 30 statements in its motion, as it must, because if it acknowledges either that they occurred or that there is a dispute as to whether they occurred, then summary judgment in Sagent's favor would be improper. If the statements were made as MICROS has alleged, then the Conditional Purchase Order, assuming it to be a contract, would be void as a result, and so this Court would have to, at a minimum, deny Sagent's Motion. To a limited extent, Sagent has disputed that the statements were made as MICROS has alleged, but that dispute also precludes entry of summary judgment in Sagent's favor, in that it is a dispute as to a material fact.

Second: when the contract is applied as a whole, taking in both the written and the unwritten terms of the contract, MICROS did not breach it.

Third: much of Sagent's legal argument is premised on a faulty legal conclusion: that the Conditional Purchase Order (and this dispute) are governed by article 2 of the Maryland Uniform Commercial Code ("U.C.C."), codified at Md. Code Ann., Com. Law I § 2-101 *et seq.*, and bases much of its analysis on the provisions of the U.C.C. As noted in MICROS's Opposition to Sagent's Motion in Limine, article 2 does not apply to software licenses, and so Sagent has not demonstrated that, as a matter of law, it is entitled to judgment in its favor.

Finally, even if, *arguendo*, Sagent were entitled to summary judgment on liability, it has not met its burden with respect to damages, and so summary judgment on damages would not be proper at this time.

General Legal Standards

A court may grant a motion for summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A material fact is one that constitutes an element essential to a party's case. *Celotex v. Catrett*, 477 U.S. at 322-23. As the Supreme Court stated in *Anderson*, ". . . the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." 477 U.S. at 248. A genuine issue as to a material fact exists if the evidence that the parties present to the court is sufficient to indicate the existence of a factual dispute that could be resolved in the nonmoving party's favor through trial. *See Anderson*, 477 U.S. at 248-49. While it is the movant's burden to show the absence of a genuine issue of material fact, *Pulliam Investment Co., Inc. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987), it is the non-moving party's burden to establish its existence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The evidence that the non-moving party presents to this end must be more than a "mere scintilla," *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984), more than "merely colorable," *Celotex v. Catrett*, 477 U.S. at 327, and more than "some metaphysical doubt." *Matsushita*, 475 U.S. at 586. The non-moving party must present evidence that is "significantly probative." *Celotex v. Catrett*, 477 U.S. at 327. Additionally, in reviewing a motion for summary judgment, the inferences

that the court draws from the facts and evidence presented shall be viewed "in the light most favorable to the party opposing the motion." *United States. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Matsushita*, 475 U.S. at 587-88; *Pulliam*, 810 F.2d at 1286; *Gill*, 773 F.2d at 595. While issues of state of mind (e.g., intent, good faith, fraud) do not automatically preclude entry of summary judgment, *see, e.g., Ennis v. National Ass'n of Business & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995), such issues rarely lend themselves to summary disposition because questions of credibility frequently dominate. *E.g., Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979); *see also Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979); *Seamons v. Snow*, 206 F.3d 1021, 1027-28 (10th Cir. 2000); *United States ex rel. Cantekin v. University of Pittsburgh*, 192 F.3d 402, 411 (3d Cir. 1999); *Mendocino Env'tl Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999); *Geier v. Medtronic, Inc.*, 99 F.3d 238, 240 (7th Cir. 1996); *Hossaini v. Western Missouri Med. Ctr.*, 97 F.3d 1085-88 (8th Cir. 1996). Evaluating credibility is among the functions reserved for the trier of fact, and it is not the role of the trial court to make determinations of credibility in deciding a motion for summary judgment. *Anderson*, 477 U.S. at 255.

 1. <u>The Pre-June 30 Statements Void The Conditional Purchase Order.</u>

MICROS has alleged that Sagent made certain pre-June 30 misrepresentations upon which MICROS relied to its detriment in sending the Conditional Purchase Order. The deposition testimony on this subject is as follows:

> "Q. Do you recall any discussion at that June 6th, 2000, meeting about the notion that Sagent and MICROS would work together to service mutual customers?
>
> A. I think that was the understanding before the meeting – going into the meeting. Perhaps reiterated, but that was not anything new during the meeting.
>
> Q. Do you have a specific recollection of it being reiterated at the meeting?

