1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
 2
    SAGENT TECHNOLOGY, INC.        :
 3
             Plaintiff            :
 4
        vs.                       :   Civil Action
 5                                    No. JFM 02-2505
    MICROS SYSTEMS, INC., et al.  :
 6
             Defendants           :
 7
                    -----------------
 8
 9        Deposition of DAN VAN VEELEN, was taken on

10   Thursday, March 6, 2003, at 7031 Columbia Gateway Drive,

11   Columbia, Maryland, commencing at 10:00 a.m., before

12   SUSAN FARRELL SMITH, Notary Public.

13                   -----------------

14   APPEARANCES:

15           MICHAEL H. TOW, ESQUIRE

16               On behalf of the Plaintiff.

17           SCOTT H. PHILLIPS, ESQUIRE

18               On behalf of the Defendants.

19

20   ALSO PRESENT:  Peter Rogers

21   REPORTED BY:  Susan Farrell Smith
```

1   reference to Gene or Vincent.  Is it correct that that

2   refers to Gene Garrett and Vincent De Gennaro

3   respectively?

4       A    That is correct.

5       Q    There is a reference in the first line to

6   promises outside the box.  What is a promise outside the

7   box?

8       A    Something made outside my presence.

9       Q    What prompted you to send this e-mail to John

10  Siegman?

11      A    If I recall the timing, it was a period in

12  which there was talk about what was happening with

13  collection on the Micros account.  John was a member of

14  a management team that would have discussed this.  And

15  as his employee, he asked me to forward to him any

16  knowledge that I had of the case.

17      Q    By the first sentence what you are trying to

18  communicate to Mr. Siegman is that Gene and/or, Gene

19  Garrett and/or Vincent De Gennaro may have said

20  something that you were not -- at a time when you were

21  not listening?

1    A    No.  That's not what I'm saying.

2    Q    Can you explain the first sentence to me?

3    A    Simply stated the sentence means anything that

4    was discussed when I was not present.

5    Q    The second line, the second sentence, I was not

6    party to any -- you wrote, I was not party to any

7    conversations.  Is that correct?

8    A    That's what it says.

9    Q    We will come back to these of course.  But you

10   have been party to numerous conversations between

11   yourself and Micros personnel over the years; is that

12   correct?

13   A    Correct.

14   Q    And in fact this is not your first visit to

15   this building you're at, 7031 Gateway Drive; is it?

16   A    No, it's not.

17   Q    There were at least two other visits that we

18   will be discussing further on, one in May of 2001 and

19   June of 2000, where you attended and were party to

20   conversations on those dates; is that correct?

21   A    Yes.

40

1    he came with you?

2        A    I'm sure that I asked him or we coordinated his

3    schedule so that he could attend this meeting.

4        Q    What was the benefit of having him at this

5    meeting?

6        A    The benefit was more for Gene so that he could

7    be actively involved in the transaction.

8        Q    Why was it helpful for Sagent to have Gene

9    actively involved in the transaction?

10       A    Because we considered this a high profile

11   transaction.

12       Q    Why?

13       A    Because based on the sales forecast and based

14   on what we had been told, this would be a very large

15   transaction.

16       Q    Define very large.

17       A    Anything larger than half a million dollars.

18       Q    Did the status have any particular importance

19   in the May 2000 timeframe?

20       A    It always has.  Not just that timeframe.  A

21   transaction that size is significant to our company

1   regardless of timeframe.

2       Q    Who was the primary voice for Sagent at that

3   meeting?

4       A    Gene Garrett.

5       Q    What was your role at that meeting?

6       A    I don't recall.  In terms -- if you can

7   rephrase and put it in terms that I can understand.

8       Q    Sure.  Gene Garrett, I think you just said that

9   again Garrett was the primary spokesperson, salesman for

10  Sagent at that meeting.  My question is:  What was your

11  role since you were not the primary spokesperson,

12  salesman at that meeting?

13      A    I would have been there in a support role in

14  maintaining -- because I maintained the relationship

15  with the customer.  I believe that would have been

