```
                                                                    1


 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2
    SAGENT TECHNOLOGY, INC.      :
 3
            Plaintiff            :
 4
       vs.                       :   Civil Action
 5                                   No. JFM 02-2505
    MICROS SYSTEMS, INC., et al. :
 6
            Defendants           :
 7
                      -----------------
 8

 9        Deposition of DAN VAN VEELEN, was taken on

10   Thursday, March 6, 2003, at 7031 Columbia Gateway Drive,

11   Columbia, Maryland, commencing at 10:00 a.m., before

12   SUSAN FARRELL SMITH, Notary Public.

13                    -----------------

14   APPEARANCES:

15          MICHAEL H. TOW, ESQUIRE

16             On behalf of the Plaintiff.

17          SCOTT H. PHILLIPS, ESQUIRE

18             On behalf of the Defendants.

19

20   ALSO PRESENT:  Peter Rogers

21   REPORTED BY:  Susan Farrell Smith
```

8

1   office.  There is a sales operation director who would
2   take a look and confirm that it was indeed a sale.  Pass
3   that at the end of the quarter to the auditors who would
4   then sift through all the deals that came in that
5   quarter so that we could formulate our quarterly revenue
6   for the market.
7           (Whereupon Deposition Exhibit No. 1 was
8   marked.)
9       Q   Please take a moment to look at the document.
10  Please let me know when you're finished with it, so we
11  can proceed.
12      A   Okay.
13      Q   Excluding the last two pages of this packet
14  that I have handed you, have you ever seen this document
15  before?
16      A   No.
17      Q   I take it you have seen the last two pages of
18  this packet before today?
19      A   Yes.
20      Q   Take a look, if you would, at the paragraph
21  numbered 3 on Page 2.  Do you have any idea who Does 1

9

```
 1   through 50 are.
 2       A   No.
 3       Q   Do you have any basis to be informed or believe
 4   that Micros has not been properly maintained,
 5   quote/unquote, as mentioned in the 1, 2, 3, 4th line of
 6   that paragraph?
 7       A   I don't understand the question.  I don't
 8   understand the phrasing.
 9       Q   I will rephrase it.  It says here that Sagent
10   is informed and believes that Micros has not been
11   properly maintained.  That's just what's written.  Have
12   I read that accurately?
13       A   Yes.
14       Q   Do you have any information or belief that
15   Micros has not been properly maintained?
16       A   I don't understand No. 3 in its entirety.
17       Q   You have no knowledge one way or the other of
18   any basis for the statements in that Paragraph 3?
19           MR. PHILLIPS:  Well, let me just object.  I
20   think he's indicated not being a lawyer that he doesn't
21   understand Paragraph 3.  With that qualification you can
```

10

```
 1   answer the question if you can.  If you can't, you
 2   can't.
 3        A    I don't believe I can answer that question.
 4        Q    Let me move on.
 5             (Whereupon Deposition Exhibit No. 2 was
 6   marked.)
 7        Q    Actually, if you can please keep this -- take a
 8   look at this first, but then I'm going to be referring
 9   back to this also.
10             MR. PHILLIPS:  Okay.
11        A    Okay.  I have seen this.
12        Q    When you say you have seen this, does that mean
13   you have seen this before?
14        A    I first saw it on Tuesday.  This week.
15        Q    The 4th of March, 2003?
16        A    That's right.
17        Q    In what context did you see it?
18        A    In a meeting with my attorney, Scott Phillips.
19        Q    Take a look, if you would, at Page No. 6 of
20   this document.  And specifically I'm interested in
21   paragraphs labeled Interrogatory No. 8 and Answer to
```

18

```
 1   reference to Gene or Vincent.  Is it correct that that
 2   refers to Gene Garrett and Vincent De Gennaro
 3   respectively?
 4        A    That is correct.
 5        Q    There is a reference in the first line to
 6   promises outside the box.  What is a promise outside the
 7   box?
 8        A    Something made outside my presence.
 9        Q    What prompted you to send this e-mail to John
10   Siegman?
11        A    If I recall the timing, it was a period in
12   which there was talk about what was happening with
13   collection on the Micros account.  John was a member of
14   a management team that would have discussed this.  And
15   as his employee, he asked me to forward to him any
16   knowledge that I had of the case.
17        Q    By the first sentence what you are trying to
18   communicate to Mr. Siegman is that Gene and/or, Gene
19   Garrett and/or Vincent De Gennaro may have said
20   something that you were not -- at a time when you were
21   not listening?
```

19

1    A    No.  That's not what I'm saying.

2    Q    Can you explain the first sentence to me?

3    A    Simply stated the sentence means anything that
4 was discussed when I was not present.

5    Q    The second line, the second sentence, I was not
6 party to any -- you wrote, I was not party to any
7 conversations.  Is that correct?

