IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SAGENT TECHNOLOGY, INC.           *

      Plaintiff                               *

v.                                                *   Civil Action No. JFM-02-2505

MICROS SYSTEMS, INC., et al.       *

      Defendants                           *

### SAGENT TECHNOLOGY, INC.'S ANSWERS TO DEFENDANT'S FIRST INTERROGATORIES TO PLAINTIFF

TO:    MICROS Systems, Inc., Defendant

FROM:  Sagent Technology, Inc., Plaintiff

Plaintiff Sagent Technology, Inc. ("Sagent" or "the Plaintiff"), by and through undersigned counsel, hereby files the following answers to the Interrogatories propounded by the Defendant, and states:

The information supplied in these Answers to Interrogatories is not based solely on the knowledge of the executing party, but includes the knowledge of the party's agents, representatives, and attorney, unless privileged.

The word usage and sentence structure is that of the attorney and does not purport to be the exact language of the executing party.

The responding party objects to the interrogatories and accompanying instructions and definitions to the extent they attempt to broaden the scope of the responding party's obligations beyond the requirements set forth in the Federal Rules of Civil Procedure and the rules of the Court.

INTERROGATORY NO. 1: Identify each person, other than a person intended to be

grounds of relevance and on the grounds that it is vague. Additionally, the requested information is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the objection, Sagent states that Gregory A. Earp and W. Virginia Walker executed the Joint Intellectual Property Agreement ("JIPA") on behalf of MICROS and Sagent, respectively. Matthew Comstock and others negotiated the JIPA on behalf of Sagent and managed the project on a day-to-day basis. Mike Venerable, Staci Cosby and Virginia Walker also participated in the negotiation and/or administration of the JIPA. Sagent reserves the right to supplement this response as discovery is continuing in this matter.

INTERROGATORY NO. 11: Identify any persons or entities whom you contend are persons needed for just adjudication within the meaning of Fed. R. Civ. P. 19, and who are not currently parties to this action or who are not specifically identified in the pleadings (as defined in Fed. R. Civ. P. 7).

ANSWER TO INTERROGATORY NO. 11: As discovery is just getting underway in this case, Sagent reserves the right to identify and join such parties and to supplement this response.

INTERROGATORY NO. 12: State all facts concerning the matters described in count paragraph 13 of the Complaint.

ANSWER TO INTERROGATORY NO. 12: Sagent objects to the interrogatory on the grounds it is vague, overly broad and unduly burdensome. Sagent cannot possibly identify herein all such facts. Discovery is just getting underway in this case and many facts have yet to come to light. Sagent reserves the right to supplement this response as discovery is continuing in this matter.

-7-

I, Steven R. Springsteel, am Chief Operating Officer and Chief Financial Officer for Sagent Technology, Inc. and am duly authorized by the corporation to execute these Answers to Interrogatories under oath on its behalf. The information set forth in these Answers was collected by others, and such information is not necessarily within my personal knowledge. Under penalty of perjury I hereby affirm that the contents of the foregoing Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

SAGENT TECHNOLOGY, INC.

By: _____
Steven R. Springsteel, Chief Operating Officer
and Chief Financial Officer


_____
Scott H. Phillips
Semmes, Bowen & Semmes
250 W. Pratt Street
Baltimore, MD 21201
410-539-5040

Attorney for Sagent Technology, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of November, 2002, an executed copy of Sagent Technology, Inc.'s Answers to Plaintiff's First Interrogatories was mailed first-class, postage prepaid and delivered by facsimile to:

Michael H. Tow, Esquire
MICROS Systems, Inc.
7031 Columbia Gateway Drive
Columbia, Maryland 21046-2289

Facsimile: 443-285-0466

*Scott H. Phillips*
Scott H. Phillips

(B0291726.WPD;1)

