IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SAGENT TECHNOLOGY, INC. | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. JFM-02-2505 |
| MICROS SYSTEMS, INC., et al | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \*

**SAGENT TECHNOLOGY, INC.'S REPLY TO DEFENDANT'S
OPPOSITION TO MOTION IN LIMINE TO EXCLUDE PAROL EVIDENCE**

Sagent Technology, Inc. ("Sagent"), Plaintiff, by and through undersigned counsel, hereby replies to Micros Systems, Inc.'s ("Micros") Opposition to Sagent's Motion In Limine to Exclude Parol Evidence ("Opposition").

A. <u>The Contract Between Sagent and Micros for the Sale of Software
Is Governed by Article 2 of the UCC and the Parol Evidence Rule
Therein</u>.

The central thrust of Micros' Opposition is that Article 2 of the UCC does not apply to this case and, therefore, the admissibility of the parol evidence identified by Sagent should be analyzed under the common law parol evidence rule. Opposition at 2. Micros contends that software is not considered "goods" and that software licenses are not considered "sales," as those terms are defined under Article 2. Opposition at 2-5. As an initial matter, Micros fails to cite a single case in which a Maryland court has held that Article 2 does not apply to software licenses. Indeed, Micros asserts that Maryland courts, "<u>if presented with the question</u>," would hold that Article 2 does not apply to software licenses. Opposition at 5 (emphasis added). This language underscores the fact that no Maryland court has ever been asked to hold that Article 2 does not

apply to software licenses and, of course, that none has so held.  Although no Maryland case has addressed this question directly, many other courts have and have held that software and software licenses constitute "goods" under Article 2.  Sagent suggests that Micros predicts incorrectly how a Maryland court would treat software in the context of Article 2, if presented with the issue.

Recognizing that the definition of "goods" under Article 2 contemplates items that are tangible, see Md. Code Ann., Com. Law I § 2-105(1) (2003), Micros argues that there is a distinction between the software encoded on a CD-ROM[1] and the physical disc itself, the "vehicle for delivery of the software."  Opposition at 3-4.  Micros contends that although the disc itself may constitute "goods" under Article 2, the encoded software does not.  Id.  The Maryland Court of Appeals has expressly rejected a previous invitation to conceptually sever encoded software from the medium on which it is delivered.  In Comptroller of the Treasury v. Equitable Trust Co., 296 Md. 459, 464 A.2d 248 (1983), the court considered the question of whether software was tangible personal property for the purpose of assessing sales taxes.  The Equitable Trust case is relevant because it reflects that Maryland courts have characterized software as tangible, the cornerstone of the definition of "goods" under Article 2 of the UCC.  In that case, Equitable Trust ("Equitable") had entered into a licensing agreement with AUXCO whereby Equitable was granted the right to use an AUXCO-supplied computer program for a one-time price of $20,000.  296 Md. at 461.  The licensing agreement stipulated that legal title to the software remained with AUXCO.  Id.  Equitable entered into a similar licensing agreement with another software supplier as well.  Id.  The Comptroller assessed sales tax against Equitable

---

[1] It is undisputed that the software that Micros purchased from Sagent was delivered on a CD-ROM.  Callnin Tr. at 59 (Exhibit B hereto); Opposition at 6.

based on the price Equitable had paid pursuant to the licensing agreements, an assessment that was affirmed by the Maryland Tax Court. Id. at 462. Equitable appealed to the Circuit Court for Baltimore City, where the assessment was abated. Id. The Comptroller, in turn, appealed to the Court of Special Appeals but the case was taken by the Court of Appeals. Id.

