1

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MARYLAND

2

SAGENT TECHNOLOGY, INC     *     CIVIL ACTION JFM-02-2505
3            Plaintiff
                           *
4      vs.                       Baltimore, Maryland
                           *
5   MICROS SYSTEMS, INC.
              Defendant    *     January 22, 2003
6            *      *      *      *      *

7            Deposition of PETER ROGERS, JR., a witness

8   of lawful age, taken on behalf of the Plaintiff in the

9   above-entitled cause, pending in the District Court of

10  the United States for the District of Maryland, before

11  Dawn L. Venker, a Notary Public in and for Baltimore

12  County, Maryland, at 7031 Columbia Gateway Drive,

13  Columbia, Maryland 21046, on the 22 day of January,

14  2003.

15            *      *      *      *      *

16  APPEARANCES:

17            SCOTT H. PHILLIPS, Esquire
                 For the Plaintiff

18
              MICHAEL H. TOW, Esquire
19               For the Defendant

20

21  Reported By:  Dawn L. Venker

GORE BROTHERS Reporting & Video Co., Inc.          Towson
410-837-3027

EXHIBIT

A

10

1 the morning of June 6th, or thereabouts -- it was on

2 June 6th.

3    Q    2000?

4    A    2000. We were visited by Vincent

5 DeGennaro, Gene Garrett, and Dan VanVeelen. Purpose of

6 the meeting -- they requested the meeting. I believe

7 Vince was -- Mr. DeGennaro was traveling with Gene

8 assessing prospects as a corporate relationship at the

9 same time really feeling out, assessing with MICROS,

10 purchases of additional licenses.

11        At the meeting, they expressed that they

12 were going to give us an offer for all licenses. They

13 left. Later that afternoon I received a call from Mr.

14 Garrett where he gave me verbally over the phone an

15 offer. I believe five licenses, ten licenses, and

16 fifty licenses.

17    Q    You said "we" a couple of times. Was there

18 any other MICROS representative present at that June

19 6th meeting?

20    A    Scott Callnin was in the meeting along with

21 myself.

11

1    Q    So it was you and Mr. Callnin,

2 Mr. VanVeelen, Vincent DeGennaro, and Gene Garrett?

3    A    Correct.

4    Q    Did you take any notes during that June 6th

5 meeting?

6    A    Yes.

7    Q    And that meeting was held here?

8    A    Yes.

9    Q    And when Mr. Garrett called you later that

10 same day, did you take any notes on that telephone

11 call?

12    A    Yes.

13    Q    Have you produced either of those sets of

14 notes to Mr. Tow in that case?

15    A    Yes.

16    Q    What, if anything, followed on the

17 telephone call from Mr. Garrett once he had offered you

18 the several licenses?

19    A    There were several phone calls. I cannot

20 tell exactly how many, but at least two from Gene

21 Garrett -- Mr. Garrett, as well as at least one from

12

1 Dan VanVeelen assessing if we were going to accept the

2 offer of purchasing licenses.

3    Q    And these calls came in subsequent days I

4 assume?

5    A    Yes, sir.

6    Q    Did you take any notes on those subsequent

7 telephone calls?

8    A    No.

9    Q    Did there come a time when you called

10 Mr. Garrett back or Mr. VanVeelen to advise him of a

11 decision the company had made in that regard?

12    A    The decision was made on the 30th of June.

13        Little background. The calls from Gene on

14 the 6th. He was quite concerned about his quarter --

15 his standing at the company. They had missed numbers,

16 i.e., financial results. It was a lot of pressure, and

17 we had met prior -- a month ago and developed a pretty

18 good rapport as Mr. Callnin expressed just in the

19 relationship meeting back in early May. He had gone to

20 Wake Forest. So we talked about ACC basketball. He

21 had run track for Wake Forest. I had run track for

13

1 Penn. So developed a good rapport and clearly wasn't a

2 term of partnership.

3        So we built upon that. Didn't feel

4 negative. We are partners. We need to make numbers.