      A.      Yes. Uh-huh."

Callnin Dep. at 74-75.

      "Q.      Did anyone from Sagent at that meeting say that MICROS could return the software and the analytical calculator to Sagent if MICROS couldn't resell or relicense it for a full refund?

      A.      I don't think that was said in exactly that manner. It was more in – I might not have the exact quote, but 'We'll help you get rid of it.'

      Q.      Who said that?

      A.      Would have been Gene [*Garrett, Sagent's Vice President of Sales for the Southeast Region at that time*].

      Q.      And what was your understanding of what he meant by that statement? …

      A.      That they would help us find clients either – first and foremost clients for Insight product who would buy this product, and thus the software, or even barring perhaps an Insight client, that they would be able to identify someone who may just want to buy the software from as an OEM even perhaps outside the context of Insight."

Callnin Dep. at 76-77.

      "Q.      Did they get more specific in terms of how they would work with you?

      A.      That they would resell it. They talked a large quantity, and that they would refund if necessary. But they clearly preferred to resell it or work through the channel. But they expressed their desire, interest, and intent to help us find customers to tell them through.

      Q.      Who said those statements?

      A.      Gene Garrett, Dan VanVeelen also, as well as Mr. DeGennaro.

      Q.      Let me make sure I understand. All three of these individuals at some point during the June 6th 2000 meeting indicated to you that if MICROS could not resell or otherwise use the licenses that were contemplated in this transaction, that they could be returned to Sagent for a full refund and that Sagent would try to resell the licenses?

      A.      That's correct."

Rogers Dep. at 13-14.

5

The deposition testimony also indicates that there were several other discussions held telephonically by and between MICROS personnel and Sagent personnel after June 6, 2000, and before June 30, 2000.

> "Q. And when Mr. Garrett called you later that same day, did you take any notes on that telephone all?
>
> A. Yes.
>
> Q. Have you produced either of those sets of notes to Mr. Tow in that case?
>
> A. Yes.
>
> Q. What, if anything, followed on the telephone call from Mr. Garrett once he had offered you the several licenses?
>
> A. There were several phone calls. I cannot tell exactly how many, but at least two from Gene Garrett – Mr. Garrett, as well as at least one from Dan VanVeelen assessing if we were going to accept the offer of purchasing licenses.
>
> Q. And these calls came in subsequent days I assume?
>
> A. Yes, sir."

Rogers Dep. at 11-12.

> "Q. Did you have any additional – apart from the communications expressed in Exhibit 7 – did you have any follow-up communications with Micros personnel between June 7 and June 30, 2000 relating to the June 6th meeting?
>
> A. I did not.
>
> Q. Do you know whether Mr. Garrett or Mr. De Gennaro had any follow-up conversations?
>
> A. There were follow-up conversations between Gene, Mr. Garrett and Peter Rogers.
>
> Q. How do you know that?
>
> A. I was present.

6

> Q. When did those occur?
>
> A. I don't remember the dates, sometime after the June 6th or June 7th date.
>
> Q. Were those also face-to-face meetings or were they by other means?
>
> A. They were via the phone."

Van Veelen Dep. at 63.

During one or more of the subsequent telephone calls, Sagent reiterated the statements made at the June 6, 2000, meeting: that Sagent and MICROS would work together to service mutual customers; that if MICROS could not resell or otherwise use the licenses that were contemplated in this transaction, that they could be returned to Sagent for a full refund and that Sagent would assist MICROS in reselling the licenses. *See* Affidavit of Peter Rogers, attached.

For its part, Sagent disputes that these statements were made at the June 6, 2000, meeting, *see* Van Veelen Dep. at 53-55, although it does not and cannot dispute the content of any subsequent telephone calls.

> "Q. At that point you had an opportunity to hear at least what Mr. Garrett was saying in the conversation?
>
> A. Yes.
>
> Q. You could not, I take it, hear what Mr. Rogers was saying during that conversation?
>
> A. No.
>
> Q. What do you remember about what Mr. Garrett said during those conversations?
>
> A. Mr. Garrett didn't say very much. It was okays and yeses and things like that.
>
> Q. When he would say okay or yes, you don't know what he was agreeing to when he said that?