16  Gene's first meeting.  We would have been introducing

17  him into the account.  And Gene was -- Gene was the type

18  of sales manager that would like to take the lead when

19  he was present.

20      Q    I take it from the way you said that, that Gene

21  Garrett is no longer in that position; is that correct?

49

1    the InSight product.

2        Q    Was there any premeeting planning that occurred

3    between yourself and/or Mr. Garrett and/or

4    Mr. De Gennaro?

5        A    We talked about the information that we needed

6    in order to give them a proposal.

7        Q    Were there any e-mails exchanged in respect of

8    the premeeting planning?

9        A    No.

10       Q    What were the respective roles of yourself,

11   Mr. Garrett and Mr. De Gennaro at the June 6th meeting?

12       A    Vincent and Gene were taking the lead on the

13   meeting, and I was there mainly again in a support

14   role.

15       Q    Why was Mr. De Gennaro brought into this

16   meeting?

17       A    Because we had gotten to a point where we

18   believed we were getting closer on a large transaction

19   and a new partnership with Micros, and Vincent wanted to

20   be in attendance due to the size of the transaction.

21       Q    Where did -- did Mr. De Gennaro have

53

1    agreement.

2        Q    Was there any discussion at the June 6th, 2000

3    meeting in respect of providing licenses, Sagent

4    licenses to Micros for purpose of relicensing directly

5    to end users?

6        A    Not that I recall.

7        Q    Was there any discussion in respect of

8    providing Sagent licenses to Micros for use at USI, with

9    what would happen to those licenses if the USI project

10   did not achieve Micros' sales goals for it?

11       A    Not that I recall.

12       Q    Was there any discussion at the June 6th, 2000

13   meeting about Shoney's as a potential customer?

14       A    Not that I recall.

15       Q    Was there any discussion at the June 6th, 2000

16   meeting with respect to Sagent providing assistance to

17   Micros in providing the Sagent licenses to end user

18   customers instead of USI?

19       A    Would you repeat the question?

20       Q    You've indicated that the discussions related

21   to Sagent providing licenses to Micros for use at USI.

1  Was there any discussion at the June 6th, 2000 meeting

2  about repositioning those licenses to be used for end

3  users?

4      A    Not that I recall.

5      Q    Was there any discussion at the June 6th, 2000

6  meeting about Sagent offering a refund or credit to

7  Micros if the project did not draw the customers that

8  Micros thought it would?

9      A    No.

10     Q    Was there any discussion of Sagent providing a

11  refund or credit to Micros in any -- for anything in

12  respect -- in respect of any licenses being discussed at

13  the June 6th, 2000 meeting?

14     A    No.

15     Q    I will tell you that both Mr. Rogers and

16  Mr. Callnin have stated under oath, as you are under

17  oath today to tell the truth the whole truth and nothing

18  but the truth, that there were discussions at the

19  June 6th, 2000 meeting about repositioning of licenses,

20  about assistance with resale of the licenses to

21  customers, and about other related terms which may have

1   included discussions of a refund or assistance with

2   resale.  I will represent to you that that's what they

3   have said.  Clearly that doesn't jive with -- if that is

4   what they said, that doesn't jive with what you have

5   just said.  Would that be a fair assessment?

6        A    Yes.

7        Q    One or both, somebody is wrong; is that

8   correct?

9        A    It would appear so.

10       Q    And you're confident at this point it's not

11  you?

12            MR. PHILLIPS:  That has been asked and answered

13  four different times now, slightly different albeit, but

14  it is the same question.  I'm going to object.  You can

15  answer it for the fourth or fifth time.  Go ahead.

16       A    What was the question?

17       Q    We will move on.

18            (Whereupon Deposition Exhibit No. 6 was

19  marked.)

20       Q    This is a document Bates numbered S-35.  It

21  appears to be a Sagent sales order form No. 1876.  I

63

1    Q   Did you have any additional -- apart from the

2  communications expressed in Exhibit 7, did you have any

3  follow-up communications with Micros personnel between

4  June 7 and June 30, 2000 relating to the June 6th,