8    A    That's what it says.

9    Q    We will come back to these of course.  But you
10 have been party to numerous conversations between
11 yourself and Micros personnel over the years; is that
12 correct?

13    A    Correct.

14    Q    And in fact this is not your first visit to
15 this building you're at, 7031 Gateway Drive; is it?

16    A    No, it's not.

17    Q    There were at least two other visits that we
18 will be discussing further on, one in May of 2001 and
19 June of 2000, where you attended and were party to
20 conversations on those dates; is that correct?

21    A    Yes.

53

```
 1   agreement.
 2       Q    Was there any discussion at the June 6th, 2000
 3   meeting in respect of providing licenses, Sagent
 4   licenses to Micros for purpose of relicensing directly
 5   to end users?
 6       A    Not that I recall.
 7       Q    Was there any discussion in respect of
 8   providing Sagent licenses to Micros for use at USI, with
 9   what would happen to those licenses if the USI project
10   did not achieve Micros' sales goals for it?
11       A    Not that I recall.
12       Q    Was there any discussion at the June 6th, 2000
13   meeting about Shoney's as a potential customer?
14       A    Not that I recall.
15       Q    Was there any discussion at the June 6th, 2000
16   meeting with respect to Sagent providing assistance to
17   Micros in providing the Sagent licenses to end user
18   customers instead of USI?
19       A    Would you repeat the question?
20       Q    You've indicated that the discussions related
21   to Sagent providing licenses to Micros for use at USI.
```

54

```
 1   Was there any discussion at the June 6th, 2000 meeting
 2   about repositioning those licenses to be used for end
 3   users?
 4       A    Not that I recall.
 5       Q    Was there any discussion at the June 6th, 2000
 6   meeting about Sagent offering a refund or credit to
 7   Micros if the project did not draw the customers that
 8   Micros thought it would?
 9       A    No.
10       Q    Was there any discussion of Sagent providing a
11   refund or credit to Micros in any -- for anything in
12   respect -- in respect of any licenses being discussed at
13   the June 6th, 2000 meeting?
14       A    No.
15       Q    I will tell you that both Mr. Rogers and
16   Mr. Callnin have stated under oath, as you are under
17   oath today to tell the truth the whole truth and nothing
18   but the truth, that there were discussions at the
19   June 6th, 2000 meeting about repositioning of licenses,
20   about assistance with resale of the licenses to
21   customers, and about other related terms which may have
```

55

```
 1   included discussions of a refund or assistance with
 2   resale.  I will represent to you that that's what they
 3   have said.  Clearly that doesn't jive with -- if that is
 4   what they said, that doesn't jive with what you have
 5   just said.  Would that be a fair assessment?
 6        A    Yes.
 7        Q    One or both, somebody is wrong; is that
 8   correct?
 9        A    It would appear so.
10        Q    And you're confident at this point it's not
11   you?
12             MR. PHILLIPS:  That has been asked and answered
13   four different times now, slightly different albeit, but
14   it is the same question.  I'm going to object.  You can
15   answer it for the fourth or fifth time.  Go ahead.
16        A    What was the question?
17        Q    We will move on.
18             (Whereupon Deposition Exhibit No. 6 was
19   marked.)
20        Q    This is a document Bates numbered S-35.  It
21   appears to be a Sagent sales order form No. 1876.  I
```

64

```
 1     Q    Conference call?
 2     A    No.
 3     Q    Mr. Garrett was on the phone with Peter Rogers
 4     and you were in the room at the time?
 5     A    Correct.  Actually we were -- he was on his
 6     mobile phone and we were outside and I was standing in
 7     his vicinity.
 8     Q    At that point you had an opportunity to hear at
 9     least what Mr. Garrett was saying in the conversation?
10     A    Yes.
11     Q    You could not, I take it, hear what Mr. Rogers
12     was saying during that conversation?
13     A    No.
14     Q    What do you remember about what Mr. Garrett
15     said during those conversations?
16     A    Mr. Garrett didn't say very much.  It was okays
17     and yesses, and things like that.
18     Q    When he would say okay or yes, you don't know
19     what he was agreeing to when he said that?
20     A    I have no idea.
21     Q    Do you remember -- did that happen on June the
```