-9-

```
> Sent: Thursday, January 23, 2003 1:43 PM
> To:   John Siegman
> Subject:   Micros emails-
> Importance:   High
>
> <<RE: Contract>>  <<RE: Insight Authorization>>  <<Status Of Request>>
> <<RE: MICROS Relationship with USI and Sagent>>  <<MICROS Relationship
> with USI and Sagent>>  <<Outstanding Invoices>>  <<Update on InSight
> Leads>>  <<RE: Proposal for Peter Rogers' Software Purchase>>  <<RE:
> Proposal for Peter Rogers' Software Purchase>>  <<RE: Sagent's E-CRM
> Seminar>>  <<RE: Outstanding Invoices>>  <<Proposal for Peter Rogers'
> Software Purchase>>  <<RE: Outstanding Invoices>>  <<Outstanding
> Invoices>>  <<InSight ASP and Whitbread IP>>
>
>
> John,
>
> I don't know if Gene or Vincent made any promises outside the box. I was
> not party to any conversations, HOWEVER, Micros has been a good client
> and legal action is not a viable solution. I would like the opportunity
> to meet with them and hear Peter's side of things-
>
> The emails I have clearly support our case-
>
> KEEP THESE BETWEEN US FOR NOW
>
>
>
> Dan VanVeelen
> Regional Sales Director
> Sagent Technology, Inc.
> direct  703/267-2705
> mobile  703/298-0126
>
```



VanVeelen DEPOSITION
EXHIBIT NUMBER 3
DATE 2/6/03
REPORTER
ART MILLER & ASSOCIATES

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2
      SAGENT TECHNOLOGY, INC       *    CIVIL ACTION JFM-02-2505
 3            Plaintiff
                                   *
 4       vs.                            Baltimore, Maryland
                                   *
 5    MICROS SYSTEMS, INC.
              Defendant            *    January 22, 2003
 6        *       *       *        *        *

 7              Deposition of SCOTT CALLNIN, a witness of

 8    lawful age, taken on behalf of the Plaintiff in the

 9    above-entitled cause, pending in the District Court of

10    the United States for the District of Maryland, before

11    Dawn L. Venker, a Notary Public in and for Baltimore

12    County, Maryland, at 7031 Columbia Gateway Drive,

13    Columbia, Maryland 21046, on the 22nd day of January,

14    2003.