AUXCO delivered to Equitable "canned" (i.e., not developed exclusively for Equitable's use) software on magnetic tape. Id. at 464. The Comptroller argued that the magnetic tapes on which the software was encoded were personal property and that acquisition of the tapes constituted a "sale" under the taxation statute, defining "sale" to mean "any transaction whereby title or possession, or both, of tangible personal property is or is to be transferred by any means whatsoever for a consideration including rental, lease, or license to use ..." Id. at 466 (emphasis added). In contrast, Equitable posited that the predominant purpose of the transaction was to obtain the program, an intangible, not the tangible tape. Id. As part of its analysis, the Equitable Trust court observed that the predominant purpose test used to determine tax applicability was "quite similar to that which we have used to determine whether a contract of sale is one for goods or services under Art. 2 of the [UCC] ...." Id. at 469. Rejecting the very position espoused by Micros -- that Maryland courts would, if asked, recognize a distinction between software and the medium on which it is delivered -- the Equitable Trust court observed,

> [T]here are problems in adopting a dominant purpose test in order conceptually to sever information or data from the physical medium employed to deliver a copy of the information ....

Id. at 470.

The court ultimately held that the software was tangible personal property subject to the sales tax. Id. at 481. In so concluding, the court expressly rejected Equitable's invitation to

conceptually sever the intangible software encoded on the magnetic tapes from the tangible tapes themselves, the very invitation Micros extends to this court.

> A tape containing a copy of a canned program does not lose its tangible character, because its content is a reproduction of the product of intellectual effort, just as the phonorecord does not become intangible, because it is a reproduction of the product of artistic effort. The price paid for a copy of a canned program reflects the cost of developing the program which the proprietor hopes to recover, with profit, by spreading the cost among its customers.

Id. at 484.

Sagent submits that the Equitable Trust decision stands for the proposition that Maryland law considers software to be tangible and does not support the conceptual severance of the software that Sagent delivered to Micros on CD-ROM from the disc itself, as proposed by Micros. At a minimum, Equitable Trust serves as evidence that a Maryland court, if presented with the question, would not hesitate to conclude that software constitutes "goods" under Article 2 of the UCC. As set forth in Equitable Trust, the disc delivered by Sagent does not lose its tangible character simply because the software encoded thereon is intangible. See also South Central Bell Tel. Co. v. Barthelemy, 643 So.2d 1240, 1246-47 (La. 1994) ("That the software can be transferred to various media ... or even that it can be transferred over the telephone lines[2], does not take away from the fact that the software was ultimately recorded and stored in physical form upon a physical object."). Sagent submits that the Equitable Trust decision supports the proposition that software constitutes "goods" under Article 2 of the UCC. As the tangible disc

---

[2] This statement rejects Micros' suggestion that the fact that software is increasingly delivered over the Internet compels the conceptual severance of the software from the tangible media on which it is delivered. See Opposition at 4.

that Sagent delivered to Micros was undeniably tangible and "movable" at the time of the June 30, 2000 contract, it constitutes "goods" as defined in § 2-105(1) and Article 2 of the UCC governs this transaction.

In further support of its contention that the UCC does not apply to this contract for the sale of goods, Micros refers the Court to the Uniform Computer Information Transactions Act ("UCITA"), codified at Md. Code Ann. Com. Law II §§ 22-101, et seq. Opposition at 5. Micros contends that the legislature's enactment of this statute is evidence that Maryland courts, if asked to do so, would not hold that Article 2 of the UCC applies to software licenses.[3] Opposition at 5-6. However, Micros observes that only 2 states – Maryland and Virginia – have adopted versions of the UCITA. Opposition at 6. It is, of course, beyond dispute that courts in the remaining 48 states have analyzed contracts for the sale of software licenses and – as evidenced by the fact that none of them has seen a need to adopt a version of UCITA – have comfortably analyzed those cases in the context of Article 2 of the UCC. As discussed above, Sagent submits that Maryland courts, too, would hold that Article 2 of the UCC governs contracts for the sale of software.