5 If we don't make numbers, may not be here. That was on

6 June 6th.

7    Q    That was Mr. Garrett on June 6th?

8    A    Mr. Garrett. Now, they expressed in that

9 meeting that morning that they were going to give us an

10 offer, and that they would work with us. And it would

11 be substantial in terms of licenses.

12    Q    Did they elaborate any on the notion that

13 we'll work with you?

14    A    Yes. They expressed that they will work

15 with us.

16    Q    Did they get more specific in terms of how

17 they would work with you?

18    A    That they would resell it. They talked a

19 large quantity, and that they would refund if

20 necessary. But they clearly preferred to resell it or

21 work through the channel. But they expressed their



18

1    Q    When you say "specific numbers," do I
2  understand that to be the number of licenses and the
3  exact discount that Sagent was offering you, those
4  sorts of things?
5    A    Yes.
6    Q    Did you consider the representation that
7  Sagent had made regarding return of the product for a
8  full refund an important statement made by the company
9  at that time?
10   A    Yes.
11   Q    Let me hand you, Mr. Rogers, what we'll
12 mark as Exhibit Number 1.
13        (Rogers Deposition Exhibit Number 1 was
14 marked by the reporter.)
15   Q    I'll ask you if you can identify that, sir?
16   A    This is a memo that I generated to Dan
17 VanVeelen providing a purchase order for MICROS to
18 Sagent to acquire the data access package and
19 analytical calculator.
20   Q    That is your signature at the bottom of the
21 first page there?

19

1    A    Yes.
2        MR. PHILLIPS:  For the record, Exhibit 1 is
3  comprised of a two-page document bearing Sagent Bates
4  numbers 32 and 33.
5    Q    What was your understanding as of June
6  30th, 2000 as to who Mr. VanVeelen was?
7    A    Mr. VanVeelen was the regional manager who
8  was the direct sales contact and technical contact to
9  MICROS from Sagent.
10   Q    Did you actually type this letter on your
11 computer?
12   A    Yes.
13   Q    And you read it before you signed it
14 obviously?
15   A    Yes.
16   Q    And on page 2 of this document, which is
17 S33, can you identify that for me?
18   A    This is the quote provided from Sagent to
19 myself that I was to attach to the letter authorizing
20 the acquisition of the product.
21   Q    Now, I think that the -- I'll admit that

20

1  the print on this is somewhat fuzzy because it has been
2  copied a number of times, but it looks like the date on
3  this price quote is June 20th, 2000.  Do you see that
4  in upper right?
5    A    6-20.
6    Q    Does that sound about right in terms of
7  when you received this price quote from Sagent?
8    A    I don't remember, but quite conceivably.
9    Q    Let me ask you to look down in the box
10 there.  There is an item for technical support and
11 upgrades.  Do you see that?
12   A    Yes.
13   Q    And to the right of that there's a printed
14 number that has been stricken through, and then it
15 looks like someone wrote 24,000 in place of that.  Do
16 you see that?
17   A    Yes.
18   Q    Do you know who did that?
19   A    No.
20   Q    Do you know why that would have been done?
21   A    I think the far right -- I believe that the

21

1  license fee number was different than the total.  This
2  was a matter of matching up.
3    Q    And is that your signature at the bottom of
4  this page?
5    A    Yes.
6    Q    How about the handwriting above and below
7  it which reads, "Approved June 30, 2000.  VP business
8  development."
9    A    That is my handwriting.
10   Q    Now, does the purchase order that you
11 issued on June 30th, 2000 reflect the same product mix
12 and price that is seen in the quote received from
13 Sagent?
14   A    Yes.  As far as my knowledge.  My cover
15 letter designated the software number and the technical
16 support number.
17   Q    Is it your contention that MICROS has paid
18 to Sagent any portion of the $136,000 reflected on both
19 the quote and your purchase order?
20   A    I have no contention.  I'm not aware of us
21 paying them.

GORE BROTHERS Reporting & Video Co., Inc.          Towson Reporting Company
410-837-3027                                        410-828-4148

30

1 received this e-mail sixteen, seventeen months later?