      A.    I have no idea.

Van Veelen Dep. at 64; *see also* Exhibit 3 to the Van Veelen deposition and Van Veelen Dep. at 18-19; Rogers Affidavit.

In sum, the existence and contents of the statements are either undisputed (with respect to the telephone calls after the June 6, 2000 meeting) or are at best disputed (with respect to the June 6 meeting). In either case, summary judgment in Sagent's favor is inappropriate, since the existence and contents of the statements are material. If the statements were made as MICROS has alleged and the evidence to date supports, and if the other elements of the counterclaim/defenses are proven as alleged, then the alleged contract is void on the basis of fraud or negligent misrepresentation. *See Snyder v. Herbert Greenbaum Assocs.*, 38 Md. App. 144, 148-49 (1977). On that basis, the statements are material, in that their existence and content would "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Consequently, a genuine dispute about them precludes the entry of summary judgment in Sagent's favor.

    2.    <u>When the terms of the contract are considered as a whole, MICROS did not breach it</u>.

Sagent's argument in favor of summary judgment is based on a central assumption: that the Conditional Purchase Order contained the parties' complete agreement on its subject matter. The facts adduced to date indicate the contrary. Because, when read as a whole, MICROS did not breach the contract, summary judgment in Sagent's favor is improper.

Apart from the pre-June 30 agreements reached, there are other indications of additional or missing terms in the Conditional Purchase Order.[1] Initially, the Conditional Purchase Order does not contain integration or merger language. While an integration clause is not in itself dispositive on the question whether the document is intended as a final and integrated agreement, *see Pumphrey v. Kehoe*, 261 Md. 496 (1971); *see also ARB Inc. v. E-Systems*, 663 F.2d 189, 199 (D.D.C. 1980) (applying Maryland law), its absence lends credence to a claim that the document was not intended as a conclusive expression of the parties' agreement

The second page of the Conditional Purchase Order states that it is subject to "Annual Maintenance & Support terms and conditions, see attached Support Agreement." *See* Exhibit 1 to the Rogers Deposition, attached, at 2. It is undisputed that no such document was attached to the Conditional Purchase Order, and Sagent has no explanation for its absence. *See* Van Veelen Dep. at 71-72. The quote on the second page also contains unexplained mathematical ambiguities – the extended total for the "Sagent DataMart Solution" is $150,000, and the extended total for the "Analytical Calculator" is $10,000, and yet the subtotal for software indicated on the quote is only $112,000. Sagent's sole explanation is that this may have been an error. Van Veelen Dep. at 70-71. Sagent has also testified that the "Exhibit A" attached to the Conditional Purchase Order as its second page ordinarily would be part of an end-user software license agreement, which was not included with the Conditional Purchase Order and which would set forth the customary terms associated with an end-user software license. *Id.* at 74-75. No license agreement was exchanged as part of the disputed transaction, and it is not clear what Sagent intended the applicable licensing terms to be, which ordinarily is an

---

[1] The admissibility of these extracontractual statements under the parol evidence rule and the statute of frauds is addressed in the briefing on Sagent's Motion in Limine. To the extent necessary, those arguments are incorporated here in support of the admissibility of the statements.

9

important matter for a software licensor. Moreover, it is clear from the post-June 30 e-mail exchanges and discussions that the parties had not reached a final agreement on what software was to be licensed, whether support was to be included, and the value of the order. *See, e.g.*, Callnin Dep. at 30-31; Van Veelen Dep. at 81-86; Exhibits 9–12 to the Van Veelen Dep. (copies attached).

The essential incompleteness of the document and the malleability of the products and pricing confirm that MICROS's obligations under the June 30 document were understood to be conditional, based on matters outside the four corners of the document, which included MICROS's success in finding an end-user customer and Sagent's fulfillment of its pre-June 30 obligations. *See* Rogers Aff. at ¶¶ 4-5. Thus, when understood in full context, MICROS's continued failure to pay, and its subsequent return of the software, still in its original shrink-wrap, *see* Callnin Dep. at 59-62; Exhibit 1 to this Opposition (letter from Michael Tow to Josef Rashty dated December 19, 2001), did not constitute a breach of the terms of the agreement. Rather, they reflected MICROS's performance of the agreement – its exercise of its right to return the software and engage Sagent's assistance in finding a customer for the software, and that MICROS's obligation to pay did not arise until an end-user customer was identified, whether by MICROS alone or by Sagent and MICROS working together. Neither MICROS nor Sagent ever identified an end-user customer for the software. For these reasons, summary judgment is improper.