5  meeting?

6    A   I did not.

7    Q   Do you know whether Mr. Garrett or

8  Mr. De Gennaro had any follow-up conversations?

9    A   There were follow-up conversations between

10  Gene, Mr. Garrett and Peter Rogers.

11    Q   How do you know that?

12    A   I was present.

13    Q   When did those occur?

14    A   I don't remember the dates.  Sometime after the

15  June 6th or June 7th date.

16    Q   Were those also face-to-face meetings or were

17  they by other means?

18    A   They were via the phone.

19    Q   On your end was it conducted on a speaker

20  phone?

21    A   No.

64

1     Q     Conference call?

2     A     No.

3     Q     Mr. Garrett was on the phone with Peter Rogers

4     and you were in the room at the time?

5     A     Correct.  Actually we were -- he was on his

6     mobile phone and we were outside and I was standing in

7     his vicinity.

8     Q     At that point you had an opportunity to hear at

9     least what Mr. Garrett was saying in the conversation?

10    A     Yes.

11    Q     You could not, I take it, hear what Mr. Rogers

12    was saying during that conversation?

13    A     No.

14    Q     What do you remember about what Mr. Garrett

15    said during those conversations?

16    A     Mr. Garrett didn't say very much.  It was okays

17    and yesses, and things like that.

18    Q     When he would say okay or yes, you don't know

19    what he was agreeing to when he said that?

20    A     I have no idea.

21    Q     Do you remember -- did that happen on June the

1   specifically the last two pages of it.

2       A    Okay.

3       Q    The text here is a little bit different than

4   what we just looked at on S-81; isn't it?

5       A    Yes, it is.

6       Q    There is a different bill to and ship to

7   address indicated?

8       A    Yes, there is.

9       Q    There is a reference in this, on this piece of

10  paper to USI where there is no such reference on S-81;

11  is that correct?

12      A    Correct.

13      Q    Turning over to the next page behind that one,

14  there is a document with a Sagent logo on it and

15  Exhibit A near the top.  Take a look in the table

16  section, there is a column labeled Sagent product and

17  the product description, license fees, quantity and

18  total.  Looks to be a license fee of a hundred and fifty

19  thousand dollars for the Sagent Data Mart Solution which

20  comprises various items, one quantity for extended price

21  of a hundred and fifty thousand.  And Analytical

1    Calculator of ten thousand dollars, and my math is much

2    better than this, but I don't add one hundred fifty

3    thousand to ten thousand and get a hundred and twelve.

4    Can you explain that one?

5        A    Some sort of error.  There is a discount figure

6    missing.

7        Q    So, it was supposed to be a hundred and twelve

8    and not a hundred and sixty?

9        A    The extended price was to be a hundred and

10   twelve.

11       Q    There is a line item for annual maintenance and

12   support for twenty-four thousand dollars.  If Micros was

13   putting this license at USI, to whom would support have

14   been provided?

15       A    To whom would support have been provided?

16       Q    Yes.

17       A    Support would have been provided to Micros.

18       Q    Just below the table there is a line that says

19   annual maintenance and support terms and conditions, see

20   attached support agreement.  To your knowledge, was a

21   support agreement attached to this document back in June

1   of 2000?

2       A    I don't recall.

3       Q    Has a support agreement -- has that -- have you

4   ever seen the support agreement that may have been

5   attached to this document?

6       A    If a -- if a maintenance and support agreement

7   had been attached, it would have been our standard

8   support and maintenance agreement.

9       Q    You don't know whether one was ever attached to

10  this particular document?

11      A    I don't know.

12      Q    Doubling back to Exhibit No. 7, you see

13  attached to that a multi page end user license agreement

14  containing a number of what I presume are standard

15  Sagent terms and conditions of licenses.  At least at

16  the time.  Why was that agreement not part of this

17  June 30 exchange?

18      A    Because this is two different deals.

19      Q    Please explain.

20      A    Well, if you look back on Page 5 of the

21  agreement, there is a listing of fifty quantity for the