15              *       *       *       *       *

16    APPEARANCES:

17              SCOTT H. PHILLIPS, Esquire
                   For the Plaintiff

18
                MICHAEL H. TOW, Esquire
19                 For the Defendant

20    ALSO PRESENT:  PETER ROGERS, JR.

21    Reported By:  Dawn L. Venker
```

GORE BROTHERS Reporting & Video Co., Inc.         Towson Reporting Company
410-837-3027                                      410-828-4148

Scott Callnin - 1/22/03

**34**

1 A   We were looking for some clients to use
2 those prepurchase licenses against. So, yes, during
3 that course of time we were e-mailing back and forth
4 about, you know, do we have any potential leads, what
5 is the outlook for the next new client. So there was,
6 yes, that -- if you call it an issue -- there was that
7 issue intermixed with this as well.
8   Q   Now, assuming as of February -- I'm
9 sorry -- October 15, 2001 -- assuming as of that date
10 Sagent had provided you with an amended invoice which
11 correctly reflected the new amount and the new product
12 configuration mix, would Sagent have paid that at that
13 time? All other things being equal. All other things
14 being the same as they were as of that date.
15       MR. TOW: Objection. You may have
16 misspoken in terms of Sagent paying.
17       MR. PHILLIPS: I did. I apologize.
18       MR. TOW: I think it was something of a
19 complex question.
20   Q   You mentioned that there were a couple of
21 things that were going on as of October 15th 2001, some

**35**

1 of which are reflected in your e-mail. One of them was
2 that Sagent had never provided you all with an amended
3 invoice, correct?
4   A   Correct.
5   Q   One of the other issues that was going on
6 was that jointly the two companies were looking for
7 customers to purchase these licenses, correct?
8   A   That's right.
9   Q   Now, let me ask you to assume as of October
10 15th, 2001 Sagent had provided MICROS with an amended
11 invoice which was correct? It correctly reflected the
12 terms, but the other -- that other issue, the new
13 customer issue, was the same as it was at that time,
14 namely you all were jointly looking for other
15 customers. Would MICROS have paid Sagent the $112,000?
16       MR. TOW: Objection. Calls for
17 speculation. You can answer as best you can.
18   A   I would at that point say that I was
19 satisfied saying that the invoicing was properly done,
20 and then I would have given my blessing or my thumbs up
21 that the product mix was correct. And then would have

**36**

1 turned it over to the appropriate persons to authorize
2 paying of the invoice.
3   Q   Who would that have been at the time?
4   A   Either Peter Rogers or Peter Rogers in
5 combination with our CFO to approve that.
6   Q   Is there any e-mail or other writing from
7 you to anybody at Sagent that indicated that one of the
8 reasons Sagent wasn't being paid was because of
9 Sagent's failure to cooperate with MICROS in the joint
10 effort to identify customers to purchase these
11 licenses?
12   A   Could you restate the beginning part of
13 that sentence.
14   Q   I'm asking you if you can identify for me
15 any e-mail or other writing that came from you that
16 went to anyone at Sagent that expressed the notion that
17 one of the reasons that Sagent wasn't being paid
18 $112,000 was because Sagent had failed to cooperate
19 with MICROS in the joint effort to identify customers
20 to purchase the license?
21   A   I'm not aware of anything that I have,

**37**

1 either with me or that I have seen, that listed any
2 specific reason why the invoice was not -- was not paid
3 after the issue of having the correct software listed
4 on the invoice was resolved.
5   Q   I mean even before that. You said that was
6 sometime in -- when did you say that was when you got
7 the -- finally got the new invoice?
8   A   Late 2000 or early 2002.
9   Q   Even before late 2001, did you find -- are
10 you aware of any correspondence that would indicate
11 that one of the reasons that Sagent wasn't being paid
12 was because of its failure to cooperate with MICROS to