Micros' reliance upon In re Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d 702 (D. Md. 2001), op. supp'd by, 2001 WL 137254, to support its contention that a contract for the sale of a software license is not a "sale" under Article 2 of the UCC is misplaced. In Microsoft, the Court merely held that consumers who purchased computers that already contained Microsoft software

---

[3] Micros concedes that UCITA took effect only after the June 30, 2000 contract was formed and, therefore, has no substantive bearing on the parties' rights or obligations in this case. Opposition at 5, n.1. It is nonetheless noteworthy that § 22-301 of the UCITA sets forth a parol evidence rule which is nearly *verbatim* of the parol evidence rule in Article 2 (§ 2-202) of the UCC. Md. Code Ann., Com. Law II § 22-301 (2002 Repl. Vol.).

lacked standing to bring certain monopoly and antitrust claims against Microsoft, the manufacturer of the software. Id. at 71-13. The Microsoft decision says nothing about whether contracts for the sale of software fall under the rubric of Article 2. In further support of its contention that Article 2 does not apply to the transaction at issue in the case at bar, Micros contends that a "sale" under the UCC must be accompanied by transfer of title to the goods from seller to buyer. Opposition at 4. Under Maryland law, however, the passage of title is not controlling on the issue of whether a sale has occurred. See Sheeskin v. Giant Food, Inc., 20 Md. App. 611, 318 A.2d 874 (1974), aff'd, 273 Md. 592, 332 A.2d 1 (1975); Giant Food, Inc. v. Washington Coca-Cola Bottling Co., 273 Md. 592, 332 A.2d 1 (1975).

Contrary to Micros' contention, many courts have held that sales of software licenses are governed by Article 2 of the UCC. Downriver Internists v. Harris Corp., 929 F.2d 1147, 1150 (6th Cir. 1991) (sale of software constitutes a sale of "goods" within meaning of UCC); Triangle Underwriters, Inc. v. Honeywell, Inc., 457 F. Supp 765, 769 (E.D.N.Y. 1978), modified, 604 F.2d 737 (2d Cir. 1979), appeal after remand, 651 F.2d 132 (2d Cir. 1981) ("Although the ideas or concepts involved in the custom-designed software remained Honeywell's intellectual property, Triangle was purchasing the products of those concepts" and the contract was therefore one for the sale of "goods" under the UCC); Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 675-76 (3d Cir. 1991) ("[O]nce in the form of a floppy disc or other medium, the program is tangible, moveable and available in the marketplace .... The importance of software to the commercial world and the advantages to be gained by the uniformity inherent in the U.C.C. are strong policy arguments favoring inclusion [of software in the UCC]."); Arlington Elec. Constr. v. Schindler Elevator, 1992 WL 43112 (1992) (Ohio court holding that in agreement

contemplating sale of both hardware and software both are considered "goods" under article 2 of the UCC); Professional Data Processing, Inc. v. D.J. Meyer, Inc., 1992 WL 196289, *4 (software system constitutes "goods" under UCC); Schroder's, Inc. v. Hogan Systems, Inc., 137 Misc.2d 738, 522 N.Y.S.2d 404 (1987)(holding that concept that software is a "good" withing meaning of UCC in combined hardware/software sale should be extended to sales of software alone). Indeed, several courts have that software is sold, not licensed.  See, e.g., RRX Indus., Inc. v. Lab-Con, Inc., 772 F.2d 543, 546 (9th Cir. 1985); Novell, Inc. v. CPU Distrib., Inc. 2000 U.S. Dist. LEXIS 9975 (S.D. Tex. May 4, 2000), summary judgment aff'd in part, denied in part, 2000 U.S. Dist. LEXIS 9952 (S.D. Tex. May 12, 2000); Softman Products Co., LLC v. Adobe Sys. Inc., 171 F. Supp. 2d 1075 (C.D. Calif. 2001).

In summary, Article 2 of the UCC governs the sale of software at issue in this case.  The import of this inevitable conclusion is that it is the parol evidence rule seen in the UCC, not the common law parol evidence rule, that governs and operates to bar admissibility of the statements that are the subject of Sagent's Motion In Limine.

      B.      The Evidence in the Record Establishes That the Parties Intended the June 30, 2000 Contract to Constitute and Reflect Their Final and Complete Agreement.