2    A    I had a discussion earlier in the year with

3 Mr. Callnin about why weren't we selling this product.

4 Understand, my role is business development, was to

5 oversee, not formally buy product lines, and I would

6 analyze products lines quarterly. So I could see what

7 revenue -- is being sold by a product line. I was

8 alarmed that we had not sold anything, or very little,

9 through the data warehouse product line. And so we met

10 earlier in 2001 really assessing where I was with this

11 product and the lack of sales thereof.

12    Q    When you saw that lack of sales, did you

13 follow up with anyone on your team here at MICROS?

14    A    Spoke with a person, Ed Rothenburg, who was

15 in the restaurant product line, and head of major

16 accounts, Alan Heyman, to say, "We got this product.

17 It doesn't seem to be selling," i.e., the product --

18 our data warehouse product. And really try to push

19 them where are we going with this product, but nothing

20 came of that. Just understand this is a small product

21 after a lot of different products that I look at.

31

1    Q    At any point, did you say to anyone here at

2 MICROS or Sagent, "Look, pursuant to our earlier

3 agreement and understanding, we are giving this back to

4 you, and we expect a full refund because we just can't

5 move it"?

6    A    I did not do that. I had really -- I had

7 no contact that I remember from Sagent past my

8 conversation with Mr. VanVeelen in the end of June

9 2000. I told Scott it was his responsibility in terms

10 of the product. I had many other things to do. Really

11 move the product along or do what has to be done in

12 terms of evaluating this product. He was responsible

13 with the sales force.

14    Q    Apart from any conversation you may have

15 had with Sagent personnel, did you ever talk to anyone

16 at MICROS, including Mr. Callnin, expressing the idea

17 that, "Look, we need to -- it's time to send this

18 product back to Sagent and request a full refund

19 because my quarterly numbers show we are not moving

20 it"?

21    A    At this time frame in November 2001 when I

32

1 was engaged in discussion as to whether to send it back

2 if we haven't had a customer, we have no purpose of

3 holding it. Let's send it back. It was unopened. We

4 didn't use it. No purpose for it.

5    Q    But in the context and in that

6 conversation, did you also add on to that to make sure

7 we get at full refund?

8    A    Yes. Returning the product would be full

9 refund.

10    Q    This was to who? Mr. Callnin?

11    A    Mr. Tow.

12    Q    Mr. Tow. And again this was in the

13 November 2001 time frame?

14    A    Yes.

15    Q    Are you aware if anyone at MICROS ever

16 expressed in writing, by handwritten note, e-mail, or

17 correspondence, the notion that this product should be

18 returned to Sagent because, again, we are not moving

19 it, and we are entitled to a full refund?

20    A    No.

21    Q    Mr. Rogers, I did not make a copy of this,

33

1 and I'm happy to do that and mark it if you want. I

2 don't think it would be necessary. These are I believe

3 the answer to interrogatories that MICROS has provided

4 in this case, and feel free to look through them. Do

5 they look familiar to you?

6    A    Yes.

7    Q    Let me ask you. This is the last page and

8 feel free to look through this. Is that your signature

9 on those answers to interrogatories?

10    A    Yes.

11        MR. PHILLIPS: Do you have any objection to

12 not marking those?

13        MR. TOW: No. That is fine. Not the basis

14 of the questions asked.

15    Q    Did you review these answers to

16 interrogatories in order to ensure their accuracy and

17 completeness?

18    A    Yes.

19    Q    I understand -- and it's certainly not an

20 issue, but I just want to make sure I understand

21 what -- that initially these were signed on your behalf

42

1 believe that is escalating.
2 Q That's a component of damages that you are
3 alleging in this case?
4 A I'm not sure how to answer that.
5 Q Have you been asked to provide any
6 information with regard to the damages that are alleged
7 and are prayed for in the counter-claim?
8 A No.
9 Q I think that's all I have for you on that
10 one. Thank you.
11 MR. TOW: Should we mark that now and copy
12 it later?
13 MR. PHILLIPS: Well, at the end of the
14 deposition as Exhibit Number 3 the answers to
15 interrogatories which Mr. Rogers has been asked about
16 and has spoken to this morning -- this afternoon.
17 (Rogers Deposition Exhibit Number 3 was
18 marked by the reporter.)
19 Q You heard Mr. Callnin speak this morning
20 about the 12000 Baltimore Avenue address in Beltsville,
21 correct?