    3.    Article 2 of the U.C.C. does not apply, and so Sagent has not demonstrated its entitlement to summary judgment as a matter of law.

Sagent's argument in favor of granting summary judgment is based on the application of article 2 of the U.C.C. to the Conditional Purchase Order. Article 2 does not apply, however, and so Sagent has not met its burden under Rule 56(c) that it is "entitled to judgment as a matter of law."

10

Article 2 applies only to "sales" of "goods."  *See* Md. Code Ann., Com. Law I § 2-102; *see also Bona v. Graefe*, 264 Md. 69, 73 (1972); *Singer v. Baltimore Gas & Elec. Co.*, 79 Md. App. 461 (1989).  "Goods" are defined in the U.C.C. as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Title 8) and things in action."  Md. Code Ann., Com. Law I § 2-105(1).  Intellectual property and other intangibles historically were not treated as goods for article 2 purposes, even if capable of being recorded or referenced in tangible form.  *See generally U.S. Test, Inc. v. NDE Envt'l Corp.*, 196 F.3d 1376 (Fed. Cir. 1999); *Grappo v. Alitalia Linee Aeree Italiane, S.P.A.*, 56 F.3d 427, 430 (2d Cir. 1995); *Fink v. DeClassis*, 745 F. Supp. 509 (N.D. Ill. 1990); *Smith Office Serv., Inc. v. Kelley*, 762 P.2d 791 (Colo. App. 1988); *but see, e.g.*, *i.LAN Sys., Inc. v. NetScout Serv. Level Corp.*, 183 F.Supp.2d 328, 332 (D. Mass. 2002).  Article 2 of the U.C.C. was drafted over 60 years ago, and was intended to apply largely to tangible goods (indeed, the software industry did not really exist at the time article 2 was drafted and initially promulgated).  Software is also fundamentally different from tangible goods in several important ways, including the relative ease of duplication and the lack of necessity of physical media or other tangible form.  For these reasons, software is not "goods" under the applicable provisions of the U.C.C.

Additionally, under the U.C.C., a "sale" occurs when title to goods passes from the seller to the buyer for an agreed price.  *Id.* §§ 2-106(1), 2-312.  By contrast, software provided under a license is an intangible and title does not pass to the licensee under a license agreement.  *See generally In re Microsoft Corp. Antitrust Litig.*, 127 F.Supp.2d 702, 709 (D. Md. 2001); *Davidson v. Microsoft Corp.*, 143 Md. App. 43 (2002).  A buyer of goods generally owns what it buys and generally has exclusive rights in the item purchased, whereas, under a software license agreement, the licensee instead receives

limited permission to use a copy of the licensor's intellectual property; the specific rights and the scope of the rights granted depend on the terms of the license agreement.  *See, e.g.*, *Advanced Computer Servs. of Mich. v. MAI Sys. Corp.*, 845 F. Supp. 356, 367 (E.D. Va. 1994).  The owner of a licensed copy rarely obtains all rights associated with the original intellectual property.  *See generally DSC Communications Corp. v. Pulse Communications, Inc.*, 170 F.3d 1354 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 923 (1999); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1084 (9th Cir. 1989).  For these reasons, a software license is not a "sale" under the U.C.C.

In this matter, the Conditional Purchase Order contemplated the license of Sagent software, albeit on unspecified terms.  *See* Van Veelen Dep. at 82 ("Q.  Better question.  The June 30 document – document discussed providing a license to Micros for certain software? A.  Yes); *id.* at 74-75 (regarding the absence of licensing terms).  Title was not passing to anything, except perhaps the CD-ROM on which the software resided, which was the only physical item delivered from Sagent to MICROS, *see* Van Veelen Dep. at 82-83, and which, ordinarily, would be sold separately at only a nominal cost.   For these reasons, the transaction contemplated in the Conditional Purchase Order was a software license and not a sale of goods, and therefore not covered by article 2 of the U.C.C.