74

1    the terms of the original agreement as an additional

2    exhibit.  So, Exhibit A, Exhibit B, Exhibit C and so

3    forth.

4        Q    And each attached to a standard -- at the time?

5        A    That's typically how it was done.

6        Q    Did Micros have a license agreement with Sagent

7    to which the June 30 transaction was going to be

8    attached?

9        A    I don't know.

10       Q    Taking a look back at the, taking the -- back

11   at these documents we see the second page has Exhibit A

12   at the top.  Is that an Exhibit A of the type that would

13   be attached to a software license agreement as an

14   attachment?

15       A    Typically the information would be included in

16   the file, but the actual data would be added to the back

17   of the contract.

18       Q    You don't know whether Micros had an end user

19   license agreement?

20       A    I wasn't involved in the original relationship

21   with Micros; so, I can't -- I don't know.  I would

1    assume so, because I wasn't asked to obtain one.

2        Q    You had the Micros account for about two years

3    before this June 2000 meeting?

4        A    No.

5        Q    When did you first start interacting with the

6    Micros account?

7        A    In about October of '99.

8        Q    And during that approximately eight month

9    period, you never had occasion to see the contract that

10   Sagent had with Micros?

11       A    The contracts were being handled by Matt

12   Comstock.  So, no.  He had managed the relationship up

13   until that point.

14       Q    And you took over for Matt Comstock?

15       A    I didn't take over for Matt Comstock.  I took

16   over in addition to Matt Comstock.  Matt would maintain

17   the services side and I would maintain the software

18   side.

19       Q    In the course of maintaining the software side,

20   you did not have occasion to see the license agreement

21   between Micros and Sagent?

76

1     A     No.

2     Q     And it is your understanding that this single

3     license was being acquired for use in connection with

4     the InSight data warehouse project at USI; is that

5     correct?

6     A     Yes.

7     Q     When you received this document, did you

8     prepare a document, did you prepare a sales order form?

9     A     I don't recall.

10     Q     Would you ordinarily have prepared a sales

11     order form of this nature in response to receipt of a

12     purchase order?

13     A     In most cases yes.  There were times that a

14     sales order was not prepared.

15     Q     What would -- what circumstances would lead to

16     a sales order not being prepared?

17     A     Time.  Having enough time.  So, if I recall

18     correctly, this particular order was faxed to me I

19     believe on the 30th, I believe late in the day.  And it

20     was sent immediately to our Mountain View office without

21     a sales order being attached.  It's common practice at

1    InSight which we accommodated.

2            (Whereupon Deposition Exhibit No. 10 was

3    marked.)

4        Q    On Page 2 of Bates No. S-20 of this Exhibit 10,

5    this appears to contain your response to the e-mail that

6    we looked at in Exhibit 9 from Scott Callnin to you.

7    And you write, there is no problem with reissuing the

8    software licenses to reflect two Data Load, one

9    Analytical Calculator, maintenance to begin with the

10   next sale.  Which next sale were you referring to?

11       A    In the previous e-mail Scott had let me know

12   that the USI InSight development had gone by the

13   wayside.  So, Scott had requested that we accommodate

14   some requests in dealing with the licenses that they had

15   acquired.  So, we were trying to be accommodating to

16   them and the next sale would have been whichever InSight

17   product got sold next.  So, in support of that sale.

18       Q    So, this -- would it be correct that this is

19   taking the license that may have originally been

20   intended to be used in conjunction with the USI effort

21   to provide it directly to an end user as part of an

82

1    InSight installation?

2        A    That's correct, and we would not charge them

3    for that transaction.

4        Q    By February 8th, 2001 had the CD rom containing

5    the software described in the June 30 documents already

6    been delivered?

7        A    I'm not sure I understand which CD rom you're