13 identify customers to purchase the licenses?
14   A   I'm not aware of any documents or notes
15 that I may have on any such statement of that nature.
16   Q   Did you ever express that sentiment to
17 anyone at Sagent verbally, either in person or on the
18 telephone?
19   A   Yes. Certainly the idea that no leads had
20 come through was discussed verbally quite a bit. We
21 had -- we would express when we had a possible client

10 (Pages 34 to 37)

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148

**74**

1  Q.  And I think I asked you earlier whether you
2 took any notes at the meeting. Did you?
3  A  I do not believe I did.
4  Q  Was there a written agenda prepared in
5 anticipation of the meeting?
6  A  No.
7  Q  We talked a little bit earlier about some
8 deep discounting that you recall Sagent making at the
9 meeting, correct?
10  A  Correct.
11  Q  Who do you recall talking about that issue?
12  A  Primarily Gene.
13  Q  Gene Garrett?
14  A  That's right.
15  Q  Do you recall any discussion at the meeting
16 about the notion that Sagent and MICROS would work
17 together to service mutual customers?
18  A  Once again?
19  Q  Do you recall any discussion at that June
20 6th, 2000 meeting about the notion that Sagent and
21 MICROS would work together to serve mutual customers?

**75**

1  A  I think that was the understanding before
2 the meeting – going into the meeting. Perhaps
3 reiterated, but that was not anything new during the
4 meeting.
5  Q  Do you have a specific recollection of it
6 being reiterated at the meeting?
7  A  Yes. Uh-huh.
8  Q  Who said that?
9  A  I believe it would have been Dan VanVeelen
10 primarily talking about – I think offer up again maybe
11 one lead at that time who I believe was Shoney's.
12 Perhaps some inquiries on our part if that had gone
13 anywhere, and just response that they were still trying
14 to follow up with that contact.
15  Q  So Shoney's was the Sagent lead?
16  A  Right.
17  Q  And the inquiries regarding the status of
18 that lead came from the MICROS folks there?
19  A  Uh-huh.
20  Q  Did MICROS talk about any specific leads it
21 had at that time at the meeting?

**76**

1  A  Yes. We would have gone over some
2 potential lead prospects. I'm not sure in the time
3 frame of summer of 2000 who we would have offered up at
4 the time, but at that point, we had been working with
5 AmeriKing. So it probably would have been, again, some
6 of the notions that other Burger Kings could have
7 followed suit.
8  Q  Did anyone from Sagent at that meeting say
9 that MICROS could return the software and the
10 analytical calculator to Sagent if MICROS couldn't
11 resell or relicense it for a full refund?
12  A  I don't think that was said in exactly that
13 manner. It was more in – I might not have the exact
14 quote, but "We'll help you get rid of it."
15  Q  Who said that?
16  A  Would have been Gene.
17  Q  And what was your understanding of what he
18 meant by that statement? I'm not holding you to those
19 words because you indicated you are not sure if that is
20 his exact quote, but what was your understanding as of
21 that time what he was trying to convey?

**77**

1  A  That they would help us find clients
2 either – first and foremost clients for Insight
3 product who would buy this product, and thus the
4 software, or even barring perhaps an Insight client,
5 that they would be able to identify someone who may
6 just want to buy the software from as an OEM even
7 perhaps outside the context of Insight.
8  Q  What is OEM?
9  A  Software reseller agreement.
10  Q  What do those letters stand for, if
11 anything?
12  A  I don't recall.
13  Q  Apart from the notion that you recall
14 Mr. Garrett expressing that Sagent would work with
15 MICROS to identify mutual customers, do you recall him
16 or any other Sagent employee at that meeting indicating
17 that if that effort were ultimately unsuccessful that
18 MICROS could return the software to Sagent for a full
19 refund?
20  A  I don't recall language to that extent.
21 Specifically full refund I don't recall.

20 (Pages 74 to 77)

Peter Rogers, Jr. - 1/22/03

1