Micros argues that the June 30, 2000 contract it entered into with Sagent was not intended to, and did not, constitute a final and complete integration of the parties' agreement, and therefore, extrinsic evidence of what the parties intended should be considered.  Opposition at 9. In what can only be characterized as circular reasoning, Micros contends that evidence of the incomplete nature of the June 30, 2000 contract is seen in the fact that it fails to reflect agreement that Micros alleges the parties had reached on the very issues that form the basis of Sagent's

Motion In Limine.  Stated differently, in an effort to prove that the June 30, 2000 contract does not reflect the parties' complete and final agreement, and thereby admit parol evidence, Micros points to the contract's omission of the very parol evidence Sagent seeks to exclude. Specifically, Micros contends that the June 30, 2000 contract is incomplete because it fails to reflect statements allegedly made by Sagent personnel at the June 6, 2000 meeting, including the alleged promise that the parties would work together to service mutual customers, that Sagent would help Micros find clients, that Sagent would accept the software in return for a full refund to Micros, and that Sagent would resell any licenses Micros was unable to sell.[4]  Opposition at 11.  These alleged promises are the very parol evidence that Sagent seeks to exclude in it Motion In Limine.  To allow Micros to cite these alleged promises as a predicate for their admission into evidence is the most transparent example of a "bootstrapping" argument imaginable.

Nonetheless, despite all of the "agreements" that Micros alleges the parties reached, but which it concedes are not reflected in the June 30, 2000 contract or any other writing, the record is replete with evidence of Micros' assent to the contract, including 1) that Peter Rogers wrote "approved" on and signed[5] the price quote Sagent had provided and 2) that Peter Rogers immediately generated a Purchase Order in response to that price quote, attached a copy of the

---

[4] Micros also points to "mathematical ambiguities" that appear on the face of Sagent's price quote. Opposition at 10.  Apart from the fact that Peter Rogers signed the price quote and wrote "approved" on it, as discussed above, the record demonstrates that the parties were absolutely clear that the value of the initial contract was $136,000 and that the value after deletion of the maintenance and support component was $112,000.  Callnin Tr. at 29 (Exhibit B hereto).

[5] In Brawley v. United States, 96 U.S. 168, 173, 24 L.Ed. 622 (1877), the Supreme Court underscored the significance of a party's signature on a contract: "If the contract did not express the true agreement, it was the claimant's folly to have signed it."

price quote to that Purchase Order, and sent it to Sagent.  Rogers Tr. (Exhibit A hereto) at 21, 12 ("The decision [to purchase the software from Sagent] was made on the 30th of June."), 19 (".... authorizing acquisition of the [software]."), 44 ("I just know that I placed an order for software.").  Sagent submits that this uncontroverted evidence reflects that Micros had no misconceptions about the completeness and finality of the June 30, 2000 contract or that the contract indeed reflected the final and complete expression of the parties' agreement.

Assuming, *arguendo,* that the parties had reached agreement on the issues itemized in Micros' Opposition – a position flatly contradicted by the record – and the contract failed to reflect those agreements, that fact alone would not automatically compel the conclusion that the June 30, 2000 contract fails for indefiniteness.  Section 2-204(3) makes clear that "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract ..."  Md. Code Ann., Com. Law I § 2-204(3).   Indeed, this Court has held that the parties' conduct is frequently conclusive on the question of whether a contract was truly formed, despite certain omissions in the contract.  See Editors Press, Inc. v. United States, 415 F. Supp. 407 (D. Md. 1975).[6]

The conduct of Sagent and Micros after June 30, 2000 compels the conclusion that both parties considered the June 30, 2000 contract to be a final and complete expression of their agreement.  Micros concedes, for instance, that there is not a single writing that reflects that the parties had ever discussed -- let alone reached agreement on -- any of the alleged promises set

---

[6] The presence or absence of an integration clause is not dispositive on the question of whether a written contract was intended as a conclusive expression of the parties' agreement.  Shoreham Developers v. Randolph Hills, 248 Md. 267, 235 A.2d 735 (1967).