43

1 A Yes.
2 Q And he also testified I believe that at
3 least as of the fall 2000 time frame the receiving
4 department was at that address?
5 A Yes.
6 Q Do you know who worked in the receiving
7 department in Beltsville as of that time?
8 A Specifically, no. I may know of some
9 people that were in shipping or receiving. Sort of a
10 general term.
11 Q Do you know who received the Sagent
12 software that was received at that address in the fall
13 2000 time frame?
14 A No.
15 Q Do you know -- would you agree with Mr.
16 Callnin that the Sagent software was, in fact, received
17 at the Beltsville location in fall 2000 time frame?
18 A I'll say it was received at the Beltsville
19 location. I don't know the exact date.
20 Q You don't -- you are not contending that
21 the Sagent was never shipped to MICROS by Sagent?

44

1 A I'm not contending that at all.
2 Q That would have included the analytical
3 calculator? Are you contending that Sagent never
4 shipped that?
5 A I'm not contending that they didn't. I
6 just know that I placed an order for software.
7 Q Did you receive confirmation from anyone at
8 MICROS that the totality of that order had, in fact,
9 been received from Sagent at some point?
10 A I received indication that a package was
11 delivered. Specific contents -- I actually physically
12 received the package from the people in Beltsville. So
13 I physically received a box, and I, in turn, then
14 turned it over to Mr. Callnin. I did not open it. I
15 do not know the date of receipt.
16 Q You heard Mr. Callnin talk this morning
17 about what he in turn did with that box, namely put it
18 on the shelf, right?
19 A Yes.
20 Q Is that -- is your understanding consistent
21 with that testimony?

45

1 A I have no reason to dispute that.
2 Q Do you know if MICROS made any copies of
3 software at any time?
4 A I do not know. We have a corporate policy
5 against copying software illegally.
6 Q Is it your understanding that at some point
7 the software was returned to Sagent?
8 A Yes.
9 Q Do you know when?
10 A Approximately December 2001.
11 Q Do you have an understanding as to whether
12 the return of the software to Sagent occurred in one
13 mailing or two mailings or more?
14 A I don't know.
15 Q You heard Mr. Callnin talk this morning
16 about how the software was treated for tax purposes
17 while it was physically here at MICROS. Do you recall
18 that testimony?
19 A I do not.
20 Q You don't recall that testimony?
21 A No, I do not.

Peter Rogers, Jr. - 1/22/03

46

1    Q    You may have been out of the room.  Do you
2 have an understanding as to how MICROS treated the
3 software for tax purposes while it was here?
4    A    I don't know specifically.
5    Q    Do you know generally?
6    A    Treated as an asset because it was no sale
7 for that at that point in time.  That's how I would
8 treat, it knowing, accounting.  I bought an asset,
9 because there no sale behind it at that point.  This
10 was done in advance of expected hope for future sales.
11    Q    And you have your MBA, correct?
12    A    Yes, sir.
13    Q    Would the treatment of the software as an
14 asset by MICROS be reflected in the corporate tax
15 returns of the company?
16    A    It would be reflected if treated as a asset
17 in the asset side.
18    Q    Would I be able to find a line item
19 somewhere -- I assume that the asset side ultimately
20 comes down to one number, correct?
21       MR. TOW:  Objection as to form.