Moreover, the Maryland legislature, in 2000, in enacting the Uniform Computer Information Transactions Act ("UCITA"), determined that article 2 of the U.C.C. does not cover software licenses.

> FOR the purpose of adopting the Maryland Uniform Computer Information Transactions Act; … establishing certain provisions of law applicable to agreements to create, modify, transfer, or distribute computer software, computer data and databases, Internet and online information, and certain other computer information and products under certain circumstances; establishing certain provisions of law applicable to licensing of computer information under certain circumstances; … establishing provisions of law applicable to the ownership and transfer rights of parties to an agreement to sell or license computer information within the scope of this Act … and generally relating to agreements created electronically or through the Internet, agreements to create, modify, transfer, distribute,

> and license computer information, and certain other matters within the scope of the
> Maryland Uniform Computer Information Transactions Act.

*See* Preface to H.B. 19 (Md., 2000 Regular Session). UCITA is a uniform law drafted by the National Conference of Commissioners on Uniform State Laws. While it resembles UCC Article 2 in many respects, it was drafted for the express purpose of creating a statutory scheme for regulating software licenses. *Specht v Netscape Communications Corp.*, 306 F.3d 17 at note 13 (2d Cir. 2002). If article 2 of the U.C.C. covered software licenses, UCITA would be superfluous.

MICROS does <u>not</u> contend that UCITA should apply to the Conditional Purchase Order; UCITA would not apply because, as a statute affecting substantive rights, it applies prospectively only unless expressly indicated in the text that it is intended to apply retroactively, and UCITA does not so indicate. *See, e.g., Keeney v. Allstate Ins. Co.*, 130 Md. App. 396 (2000); *see generally* Md. Code Ann., Com. Law II §§ 22-101 *et seq*. UCITA took effect October 1, 2000, several months after the date of the Conditional Purchase Order, and, in the bill text, the Legislature made absolutely clear its intent that the statute would not have retroactive effect.

> SECTION 4. AND BE IT FURTHER ENACTED, That a presently existing obligation or contract right may not be impaired in any way by this Act.
>
> SECTION 5. AND BE IT FURTHER ENACTED, That this Act shall be construed only prospectively and may not be applied or interpreted to have any effect on or application to any right of action that accrues before the effective date of this Act.
>
> …
>
> SECTION 8. AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2000.

*See* H.B. 19 (Md., 2000 Regular Session) sections 4, 5, and 8.

Rather, the point is that no Maryland court would hold that article 2 of the U.C.C. covers software licenses, based in part on the undeniable facts that software is not "goods" and a license is not a

13

"sale," and based in part on the Maryland Legislature's determination that enactment of a body of commercial law statutes regulating software licensing was necessary and appropriate despite the existence of article 2.

Consequently, for all of the foregoing reasons, a Maryland court would not apply article 2 of the U.C.C. to a software license, including the transaction at issue in this case, and so Sagent's arguments on the interpretation, application, and effect of various provisions of article 2 do not apply to the transactions at issue. For this reason, Sagent is not entitled to judgment as a matter of law, as its legal analysis has no application to the claims at issue.[2]

    4.    Even if entitled to summary judgment on liability, Sagent is not entitled to summary judgment on damages.

Assuming *arguendo* that the Conditional Purchase Order constituted a final and binding agreement between the parties and further assuming that MICROS unjustifiably breached it by failing to pay the amount stated in it, as amended by Sagent over 16 months after its effective date, Sagent has not proved its damages sufficiently to warrant entry of summary judgment in its favor with respect to damages.