8    talking about.

9        Q    Better question.  The June 30 document --

10   document discussed providing a license to Micros for

11   certain software?

12       A    Yes.

13       Q    How was that software delivered to Micros?

14       A    Delivered via CD rom and software package.  So,

15   in boxes with packaging, with user guides, things like

16   that.

17       Q    When was that delivered?

18       A    It would have been shipped that day.

19       Q    June 30th?

20       A    June 30th.

21       Q    From California?

1     A     Yes.  Via Fed Ex is typically -- or UPS,

2 whatever was the vendor of choice at that time.

3     Q     So, it would have arrived sometime on a

4 business day in the following week?

5     A     Presumably.

6     Q     Okay.  In your February 8th e-mail, you discuss

7 reissuing the software licenses.  By agreeing to that

8 would that require the delivery of an additional CD rom?

9     A     No.

10     Q     Why not?

11     A     Because in reallocating the license they

12 already owned, we would not be recognizing any

13 additional revenue.

14     Q     Did they already have on the CD rom that had

15 been delivered back in June/July of '00 this software as

16 well as the software described in the June 30 documents?

17     A     Yes.

18     Q     It was all on the same CD?

19     A     Yes.

20     Q     Is there any way to tell whether the CD roms

21 that you -- that Sagent delivers have been used?

84

1     A     Not that I'm aware of.

2     Q     Turning over to the first page of this exhibit,

3     S-19, at the bottom there is a March 16 e-mail from

4     Scott Callnin to you asking about a reissued invoice

5     based on a hundred and twelve thousand dollars.  Can you

6     describe generally what that is referring to?

7     A     What we were doing there is deferring the

8     maintenance cost until they were able to pass the

9     license to a client so that they wouldn't be paying for

10    maintenance they didn't need at that point.  Again, we

11    were accommodating their request.

12    Q     When that invoice would have been issued, would

13    that have been a revenue recognizable transaction giving

14    rise to a commission for you?

15    A     No.

16    Q     You would have received your commission on this

17    transaction circa July or August of 2000 in the ordinary

18    course?

19    A     Correct.

20    Q     And the software that was delivered on the CD

21    rom whenever it was delivered was capable of being

1    installed and used at USI or at an end user customer

2    directly?

3        A    Correct.

4            (Whereupon Deposition Exhibit No. 11 and 12

5    were marked.)

6        Q    Take a look, if you would, over at Exhibit

7    No. 12.  There is an e-mail at the top dated

8    October 16th, 2001 from yourself to Mr. Callnin.  It's

9     -- first line reads, good to hear from you.

10   Fortunately our federal business has been pretty lively

11   of late.  How much of that federal business was Gary

12   Jones?

13           MR. PHILLIPS:  Object to relevance.  You can

14   answer.

15       A    I don't know.

16       Q    There is a reference further down to a call

17   from Tiffany to get her okay to approve all the

18   adjustments.  Is that a reference to Tiffany Nguyen

19   whose name we have seen previously?

20       A    Yes.

21       Q    Look over, if you would, No. 11.  This appears

86

1    to be an e-mail from Tiffany Nguyen to Joseph Rashty

2    dated Friday, October 12th, 2001 with yourself being

3    CC'ed on it.  And it states in the second line the

4    reason is that at the time of purchase Micros had the

5    intention of rebuilding and resell software to

6    AmeriKing.  Micros has promised that they were able to

7    resell the rebuilt product to AmeriKing, then it's up to

8    AmeriKing to purchase the support.  Ms. Nguyen was not

9    involved in any of the discussions that took place

10    during June of 2000.  Is that correct?

11        A    That's correct.

12        Q    Anything she knows about what was said or not

13    said during the June 2000 discussions would have come

14    from you; is that correct?

15        A    No.

16        Q    From who else would have been the source of

17    information for her about what was said during the June

18    2000 meetings?

19        A    She would have no source of information on that

20    particular topic.

21        Q    Do you have any idea how -- why she's going to