```
         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND

SAGENT TECHNOLOGY, INC     *    CIVIL ACTION JFM-02-2505
         Plaintiff
                           *
    vs.                         Baltimore, Maryland
                           *
MICROS SYSTEMS, INC.
         Defendant         *    January 22, 2003
      *      *      *      *      *

         Deposition of PETER ROGERS, JR., a witness
of lawful age, taken on behalf of the Plaintiff in the
above-entitled cause, pending in the District Court of
the United States for the District of Maryland, before
Dawn L. Venker, a Notary Public in and for Baltimore
County, Maryland, at 7031 Columbia Gateway Drive,
Columbia, Maryland 21046, on the 22 day of January,
2003.
         *      *      *      *      *

APPEARANCES:

         SCOTT H. PHILLIPS, Esquire
              For the Plaintiff

         MICHAEL H. TOW, Esquire
              For the Defendant


Reported By:  Dawn L. Venker
```

GORE BROTHERS Reporting & Video Co., Inc.        Towson Reporting Company
410-837-3027                                     410-828-4148

### Page 10

1 the morning of June 6th, or thereabouts -- it was on
2 June 6th,
3    Q    2000?
4    A    2000. We were visited by Vincent
5 DeGennaro, Gene Garrett, and Dan VanVeelen. Purpose of
6 the meeting -- they requested the meeting. I believe
7 Vince was -- Mr. DeGennaro was traveling with Gene
8 assessing prospects as a corporate relationship at the
9 same time really feeling out, assessing with MICROS,
10 purchases of additional licenses.
11       At the meeting, they expressed that they
12 were going to give us an offer for all licenses. They
13 left. Later that afternoon I received a call from Mr.
14 Garrett where he gave me verbally over the phone an
15 offer. I believe five licenses, ten licenses, and
16 fifty licenses.
17    Q    You said "we" a couple of times. Was there
18 any other MICROS representative present at that June
19 6th meeting?
20    A    Scott Callnin was in the meeting along with
21 myself.

### Page 11

1    Q    So it was you and Mr. Callnin,
2 Mr. VanVeelen, Vincent DeGennaro, and Gene Garrett?
3    A    Correct.
4    Q    Did you take any notes during that June 6th
5 meeting?
6    A    Yes.
7    Q    And that meeting was held here?
8    A    Yes.
9    Q    And when Mr. Garrett called you later that
10 same day, did you take any notes on that telephone
11 call?
12    A    Yes.
13    Q    Have you produced either of those sets of
14 notes to Mr. Tow in that case?
15    A    Yes.
16    Q    What, if anything, followed on the
17 telephone call from Mr. Garrett once he had offered you
18 the several licenses?
19    A    There were several phone calls. I cannot
20 tell exactly how many, but at least two from Gene
21 Garrett -- Mr. Garrett, as well as at least one from

### Page 12

1 Dan VanVeelen assessing if we were going to accept the
2 offer of purchasing licenses.
3    Q    And these calls came in subsequent days I
4 assume?
5    A    Yes, sir.
6    Q    Did you take any notes on those subsequent
7 telephone calls?
8    A    No.
9    Q    Did there come a time when you called
10 Mr. Garrett back or Mr. VanVeelen to advise him of a
11 decision the company had made in that regard?
12    A    The decision was made on the 30th of June.
13       Little background. The calls from Gene on
14 the 6th. He was quite concerned about his quarter --
15 his standing at the company. They had missed numbers,
16 i.e., financial results. It was a lot of pressure, and
17 we had met prior -- a month ago and developed a pretty
18 good rapport as Mr. Callnin expressed just in the
19 relationship meeting back in early May. He had gone to
20 Wake Forest. So we talked about ACC basketball. He
21 had run track for Wake Forest. I had run track for

### Page 13

1 Penn. So developed a good rapport and clearly wasn't a
2 term of partnership.
3       So we built upon that. Didn't feel
4 negative. We are partners. We need to make numbers.
5 If we don't make numbers, may not be here. That was on
6 June 6th.
7    Q    That was Mr. Garrett on June 6th?
8    A    Mr. Garrett. Now, they expressed in that
9 meeting that morning that they were going to give us an
10 offer, and that they would work with us. And it would
11 be substantial in terms of licenses.
12    Q    Did they elaborate any on the notion that
13 we'll work with you?
14    A    Yes. They expressed that they will work
15 with us.
16    Q    Did they get more specific in terms of how
17 they would work with you?