forth on page 11 of its Opposition. Rogers Tr. at 32, 49 (Exhibit A hereto); Callnin Tr. at 68-71 (Exhibit B hereto). This fact is particularly compelling in light of Peter Rogers' admission that he considered Sagent's alleged agreement to accept the software from Micros in return for a full refund to be an "important" concession. Rogers Tr. at 18 (Exhibit A hereto). Indeed, although Rogers took notes at both the May 10, 2000 and June 6, 2000 meetings with Sagent – where Sagent is alleged to have made this "important" concession – those notes fail to make even a single reference to the alleged concession. Rogers Tr. at 51-52, 55-58 (Exhibit A hereto).[7] Additionally, despite the many e-mails exchanged between representatives of Sagent and Micros after June 30, 2000, there is not a single reference to any of the "promises" itemized on page 11 of Micros' Opposition. In fact, those e-mails consistently reflect Micros' repeated promises to make payment to Sagent for the software it had purchased on June 30, 2000 and that the only impediment to that payment being made was Sagent's inability to provide a corrected invoice, which Sagent ultimately provided on October 18, 2001.[8] Callnin Tr. at 35-36, 54-55 (Exhibit B

---

[7] Micros cites pages 77-78 and 81 of the Van Veelen deposition, and Exhibits 9 and 10 thereto, to rebut Sagent's contention that Micros never confirmed in writing the "important" concession it alleges Sagent had made. Opposition at 13. However, there is absolutely no discussion in any of those citations of Sagent's alleged agreement to accept the software in return for a full refund to Micros.

[8] Although Micros alleges that Sagent repeatedly attempted to "modify the invoice and product mix in an attempt to convince Micros to transform the Conditional Purchase Order into an unconditional and binding agreement ...", see opposition at 15, Scott Callnin's testimony and the documentary evidence in the record make it clear that it was Micros that requested that the maintenance component of the June 30, 2000 contract be deleted, a request that Sagent accommodated. See Exhibit F to Sagent's Motion In Limine at S00021 (Callnin to Van Veelen: "I'd like to take the $24,000 for support off the Rogers' purchase. ... Let me know if that is acceptable."); Callnin Tr. at 30-31 (Exhibit B hereto) ("[the parties] had had verbal agreement sometime not too long after the initial meeting in [sic] June 6th, 2000 about making the changes to the software mix ...").

hereto). If Micros truly believed that Sagent agreed to accept the software in return for a full refund, one must question why Micros has never requested yet another corrected invoice from Sagent reflecting a zero balance. Finally, if Micros considered the "full refund" agreement to be a matter the parties had undoubtedly agreed upon, one must question why – in reliance on that agreement – Micros did not initially pay Sagent for the software it had purchased, knowing that Sagent had agreed to accept the return of the software for a full refund if it Micros could not resell it. Sagent submits that the fact that Micros did not take this course of action reflects that Micros never considered the "full refund" notion to be a matter on which the parties had agreed.

Sagent submits that this evidence of the parties' post-contractual conduct demonstrates clearly that both parties considered and intended the June 30, 2000 contract to express their final and complete agreement on this sale. Accordingly, the parol evidence rule seen in § 2-202 of the UCC bars parol evidence to contradict, vary or explain any terms of the contract.[9]

Finally, Micros attempts to distinguish Snyder v. Greenbaum & Assocs., Inc., 38 Md. App. 144, 380 A.2d 618 (1977), cited by Sagent. Opposition at 12. In Snyder, the defendant had unilaterally canceled a contract with the plaintiff and, at trial, attempted to introduce evidence showing that the parties had routinely granted one another a unilateral right of cancellation. 38 Md. App. at 149. The trial court excluded this parol evidence and the appeals court affirmed that ruling, concluding that a right of unilateral cancellation was of such import that it would have

---

[9] Although Micros contends that the fraud exception to the common law parol evidence rule applies and serves as a basis for the admission of the statements in question, Sagent posits that it is the Article 2 parol evidence rule that governs this case. That parol evidence rule contains no fraud exception. Md. Code Ann. Com. Law I § 2-202. Moreover, as set forth in Sagent's Motion to Dismiss the Counterclaim, Micros' fraud and negligent misrepresentation claims should be dismissed.