47

1    Q    I assume that the asset side of the ledger
2 sheet would ultimately be reflected in one number.
3 Would that be correct?
4    A    Yes.
5    Q    And that number in turn would be derived
6 from a series of line items above it, correct?
7    A    Correct.
8    Q    Would I be able to identify as a line item
9 on the asset side of the ledger sheet this particular
10 software from Sagent?
11    A    Theoretically assuming if recorded
12 properly, yes.
13    Q    Have you at any time while you have been
14 employed by MICROS negotiated with vendors regarding
15 the terms of any price quote that they have provided to
16 you?
17    A    Yes.
18    Q    Have you on any of those occasions had
19 disagreements with any of the terms reflected in that
20 written price quote?
21    A    I'm not sure disagreement.  I would have

48

1 discussion, or I would object to something, would no
2 accept it.
3    Q    How would you express that disagreement or
4 objection back do that vendor?
5    A    Either verbally or in writing.  Nowadays
6 generally by e-mail, but generally could be in writing
7 or e-mail.
8    Q    Is it your typical practice to reflect
9 somewhere in writing, whether it is an e-mail or a
10 letter, the terms of a collateral agreement that MICROS
11 had reached with that particular vendor regarding a
12 particular transaction?
13    A    Not always.  Very specific on the numbers
14 to what we have to pay.  Focus on the numbers and/or
15 payment terms.
16    Q    Earlier you indicated that the
17 representations that were made at the June 6th meeting
18 and in the June 6th telephone call by Sagent were
19 important to you in this transaction, correct?
20    A    Yes.
21    Q    Something that is elevated to that level,

49

1 would you typically confirm that in writing?
2    A    For something of magnitude of buying fifty
3 licenses, yes.
4    Q    I don't necessarily mean the fifty
5 licenses.  I mean would you confirm back to Sagent in
6 writing the notion that they had said, "Look, we'll
7 take this stuff back if you can't move it, and we'll
8 give you a full refund"?
9    A    I may in the past.  I don't remember
10 specifically.
11    Q    But you certainly didn't do it in this
12 specific instance?
13    A    No.
14    Q    Are you aware -- I'm going to ask the flip
15 side of that question.  Are you aware of any
16 documentation from Sagent to MICROS which set forth
17 their agreement to accept for a full refund the
18 software if you couldn't move it?
19    A    No.
20    Q    Are you aware of any documents to or from
21 either MICROS or Sagent which reflects the notion that

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148

50

1 the contemplated transaction in Exhibit Number 1 was
2 conditional upon anything at all?
3    A    It was implied because we had a partnership
4 arrangement with Sagent, and then we purchased --
5 however we define it -- acquired a package with
6 expectations that we had prospects coming up in the
7 fall. And we purchased that or acquired it because it
8 was a requirement to get the product on the Sagent --
9 USi data warehouse. So we had to get a demo package
10 going in order to sell it to customers.
11        So I purchased, acquired one package to get
12 the minimum required for the project to succeed. To
13 get up and have a demo package. After that, my
14 involvement really ended. I was just involved for a
15 two-month period looking at the business relation.
16 Actual execution I had no role in.
17    Q    And that two-month period was early on in
18 the May to June 2000 time frame?
19    A    Correct.
20    Q    Mr. Rogers, let me hand you what will be
21 marked as Exhibit Number 4.

51

1        (Rogers Deposition Exhibit Number 4 was
2 marked by the reporter.)
3    Q    Have you at any time prior to today seen
4 that document?
5    A    No.
6    Q    Let me hand you Exhibit Number 5.
7        (Rogers Deposition Exhibit Number 5 was
8 marked by the reporter.)
9        MR. PHILLIPS: For the record, this bears
10 documents MICROS Bates number 161 through 163.
11    Q    Do you recognize any of the handwriting
12 here?
13    A    Yes.
14    Q    Do you recognize all of the handwriting?
15    A    Yes.
16    Q    Whose handwriting is it?
17    A    Mine.
18    Q    And can you tell me what this reflects?
19    A    The first page 000161 reflects my notes
20 from a meeting I believe dated 5-10-00. I didn't put
21 '00 in, but May 10th.