Damages for breach of contract "seek to vindicate the promisee's expectation interest." *Andrulis v. Levin Constr.*, 331 Md. 354, 374 (1993). Expectation interest damages include losses sustained, *i.e.*, "out of pocket damages," and gains lost, *i.e.*, "benefit of the bargain" damages. *Beard v. S/E Joint Venture*, 321 Md. 126, 133 (1990), *reconsideration denied*, 322 Md. 225 (1991). In general, damages are not recoverable if the losses are avoidable; a plaintiff has the duty to use reasonable efforts to mitigate its damages, including in breach of contract cases. *See, e.g., M&R Contractors & Builders v.*

---

[2] Even if, *arguendo*, article 2 applied, evidence of pre-June 30 misrepresentations would be admissible and would preclude summary judgment in that they would render the contract void. *See Snyder*, 38 Md. App. at 148.

14

*Michael*, 215 Md. 340 (1958); *see also Rockingham County v. Luten Bridge Co.*, 35 F.2d 301 (4th Cir. 1929).[3]

Sagent's claim herein is based on the full value of the alleged contract. Its motion and other evidence presented to date are devoid of any indication that it made any attempt to resell or relicense the subject matter of the alleged contract, or otherwise mitigate its damages, despite that it is undisputed that MICROS returned the subject of the alleged contract to Sagent still in its original shrink wrap. *See, e.g.*, Callnin Dep. at 59-62; Exhibit 1 to the Opposition. To award Sagent the full value of the alleged contract without regard to efforts to mitigate puts Sagent in a better position than if the contract had been performed, as it has in its possession the subject of the contract and, presumably, may relicense it at any time for additional consideration. Consequently, even if this Court determines that summary judgment is appropriate on liability, summary judgment is not appropriate on damages. *See generally* Fed. R. Civ. P. 56(c).

Additionally, Sagent's calculation of interest back to July 30, 2000 is improper. Since the amount payable under the Conditional Purchase Order was not fixed or final, if at all, until October 2001, any prejudgment interest should run from that date and not the original payment date of the document. *See generally I.W. Berman Props. v. Porter Bros., Inc.*, 276 Md. 1, 15-21 (1975).

---

[3] Even if, *arguendo*, article 2 applied, a similar result would obtain. *See, e.g.*, Md. Code Ann., Com. Law I § 1-106 (the comments indicate that compensatory damages do not include damages that should have been mitigated); *id.* §§ 2-706 and 2-708 (granting sellers compensatory damages measured by lost profits, whether actual or theoretical); *Snyder*, 38 Md. App. at 153. An action for the full contract price is appropriate only when the buyer still has the goods or the seller cannot reasonably resell them, Md. Code Ann., Com. Law I § 2-709, or when the seller demonstrates that it is a "lost volume seller," *id.* § 2-708(2), which Sagent has not yet done.

5.     **Conclusion**.

For the foregoing reasons, Sagent's Motion for Summary Judgment should be denied.

*Michael H. Tow*
Michael H. Tow, Bar No. 12042
 MICROS Systems, Inc.
 7031 Columbia Gateway Drive
 Columbia, MD 21046-2289
 (443) 285-8052 (tel)
 (443) 285-0466 (fax)

Counsel for MICROS Systems, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April, 2003, a copy of the foregoing Defendant's Opposition to Plaintiff's Motion for Summary Judgment and its accompanying exhibits was filed and served electronically on: Scott H. Phillips, Esq., Semmes Bowen & Semmes, 250 W. Pratt Street, Baltimore, MD 21201, and was mailed via first class mail, postage prepaid, to: Adron W. Beene, Esq., Law Offices of Adron W. Beene, 6472 Camden Ave, Ste 204, San Jose, CA 95120.

*Michael H. Tow*
Michael H. Tow, Bar No. 12042
MICROS Systems, Inc.
7031 Columbia Gateway Drive
Columbia, MD 21046-2289
(443) 285-8052 (tel)
(443) 285-0466 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **SAGENT TECHNOLOGY, INC.** | * |
| Plaintiff | * |
| v. | *   Case No. JFM-02-2505 |
| **MICROS SYSTEMS, INC.** | * |
| Defendant | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER

Upon consideration of Plaintiff's Motion for Summary Judgment, Defendant's Opposition thereto, any further briefing thereon, any oral argument thereon, and the grounds of the Defendant's Opposition being well-taken, it is this ___ day of _____, 2003,

**ORDERED**, that Plaintiff's Motion for Summary Judgment be and it hereby is **DENIED**.

_____
Judge, United States District Court for the
District of Maryland