18    A    That they would resell it. They talked a
19 large quantity, and that they would refund if
20 necessary. But they clearly preferred to resell it or
21 work through the channel. But they expressed their

Peter Rogers, Jr. - 1/22/03

**14**

1 desire, interest, and intent to help us find customers
2 to tell them through.
3    Q   Who said those statements?
4    A   Gene Garrett, Dan VanVeelen also, as well
5 as Mr. DeGennaro.
6    Q   Let me make sure I understand. All three
7 of these individuals at some point during the June 6th,
8 2000 meeting indicated to you that if MICROS could not
9 resell or otherwise use the licenses that were
10 contemplated in this transaction, that they could be
11 returned to Sagent for a full refund and that Sagent
12 would try to resell the licenses?
13    A   That's correct.
14    Q   When Mr. Garrett called you later that day,
15 was that notion again expressed in that telephone call?
16    A   Yes. Because he offered a substantial
17 discount to go to five, ten, or fifty, and I expressed
18 my concern how could I consume all that given at the
19 time I had only sold I believe two or three licenses.
20 So five licenses seemed somewhat relevant, but they
21 express interest, "Here's an offer for ten and fifty.

**15**

1 Substantial discounts." I expressed, "How can I handle
2 those if I don't have customers?" They said, "We'll
3 work with you. We'll help you get rid of them."
4 Really language in terms of take them.
5       Because we had met back in May, and we had
6 bright -- we had optimism that product would take hold.
7 We were going to deploy it on the USi platform offered
8 via the Web. It was a lot of speculation --
9 speculation is not the right word -- industry buzz
10 about a lot of software systems moving to the Web.
11       So it was in that vein that we acquired --
12 we needed a license to get our USi product going and
13 really was just wondering how many customers. It was
14 really difficult only having three how many were really
15 going to sell, but I was struck by the extent of the
16 numbers they were offering, plus the discounts.
17    Q   Among Mr. Garrett, Mr. VanVeelen, and
18 DeGennaro, which of those three indicated to you the
19 notion that Sagent would take the product back and
20 fully credit your account if you couldn't use them?
21    A   Mr. Garrett.

**16**

1    Q   Did the other two say anything along those
2 lines?
3    A   There was -- in the conversation in the
4 morning, language was used. In the afternoon
5 conversation, it was just between myself and
6 Mr. Garrett. He said we'll take them if needed.
7    Q   I meant to refer to the morning meeting --
8 I apologize -- when everyone was there.
9    A   Mr. Garrett expressed that with backup. It
10 is difficult with three people talking the exact
11 language, but Mr. Garrett was the key salesperson.
12    Q   And he is the one that made that specific
13 comment to you?
14    A   That's correct, but at the same time during
15 the conversation, he was supported by Dan --
16 Mr. VanVeelen as well as Mr. DeGennaro.
17    Q   In what way did those two gentlemen support
18 that comment?
19    A   Terms -- comment about the partnership, and
20 that they want to work with us to sell through. And
21 they looked at us as a key sales partner with the

**17**

1 product.
2    Q   Did either of them express the specific
3 comment that Sagent would accept for a full refund the
4 product back if you couldn't use it?
5    A   They would say -- the language was that
6 we'll help you sell through, and take back if needed.
7 I can't remember specifically full refund.
8    Q   We'll talk in a little while about some
9 notes. I don't know whether they are your notes yet,
10 but there are some notes that have been produced. In
11 that context, let me ask you this. Did you record in
12 the handwritten notes that you took from either the
13 morning meeting or the afternoon telephone call from
14 Mr. Garrett this notion about return of the product and
15 full refund?
16    A   No.
17    Q   Is there any reason you did not?
18    A   No. I would write numbers down generally.
19 Specific numbers so I didn't misquote them. I take
20 notes, but I don't exactly write down everything in a
21 conversation.

22

1  Q  Pay them any money?
2  A  As related to transaction?
3  Q  Correct.
4  A  Answer to that. I don't believe we have
5 paid them anything related to this transaction.
6  Q  Do you understand that subsequently there