been reflected in the written contract had the parties intended such a right. <u>Id.</u> at 151-52. Micros attempts to distinguish factually the <u>Snyder</u> case from the case at bar by contesting that the record in the instant case fails to reflect evidence that the parties negotiated the terms of the June 30, 2000 contract. Opposition at 12. However, the record is replete with evidence of such negotiations. Scott Callnin testified, for instance, that although he was not involved in the "negotiations," he attended a pre-contract meeting where he was asked his thoughts regarding what "future prospects" might be available to Micros. Callnin Tr. at 22 (Exhibit B hereto). Callnin also discussed the rough parameters the parties discussed at that meetings. Callnin Tr. at 25 (Exhibit B hereto); <u>see also</u> Rogers Tr. at 55-57 (Exhibit A hereto)(discussing negotiations with Sagent regarding the number of licenses to be purchased and the payment terms). Indeed, the allegedly false "promises" and misrepresentations that Micros alleges Sagent personnel made are alleged to have been made at meetings on May 10, 2000 and June 6, 2000. Opposition at 11; Micros Counterclaim at ¶¶ 6-7. It is facially inconsistent for Micros to argue that Sagent made certain false promises and misrepresentations at meetings held several weeks before the June 30, 2000 contract, but to also contend that the parties never negotiated that contract. <u>See also</u> Rogers Tr. at 18 (Exhibit A hereto) (characterizing as "important" Sagent's alleged agreement to accept the software in return for a full refund). Accordingly, <u>Snyder</u> is not factually distinguishable from the case at bar and the its holding should apply here.

      C.    <u>The Statute of Frauds</u>

In its Opposition, Micros argues that the statute of frauds argument raised in Sagent's Motion In Limine is irrelevant. Opposition at 14-15. Micros is, of course, correct that logically

modifications to a contract can occur only after a contract has been formed, and that the statements that Sagent considers to be inappropriate parol evidence occurred before the June 30, 2000 contract was formed. Sagent contends, however, that a contract was formed on June 30, 2000 and that Micros' efforts to introduce into evidence any statements allegedly made by Sagent personnel at the May 10, 2000 or June 6, 2000 meetings, see Micros' Counterclaim at ¶¶ 6-7, are barred not only by the parol evidence rule, but also by the statute of frauds. Sagent's argument in this regard is admittedly moot if Micros does not contend -- as an alternative basis for admissibility -- that those statements are admissible as modifications to the June 30, 2000 contract between the parties. However, to the extent that Micros raises such an argument, the UCC statute of frauds bars admissibility of these statements as the contract at issue is one for the sale of goods in excess of $500. See Md. Code Ann., Com. Law I § 2-209(3) and Off. Cmt. 3 thereto.

Finally, Micros does not contest Sagent's contention that § 2-326(3) of the UCC requires that any agreement that delivered goods – even though they conform to the contract – may be returned by the seller must be in writing. Md. Code Ann., Com. Law I § 2-326(3). Accordingly, any attempt by Micros to infer an unwritten agreement between the parties whereby Micros could return the software to Sagent for a full refund under any circumstance is barred by the statute of frauds.

### D.   Course of Dealing

Micros concedes in its Opposition that it does not rely upon the "course of dealing" exception set forth § 2-202(a) of the UCC as a predicate for the admissibility of the parol

evidence that forms the basis of Sagent's Motion In Limine. Opposition at 14, n.2.

## CONCLUSION

For the foregoing reasons, and those set forth in Sagent's Motion In Limine, Sagent respectfully requests that the Court grant its Motion In Limine.

Respectfully submitted,

*Scott H. Phillips*
Scott H. Phillips, #013244
SEMMES, BOWEN & SEMMES
250 W. Pratt Street
Baltimore, Maryland 21201
(410) 539-5040

Counsel for Sagent Technology, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of April, 2003, a copy of the foregoing Reply to Defendant's Opposition to Motion In Limine to Exclude Parol Evidence was filed and served electronically on all counsel of record.

*Scott H. Phillips*
Scott H. Phillips

(B0338357.WPD;1)