52

1    Q    2000?
2    A    Correct. With Gene Garrett and Dan
3 VanVeelen.
4    Q    It was just the three of you in this
5 meeting?
6    A    Scott Callnin was in the meeting also.
7    Q    Is there any reason his name would not be
8 reflected as an attendee.
9    A    No. Just he's a MICROS person. I put down
10 people generally outside. NonMICROS.
11    Q    And where did that meeting occur?
12    A    Here in the Columbia office building.
13    Q    And one of the issues addressed during that
14 meeting was the transaction contemplated in Exhibit
15 Number 1, the 63000 purchase order?
16    A    No. This meeting related to the current
17 agreement that we had with Sagent that was a
18 partnership. When I got involved in the project in
19 April and learned more about the economics, I was
20 somewhat alarmed that we would sell the product and we
21 had to share it 50-50 with Sagent. At the same time,

53

1 we had to buy software from Sagent and sell it, and,
2 you know, fifty percent of the profit and the sales
3 would be going back to Sagent. So we can make very
4 little on the intellectual property. Do all the sales
5 effort, and any type of consulting, then again we had
6 to pay Sagent. We'd split 50-50. I thought that this
7 product under current relationship was uneconomical for
8 MICROS.
9    Q    You were referring to the joint
10 intellectual property agreement?
11    A    If that's how it is recorded. I would say
12 the business relationship. When we enter into a deal
13 with an end user, that fifty percent of the proceeds
14 would go to Sagent.
15    Q    Did the June 30, 2000 purchase order come
16 up in this May 10, 2000 meeting at all?
17    A    No.
18    Q    I can read -- if I could, ask you to flip
19 back. I can read a lot of this, but some of it I
20 can't. Particularly the --
21    A    My handwriting isn't very good.

Peter Rogers, Jr. - 1/22/03

54

1    Q    -- the fifth line down. The one below
2  "Insight agreement." The line below that. Something
3  "platform"?
4    A    We had discussed -- I had discussed with
5  Dan VanVeelen I believe in April -- I was put in touch
6  with him via Scott, and I was asked to really intercede
7  in that program back in April by Mr. Rovani because the
8  first product we were going to bring up was the Insight
9  product on the USi. John had no knowledge about that.
10        So I worked with Scott's group and Tony
11  Seville. What's this business look like? And then I
12  found out about the economics of the deal, and as a
13  corporate officer somewhat alarmed. This is a large
14  company. Certain projects get sort of lost at times.
15        So I was involved really looking at that.
16  How do we improve the economics? Are we going to sell
17  it? How do we get this coming up? And I was concerned
18  literally about the economics.
19        So I believe that I spoke with Dan in April
20  and asked him how else can we restructure this, and so
21  this meeting I believe was prompted by Dan to really

55

1  talk about moving us off of a shared 50-50 to an OEM
2  agreement, i.e., my comment down below, "Formulate an
3  OEM," which means original equipment manufacturer
4  agreement. That we would buy the product and then
5  resell it.
6    Q    Can you read for me the last two
7  paragraphs?
8    A    "Goal to enter an OEM agreement.
9  Multi-year. Three-year. Formulate an OEM."
10    Q    And the paragraph below?
11    A    "Maintenance fee per customer. Ease to
12  administer for an annual fee. Adjustable annually.
13  For install base."
14    Q    Again, this had nothing specifically to do
15  with the two data load or the analytical calculator
16  that are contemplated in the June 30 purchase order?
17    A    That's correct.
18    Q    Let's turn to the next two pages. I assume
19  these next two reflect your notes from June 6th, 2000
20  meeting?
21    A    Yes.

56

1    Q    We have spoken at some length already about
2  that meeting, correct?
3    A    Yes.
4    Q    And, of course, this meeting did have to do
5  with the software package that we are talking about in
6  this case, right?
7    A    Yes.
8    Q    The third block down there below
9  "discussion," can you read that one for me?
10    A    "Prepurchase of software-possibility. Give
11  us a price for five and ten licenses."
12    Q    And how about the next line below that?
13    A    I would have had a phone call with a person
14  called Ms. Sherry Maye. So I would have logged that
15  call in after that meeting. So the line going down
16  below, "Scheduled me. Cofounder." The comments,
17  "Start up Internet company. Broadvision." Had nothing
18  to do with Sagent. Just my notes on the page.
19    Q    Did the Sherry Maye call have anything to
20  do with Sagent?
21    A    No.