7 was an agreement between the parties that the $24,000
8 line item for technical support and upgrades was
9 eliminated from the transaction?
10  A  I was not aware of that.
11  Q  Have you become aware of that at some
12 point?
13  A  Yes.
14  Q  When was the first time you became aware of
15 that.
16  A  This morning.
17  Q  And that was in the process of
18 Mr. Callnin's deposition?
19  A  Yes.
20  Q  Did you at any time become aware that there
21 was a subsequent agreement between the parties to

23

1 reconfigure the product mix that is reflected in the
2 quote received from Sagent?
3  A  You have to repeat that question. I didn't
4 understand it properly.
5  Q  If you take a look at S33, which is the
6 quote, in that box there is a certain product mix.
7 Specifically it talks about one data access server,
8 design studio with report and analysis, administration,
9 and I don't know what else. The line below that reads,
10 "Analytical calculator." Do you see all that?
11  A  Yes.
12  Q  Did you at some point become aware of an
13 agreement between the parties that that product mix
14 would be changed?
15  A  Yes.
16  Q  When did you first learn that?
17  A  This morning.
18  Q  Did you at some point become aware that
19 there was an agreement among the parties that this
20 amount of $136,000 would be amended to reflect
21 $112,000?

24

1  A  Yes.
2  Q  When did you first learn that?
3  A  This morning.
4  Q  And again that was in the context of
5 Mr. Callnin's deposition?
6  A  Yes.
7  Q  Is it your understanding that at some point
8 Sagent ultimately provided MICROS with an amended
9 invoice for this particular transaction reflecting
10 $112,000 as the amount due and owing?
11  A  Yes.
12  Q  When did you first learn that?
13  A  This morning.
14  Q  Let me hand you what we are going to mark
15 as Exhibit Number 2. This is the Sagent Bates number
16 60.
17     (Rogers Deposition Exhibit Number 2 was
18 marked by the reporter.)
19  Q  This is an e-mail from Mr. Tow dated
20 November 26th, 2001 which indicates that you were
21 copied on it. Do you recall receiving that?

25

1  A  Yes.
2  Q  Does it sound correct that you would have
3 received it on or about that date?
4  A  Yes.
5  Q  And Mr. Tom Patz was general counsel for
6 MICROS as of that date?
7  A  Yes.
8  Q  Do you have any idea why Mr. Tow copied
9 Mr. Patz on this e-mail?
10  A  I would have to assume, since Mr. Tow
11 reports directly to Mr. Patz, that he copies him as a
12 matter of course.
13  Q  Have you seen previous instances in which
14 the general counsel for the company has been copied on
15 a billing matter with a vendor?
16  A  No.
17  Q  The second --
18  A  Could be, but I've not been involved in any
19 billing problems where it would have been necessary to
20 put them on that.
21  Q  Second paragraph of this e-mail beginning

7 (Pages 22 to 25)

**Page 30**

1 received this e-mail sixteen, seventeen months later?
2  A    I had a discussion earlier in the year with
3 Mr. Callnin about why weren't we selling this product.
4 Understand, my role is business development, was to
5 oversee, not formally buy product lines, and I would
6 analyze products lines quarterly. So I could see what
7 revenue -- is being sold by a product line. I was
8 alarmed that we had not sold anything, or very little,
9 through the data warehouse product line. And so we met
10 earlier in 2001 really assessing where I was with this
11 product and the lack of sales thereof.
12  Q    When you saw that lack of sales, did you
13 follow up with anyone on your team here at MICROS?
14  A    Spoke with a person, Ed Rothenburg, who was
15 in the restaurant product line, and head of major
16 accounts, Alan Heyman, to say, "We got this product.
17 It doesn't seem to be selling," i.e., the product --
18 our data warehouse product. And really try to push
19 them where are we going with this product, but nothing
20 came of that. Just understand this is a small product
21 after a lot of different products that I look at.

**Page 31**

1  Q    At any point, did you say to anyone here at
2 MICROS or Sagent, "Look, pursuant to our earlier
3 agreement and understanding, we are giving this back to
4 you, and we expect a full refund because we just can't
5 move it"?
6  A    I did not do that. I had really -- I had
7 no contact that I remember from Sagent past my
8 conversation with Mr. VanVeelen in the end of June
9 2000. I told Scott it was his responsibility in terms
10 of the product. I had many other things to do. Really