57

1    Q    And then the Gene Garrett reference with a
2  telephone number, correct?
3    A    Correct.
4    Q    And below that, "Five packages. Ten
5  packages. Fifty packages" and the corresponding dollar
6  amount next to each, correct?
7    A    Yes.
8    Q    And the first line of page 163?
9    A    I wrote down comments. "Payment terms."
10  Told me when we could pay. "One-third. One-third.
11  One-third." I can only -- forget what the one-third,
12  one-third, one-third meant. And "per package fifty
13  percent. $100,000." I forget what that referred to.
14    Q    The next gentleman with a telephone number
15  and "security consultant." Does that have anything to
16  do with this case?
17    A    No.
18    Q    And below that June 7 I believe?
19    A    Correct.
20    Q    What is that?
21    A    That looks as though that is comments. We

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148

58

1 would sit down and discuss the upcoming preparation of
2 the MICROS 10K. No relationship to Sagent.
3    Q    And that takes us down to -- is it POA2?
4    A    Part two.
5    Q    Does that have anything to do with the
6 Sagent transaction?
7    A    No.
8    Q    And then we are down to January 8th?
9    A    Uh-huh.
10    Q    And "Mike Weintraub." Does that block of
11 handwriting through the bottom of the page have
12 anything to do with this case?
13    A    No.
14    Q    We've talked about the fact that page 161
15 reflects your notes on a May 10th, 2000 meeting,
16 correct?
17    A    Yes.
18    Q    That had nothing to do with this particular
19 case, right?
20    A    In terms of the specific product purchased,
21 no, but I would say that they are somewhat connected

59

1 just because they were Sagent.
2    Q    Let me ask you this. That is fair enough.
3 During the May 10th, 2000 meeting, did any Sagent
4 representative express at that time the notion that the
5 product contemplated in the purchase order could be
6 returned for full credit if you all couldn't use it?
7    A    No.
8    Q    One of the allegations in the counter-claim
9 is that MICROS selected to license this software
10 directly with Sagent based in substantial part on the
11 representations made by Sagent personnel, and my
12 question to you is about that phrase "in substantial
13 part." That leads me to believe that there were other
14 factors that led to that decision by MICROS. Are you
15 aware of yours?
16    A    I don't understand the definition "in
17 substantial part."
18    Q    Do you have an understanding as to why
19 MICROS ultimately elected to license this software
20 directly with Sagent?
21    A    Because we had back in I believe the 1998

60

1 time frame when we started working this product
2 somewhat MICROS selected Sagent software. In turn we
3 were dealing with a company called Talus. Talus was
4 bought by Sagent. So deal with Talus. We dealt with
5 Sagent. Historical relationship.
6    Q    Did the direct licensing of the software
7 with Sagent have anything to do with affirmative
8 representations made by Sagent personnel?
9    A    Historically?
10    Q    Well, specifically. There was a decision
11 the company made to license this product directly with
12 Sagent, correct?
13    A    Yes.
14    Q    And what I'm trying to get at is what the
15 basis is for that decision made by MICROS was?
16    A    I was not part of that. So I couldn't
17 relate to it.
18    Q    Do you have an understanding of the amount
19 of money that MICROS has attributed to marketing costs
20 for the Insight product?
21    A    No.

61

1    Q    Is there some person or group within MICROS
2 that would track those dollars?
3    A    Specifically for a project directly, no.
4    Q    You seem to be indicating that there might
5 be a more general reflection of those numbers
6 somewhere?
7    A    I think specifically if someone was asked
8 to come up with numbers, would have to go back and look
9 at invoices. It would be a specific data research and
10 analysis of direct dollars and of evaluation of time.
11    Q    Let me hand you what I'll mark as Exhibit
12 Number 6.
13        (Rogers Deposition Exhibit Number 6 was
14 marked by the reporter.)
15    Q    You are free to review the whole thing. I
16 have very limited questions. It is on the first page.
17    A    I would just like to look at the whole
18 document.
19    Q    Absolutely.
20    A    I'm ready to answer.
21    Q    You'll see some handwriting on the top