11 move the product along or do what has to be done in
12 terms of evaluating this product. He was responsible
13 with the sales force.
14  Q    Apart from any conversation you may have
15 had with Sagent personnel, did you ever talk to anyone
16 at MICROS, including Mr. Callnin, expressing the idea
17 that, "Look, we need to -- it's time to send this
18 product back to Sagent and request a full refund
19 because my quarterly numbers show we are not moving
20 it"?
21  A    At this time frame in November 2001 when I

**Page 32**

1 was engaged in discussion as to whether to send it back
2 if we haven't had a customer, we have no purpose of
3 holding it. Let's send it back. It was unopened. We
4 didn't use it. No purpose for it.
5  Q    But in the context and in that
6 conversation, did you also add on to that to make sure
7 we get at full refund?
8  A    Yes. Returning the product would be full
9 refund.
10  Q    This was to who? Mr. Callnin?
11  A    Mr. Tow.
12  Q    Mr. Tow. And again this was in the
13 November 2001 time frame?
14  A    Yes.
15  Q    Are you aware if anyone at MICROS ever
16 expressed in writing, by handwritten note, e-mail, or
17 correspondence, the notion that this product should be
18 returned to Sagent because, again, we are not moving
19 it, and we are entitled to a full refund?
20  A    No.
21  Q    Mr. Rogers, I did not make a copy of this,

**Page 33**

1 and I'm happy to do that and mark it if you want. I
2 don't think it would be necessary. These are I believe
3 the answer to interrogatories that MICROS has provided
4 in this case, and feel free to look through them. Do
5 they look familiar to you?
6  A    Yes.
7  Q    Let me ask you. This is the last page and
8 feel free to look through this. Is that your signature
9 on those answers to interrogatories?
10  A    Yes.
11     MR. PHILLIPS: Do you have any objection to
12 not marking those?
13     MR. TOW: No. That is fine. Not the basis
14 of the questions asked.
15  Q    Did you review these answers to
16 interrogatories in order to ensure their accuracy and
17 completeness?
18  A    Yes.
19  Q    I understand -- and it's certainly not an
20 issue, but I just want to make sure I understand
21 what -- that initially these were signed on your behalf

**micros**

MICROS Systems, Inc.
7031 Columbia Gateway Drive
Columbia, MD 21046-2289
443.285.6000 Telephone
www.micros.com

June 30, 2000

Dan VanVeelen
Regional Manager
Sagent Technology
3601 Eisenhower Avenue
Suite 130
Alexandria, Va 22304

Dear Dan:

This letter serves as a purchase order by MICROS Systems, Inc, PO#6.30.00, for the software and services specified in the attached quote. This order provides for MICROS's purchase of the specified Sagent products to be used by USi Internetworking with MICROS's Insight Product Warehousing Product.

Terms: net 30
Price: Software           $112,000.00  Data Access Package & Analytical Calculator)
       Technical Support    24,000.00
       Total Price        $136,000.00

Bill To and Ship To Address:
MICROS Systems, Inc.
12000 Baltimore Avenue
Beltsville, MD 20705-1291

Please call me if you have any questions.

Sincerely,

Peter J. Rogers, Jr.
Vice President, Business Development & Investor Relations
MICROS Systems, Inc.



DEPOSITION
EXHIBIT
Rogers
1   2-03



# Micros

Exhibit A

**Company Name:** Micros
**Attention:** Peter Rogers
**Address:** 7031 Columbia Gateway Dr.
Columbia, MD 21046

**Sagent Office:** Alexandria, Va
**Sagent Rep:** Dan VanVorkan
**Sagent Tel:** 703-317-3252
**Sagent Fax:** 703-317-2301
**Date:** 6/30/00

**FAX number:** 443-285-0059
**Telephone number:** 443-285-0466

| Sagent Product & Description | Product Includes | License Fee | Qty | Total |
|---|---|---|---|---|
| Sagent Data Mart Solution | Sagent Data Access Package including 1 Data Access Server (2 cpu) 1 Design Studio with Reports & Analysis, Admin, and Automation. | $150,000 | 1 | $150,000 |
| | Analysis Calculator | $10,000 | 1 | $10,000 |
| | Software Subtotal | | | $112,000 |
| | Software Total | | | $112,000 |
| Annual Maintenance & Support | Technical Support & Upgrades | $24,000 | 1 | $24,000 |
| | | | | $136,000 |
| TOTAL INVESTMENT** | | | | $136,000 |

*Annual Maintenance & Support terms and conditions, see attached Support Agreement. Maintenance and Support includes phone and online support, enhancements, and upgrades.

**Additional Terms & Conditions:
1) Applicable tax, handling and shipping are additional.
2) Payment terms Net 30.

Approved
[signature]
6/30/00
VP, Business Development