```
             IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND

SAGENT TECHNOLOGY, INC     *     CIVIL ACTION JFM-02-2505
          Plaintiff
                           *
     vs.                         Baltimore, Maryland
                           *
MICROS SYSTEMS, INC.
          Defendant        *     January 22, 2003
          *      *      *      *      *
```

Deposition of SCOTT CALLNIN, a witness of lawful age, taken on behalf of the Plaintiff in the above-entitled cause, pending in the District Court of the United States for the District of Maryland, before Dawn L. Venker, a Notary Public in and for Baltimore County, Maryland, at 7031 Columbia Gateway Drive, Columbia, Maryland 21046, on the 22nd day of January, 2003.

                  *      *      *      *      *

APPEARANCES:

         SCOTT H. PHILLIPS, Esquire
            For the Plaintiff

         MICHAEL H. TOW, Esquire
            For the Defendant

ALSO PRESENT:  PETER ROGERS, JR.

Reported By:  Dawn L. Venker

EXHIBIT B

**Page 22**

1 quarter.
2   Q   In what time frame did these initial talks
3 with Mr. Comstock or Mr. VanVeelen take place with you?
4   A   This would have been late May or early
5 June.
6   Q   Of 2000?
7   A   That's right.
8   Q   And at some point did you serve as a
9 liaison between Mr. Rogers who was executive designated
10 on behalf of MICROS and the individuals at Sagent with
11 regard to this purchase?
12   A   Only to the extent I just described, to put
13 the two together and then afterwards to follow up on
14 some of the correspondence between the companies.
15   Q   Did you have any role in the negotiation,
16 for lack of a better word, between the two companies
17 with regard to this purchase?
18   A   I sat in on a meeting in which the idea was
19 first discussed, and my input was asked for in terms of
20 what kind of future prospects there might be. The
21 ability to sell the product and some sort of a forecast

**Page 23**

1 roughly that we might expect. But not -- I was not
2 involved at all in the negotiations as far as the
3 outcome of the final decision which resulted in the
4 paperwork that is here in front of us.
5   Q   So was the meeting between MICROS personnel
6 only, or were there Sagent personnel included in that
7 meeting?
8   A   There were Sagent personnel.
9   Q   Can you give me an idea of who was at the
10 meeting?
11   A   That would have been --
12   Q   Yourself obviously?
13   A   -- myself, Peter Rogers, Dan VanVeelen,
14 Gene --
15   Q   Garrett?
16   A   -- Garrett -- that's correct -- and a
17 Vince. I can't recall his last name.
18   Q   DeGennarow?
19   A   I think that's roughly right.
20   Q   Anyone else that you can recall?
21   A   I don't recall anybody else in the meeting.

**Page 24**

1   Q   Where was that meeting held?
2   A   Here at MICROS.
3   Q   What time frame?
4   A   Early June. I believe perhaps the 6th.
5   Q   Did you take any notes at that meeting?
6   A   I did not.
7   Q   And describe for me again -- you indicated
8 earlier that someone had asked your input about, among
9 other things, the ability of MICROS to resell the
10 license; is that correct?
11   A   That's right.
12   Q   Were there any other areas of input that
13 you were asked to provide at the meeting?
14   A   No. Basically just future prospects. The
15 nature of that meeting was a lot of relationship talk.
16 We really hadn't hashed out any real specifics other
17 than to get the idea of what might be coming our way.
18 Both MICROS and Sagent partners going into this project
19 in the future.
20   Q   Do you recall any questions or comments
21 made by Mr. Rogers at the meeting?

**Page 25**

1   A   Rough recollection of various pieces of the
2 conversation. Some of it merely on a personal level.
3 Relationship type things. A lot of talk about Gene and
4 Peter being on track teams for their respective
5 schools, and then Peter was involved with kind of
6 bringing out the questions about what we would have in
7 the way of future projects and what we might expect and
8 what might be reasonable as far as our possible
9 transactions at that time given the financial shape
10 that we were in as well.
11       So there was talk about just getting closer
12 to the right number with Sagent maybe talking dozens or
13 a hundred licenses, and Peter saying it certainly
14 wouldn't be that. So the talk moved towards lower
15 numbers. May be perhaps ten or a few licenses, but
16 again no promises at that point.
17   Q   You mentioned MICROS' financial condition
18 at that point. Describe for me generally what the
19 financial condition of the company was at that time?
20   A   Certainly not as strong as it had been a
21 couple years prior. At that point, we had followed the

**26**

1 rest of the technology and hospitality companies into
2 downward trends. Certainly not as deep as most
3 companies were feeling it, but in the way of some of
4 the financial positions, cash available, and that sort
5 of thing, I don't know what the standing was at that
6 time.
7    Q    Was there any discussion about concessions
8 that Sagent might be able to make to make this
9 transaction more attractive to MICROS?
10   A    There would definitely be fairly deep
11 discounting involved off of their regular retail
12 pricing.
13   Q    Anything else along those lines?
14   A    That Sagent would assist us in selling had
15 been the understanding of the relationship going back
16 for a number of years. That we were 50-50 partners on
17 this project, and that they put in their equal time on
18 helping us to sell to various clients as well.
19   Q    You say that went back a number of years.
20 Was that specifically discussed at this June 6th
21 meeting?

**27**

1    A    Yes. Yes. The idea that Sagent would help
2 to sell the product was discussed.
3    Q    And tell me who was involved in that
4 conversation and who said what?
5    A    Primarily that would have been Dan
6 VanVeelen, as he was the main contact as far as the
7 product was concerned, and he would have the feel for
8 what leads they'd have. And he would have an opinion
9 as well that he did put into the conversation about
10 future client activity. The numbers that we might
11 expect to -- projects we might expect to go into as
12 well.
13   Q    Is it your contention that MICROS has paid
14 to Sagent any portion of the $136,000 reflected on both
15 the purchase order as well as the price quote provided
16 earlier to MICROS by Sagent?
17        MR. TOW: Objection as to form.
18   Q    Did you understand the question?
19   A    Yes. I understand, and I do not believe
20 that any portion of this amount has been paid.
21   Q    Let me hand you the next document which

**28**

1 we'll mark as Number 2, please.
2        (Callnin Deposition Exhibit Number 2 was
3 marked by the reporter.)
4        MR. PHILLIPS: For the record, Exhibit
5 Number 2 reflects MICROS Bates Numbers 5 through 10.
6    Q    If you would take a moment to look through
7 that, if you would, sir, MICROS Bates number 5 through
8 10.
9        Mr. Callnin, feel free to look at all of
10 that. I can tell that most of my questions will be on
11 page 9, but feel free to look at all of it.
12        MR. TOW: You should just look at all of it
13 to understand what you are looking at.
14   Q    Ready to proceed? As I said, let me ask
15 you turn to page 9, which I think you have already
16 done. Let me ask you to look at the bottom e-mail
17 there. It's a February 8th, 2001 e-mail from you to
18 Mr. VanVeelen. Do you see that one?
19   A    Yes.
20   Q    And I think -- correct me if I'm wrong --
21 this reflects what we were talking about a little bit

**29**

1 earlier with regard to deletion of the maintenance
2 support aspect of the initial invoice as well as the
3 reconfiguration of the mix of product. Is that your
4 understanding?
5    A    That's right.
6    Q    And if you look at the e-mail above that,
7 which is Mr. VanVeelen's reply to that of that same
8 date, it appears that Sagent is amenable to those
9 changes. Is that your understanding?
10   A    Yes.
11   Q    And those changes would in turn reduce the
12 amount of the invoice from the initial 136,000 down to
13 112,000. Is that your understanding?
14   A    That's right.
15   Q    Is it your contention that MICROS has paid
16 to Sagent any portion of that 112,000?
17   A    I do not believe any portion of that has
18 been paid.
19   Q    Let me ask you to take a look at -- it is
20 in that same document. If you'd turn to page 6. If
21 you look a little more than halfway down at the close

**30**

1 of that e-mail, you say, "Thanks, Dan. Scott Callnin,"
2 and then there is your phone number. Do you see that?
3   A   Yes.
4   Q   If you look to the very paragraph right
5 above that, "And I will honestly push very hard on this
6 end." Do you see that?
7   A   The one just above?
8   Q   Correct.
9   A   Yes.
10  Q   That indicates that as of the date of that
11 e-mail, which is reflected on the previous page, of
12 October 15th, 2001, you were still trying to get Sagent
13 paid for the $112,000 invoice. Is that your
14 understanding?
15  A   Was trying to get the invoices changed and
16 for the outstanding accounting issues to be cleared up.
17  Q   When you say the invoices changed, tell me
18 what you mean by that.
19  A   Although we had had verbal agreement
20 probably sometime not too long after the initial
21 meeting in June 6th, 2000 about making the changes to

**31**

1 the software mix, and then we didn't have a formal
2 writing of the objectives until February 8th, we did
3 not see -- even though there was on that same date
4 acceptance of the proposal, we did not see an invoice
5 for well over a year that reflected the types of
6 changes that we are talking about.
7   Q   So you were looking to get from Sagent an
8 invoice which reflected the agreement that you all had
9 reached in terms of reconfiguring the product mix and
10 deleting the maintenance and support aspect?
11  A   Correct.
12  Q   And as of February 8th, 2001, MICROS had
13 not received such an amended invoice?
14  A   We hadn't.
15  Q   But you mentioned sometime about a year or
16 more than a year later you ultimately did.
17  A   Yes, we did.
18  Q   And do you recall when that was?
19  A   I believe that was about November of 2001.
20 Would have been a few months after that, putting it in
21 the winter of 2002.

**32**

1   Q   A few minutes ago you said that in addition
2 to trying to get the invoices changed, you were trying
3 to get some accounting issues cleared up. I think that
4 was your phrase. What do you mean by that?
5   A   We had several different fronts that had
6 their own separate accounting paperwork generated, and
7 they had been mixed in with one another. Invoices
8 improperly being assigned to one project versus
9 another. Sagent had I think two or three pretty large
10 turnovers in their finance department, and so at least
11 three different times over the year between our
12 meetings with this and about the winter of 2002 I had
13 to go through -- go through every invoice that was ever
14 generated, every payment that was listed from our
15 finance department in regard to the invoices, match
16 them up, and explain to Sagent where some of their
17 holes were in their paperwork and accounting. And then
18 get back to our finance department about what should be
19 or shouldn't be issued in the way of payments towards
20 those invoices.
21  Q   When you said some of the holes in the

**33**

1 Sagent invoicing or paperwork, am I correct in
2 understanding that those reflected projects that had
3 nothing to do with this particular transaction?
4   A   That's correct. Although some of the
5 transactions or some of the invoices were mistakenly
6 assumed to be transactions from those other projects.
7 At one point, notably the $24,000 that was an original
8 line item on the original purchase order in question
9 here --
10  Q   Exhibit Number 1?
11  A   -- had been assumed -- yes. That's
12 right. -- had been assumed to be annual support for one
13 of our first clients. I indicate in this e-mail of
14 October 15th that it was an incorrect billing.
15  Q   As of October 15th, 2001, was there any
16 other issue, apart from your need for a revised
17 invoice, that reflected the reconfigured product mix
18 and the deletion of the maintenance and support
19 component? Anything other than that that precluded
20 MICROS from paying that $112,000 to Sagent? Were you
21 looking for anything else?

**34**

1  A  We were looking for some clients to use
2 those prepurchase licenses against. So, yes, during
3 that course of time we were e-mailing back and forth
4 about, you know, do we have any potential leads, what
5 is the outlook for the next new client. So there was,
6 yes, that -- if you call it an issue -- there was that
7 issue intermixed with this as well.
8  Q  Now, assuming as of February -- I'm
9 sorry -- October 15, 2001 -- assuming as of that date
10 Sagent had provided you with an amended invoice which
11 correctly reflected the new amount and the new product
12 configuration mix, would Sagent have paid that at that
13 time? All other things being equal. All other things
14 being the same as they were as of that date.
15    MR. TOW: Objection. You may have
16 misspoken in terms of Sagent paying.
17    MR. PHILLIPS: I did. I apologize.
18    MR. TOW: I think it was something of a
19 complex question.
20  Q  You mentioned that there were a couple of
21 things that were going on as of October 15th 2001, some

**35**

1 of which are reflected in your e-mail. One of them was
2 that Sagent had never provided you all with an amended
3 invoice, correct?
4  A  Correct.
5  Q  One of the other issues that was going on
6 was that jointly the two companies were looking for
7 customers to purchase these licenses, correct?
8  A  That's right.
9  Q  Now, let me ask you to assume as of October
10 15th, 2001 Sagent had provided MICROS with an amended
11 invoice which was correct? It correctly reflected the
12 terms, but the other -- that other issue, the new
13 customer issue, was the same as it was at that time,
14 namely you all were jointly looking for other
15 customers. Would MICROS have paid Sagent the $112,000?
16    MR. TOW: Objection. Calls for
17 speculation. You can answer as best you can.
18  A  I would at that point say that I was
19 satisfied saying that the invoicing was properly done,
20 and then I would have given my blessing or my thumbs up
21 that the product mix was correct. And then would have

**36**

1 turned it over to the appropriate persons to authorize
2 paying of the invoice.
3  Q  Who would that have been at the time?
4  A  Either Peter Rogers or Peter Rogers in
5 combination with our CFO to approve that.
6  Q  Is there any e-mail or other writing from
7 you to anybody at Sagent that indicated that one of the
8 reasons Sagent wasn't being paid was because of
9 Sagent's failure to cooperate with MICROS in the joint
10 effort to identify customers to purchase these
11 licenses?
12  A  Could you restate the beginning part of
13 that sentence.
14  Q  I'm asking you if you can identify for me
15 any e-mail or other writing that came from you that
16 went to anyone at Sagent that expressed the notion that
17 one of the reasons that Sagent wasn't being paid
18 $112,000 was because Sagent had failed to cooperate
19 with MICROS in the joint effort to identify customers
20 to purchase the license?
21  A  I'm not aware of anything that I have,

**37**

1 either with me or that I have seen, that listed any
2 specific reason why the invoice was not -- was not paid
3 after the issue of having the correct software listed
4 on the invoice was resolved.
5  Q  I mean even before that. You said that was
6 sometime in -- when did you say that was when you got
7 the -- finally got the new invoice?
8  A  Late 2000 or early 2002.
9  Q  Even before late 2001, did you find -- are
10 you aware of any correspondence that would indicate
11 that one of the reasons that Sagent wasn't being paid
12 was because of its failure to cooperate with MICROS to
13 identify customers to purchase the licenses?
14  A  I'm not aware of any documents or notes
15 that I may have on any such statement of that nature.
16  Q  Did you ever express that sentiment to
17 anyone at Sagent verbally, either in person or on the
18 telephone?
19  A  Yes. Certainly the idea that no leads had
20 come through was discussed verbally quite a bit. We
21 had -- we would express when we had a possible client

**Page 54**

1  Q   Let me hand you what we are going to mark
2  as Exhibit Number 5 which bears MICROS Bates number 11
3  and 12.
4      MR. PHILLIPS: And I will point out,
5  Michael, that my copy was poor. We can confirm that
6  this is actually another 1 that is the following
7  number.
8      MR. TOW: That's fine.
9      (Callnin Deposition Exhibit Number 5 was
10 marked by the reporter.)
11 A   Okay.
12 Q   Mr. Callnin, this purports to be an e-mail
13 that Tiffany Nguyen -- N-G-U-Y-E-N -- that Sagent sent
14 to you on October 18, 2001 in which she attaches a
15 "revised invoice for the initial sales," and again, let
16 me ask you if you recall receiving this e-mail and the
17 attachment?
18 A   This one, yes. I recall receiving this.
19 Q   Both pages?
20 A   Yes.
21 Q   An did you read it when you received it?

**Page 55**

1  A   Yes.
2  Q   Does the second page, which is page 12, is
3  that the corrected invoice that you were referring to
4  earlier that you said arrived sometime in late 2001?
5  A   Yes. There is the corrected invoice.
6  Q   Let me shift gears a little bit and ask you
7  about the answers to interrogatories that MICROS has
8  provided in this case. Did you have any role in
9  preparing those answers to interrogatories? Let me
10 first ask you whether you have ever seen them?
11 A   I've seen them within the last couple of
12 weeks.
13 Q   And that probably answers my next question.
14 Did you have any role in preparing them?
15 A   No.
16 Q   Were you asked to review them, once they
17 had been completed, for accuracy or completeness?
18 A   No.
19 Q   There is a reference in the answers to
20 interrogatories to an address at Beltsville, 12000
21 Baltimore Avenue. Can you tell me what is there?

**Page 56**

1  A   That's the old headquarters of MICROS
2  Systems.
3  Q   And what is currently housed there?
4  A   Just the original office building, and I'm
5  not sure if we still have a receiving department there
6  or not. We may have completely vacated the area.
7  Q   What was there as of June 30th, 2000?
8  A   At that point, there was a receiving area
9  there.
10 Q   And is it your understanding that the
11 software and analytical calculator that Sagent shipped
12 to MICROS was actually delivered to that address as
13 opposed to this address?
14 A   That might be accurate. I'm not certain,
15 but that would be about right.
16 Q   Let me ask you. I think it might be
17 reflected on Exhibit Number 1. Does that refresh your
18 recollection in responding to that previous question?
19 A   Yes. It appears that they have that as
20 their ship to address. So it was likely the location
21 where their software arrived.

**Page 57**

1  Q   And it's not your contention, is it,
2  Mr. Callnin, that Sagent failed to deliver either
3  that -- the software or analytical calculator that is
4  reflected and contemplated in Exhibit Number 1, is it?
5  A   No.
6  Q   Do you have an understanding of who would
7  have re -- who physically would have received the
8  software from Sagent at the Beltsville address as of
9  the June, July 2000 time frame?
10 A   I don't know.
11 Q   You mentioned a receiving department
12 earlier; is that correct?
13 A   Uh-huh.
14 Q   That was there at the time?
15 A   Yes.
16 Q   How many people worked in that department?
17 A   I don't know.
18 Q   Do you know who the head of it was back in
19 the June, July 2000 time frame?
20 A   No.
21 Q   Do you know the names of any of the people

15 (Pages 54 to 57)

### Page 58

1 who worked in the receiving department during that time
2 frame?
3  A  No.
4  Q  Did you ever personally see the software
5 that Sagent delivered to MICROS?
6  A  Yes.
7  Q  When did you see it?
8  A  I can't recall even very closely when it
9 did arrive. It was, as best I can recall, sometime in
10 the fall of 2000.
11  Q  And at that time was your office in
12 Beltsville?
13  A  I believe we moved -- two years ago, no.
14 Three years ago. Yes, I believe. No. I believe we
15 were here in this location. Fall of 2000 we were here
16 at this location.
17  Q  Were you physically here when you saw the
18 software for the first time?
19  A  Yes.
20  Q  Can you describe for me what it looked
21 like? Was it open? Was it in packaging?

### Page 59

1  A  It was delivered actually to me in my
2 office. I opened the mailing box, and the software
3 manuals and disks were shrink wrapped, and I put that
4 on my shelf in my office.
5  Q  So it was initially delivered to MICROS,
6 Beltsville, correct?
7  A  That's right.
8  Q  And then there is some sort of internal
9 delivery procedure within the company whereby it made
10 its way from Beltsville to Columbia?
11  A  Correct.
12  Q  You mentioned multiple disks. How many
13 were there?
14  A  I don't recall. It may have been one
15 because I knew it's their practice to put all the
16 various software on one disk and just provide a
17 different key for what they wanted to unlock on the
18 disk. Though there may have been documentation disks
19 or tutorial discs as well, or perhaps portions of what
20 was delivered might have been on a second disk. I
21 can't remember. It might have been one. It might have

### Page 60

1 been multiple.
2  Q  I think you said that the disk, or disks
3 were shrink wrapped at that time, right?
4  A  Yes.
5  Q  And you took them out of not the shrink
6 wrap, but the mailing package?
7  A  Correct.
8  Q  And put them on a shelf in your office?
9  A  That's right.
10  Q  Did you or anyone else at your direction
11 make copies of either the disk or disks that were
12 contained therein?
13  A  No. They were never removed from the
14 shrink wrap.
15  Q  How long did they stay on the shelf in your
16 office?
17  A  Probably about fourteen months. Again, I
18 don't have a good recollection of exactly when I
19 received them or when I turned them over.
20  Q  And to whom did you turn them over
21 ultimately?

### Page 61

1  A  To Michael Tow.
2  Q  And that was approximately fourteen months
3 after they arrived in your office in the fall -- did
4 you say the fall of 2000? Yeah.
5  A  That would be about right.
6  Q  Did you turn all of that material over to
7 Mr. Tow at one time?
8  A  Yes. That's right.
9  Q  Did he return to you some months later and
10 retrieve from you additional materials provided by
11 Sagent?
12  A  I don't recall if he did.
13  Q  Do you have an understanding of what
14 Mr. Tow did with the materials he retrieved from you?
15  A  I believe he returned them to Sagent.
16  Q  Do you have an understanding as to why?
17  A  I believe that was to show them -- to
18 return it in the form it came. Was to show them that
19 we hadn't ever used the software.
20  Q  But I mean why was it returned at all?
21  A  At the time that it was asked from me and I

66

1 between the two companies where you say -- you talk
2 about what the products mix will be, what the delivery
3 terms will be, what the price will be? That sort of
4 back and forth?
5   A   Yes. I had experience in that regard again
6 with Sagent, but more on the lines of the consultant --
7 the services we would agree to purchase from them on
8 various projects.
9   Q.  I read some of e-mails about a gentleman
10 who worked for Sagent by the name Sanjay?
11   A   Sanjay, yes.
12   Q   He did some consulting work for MICROS with
13 regard to I think the AmeriKing project; is that right?
14   A   That's right.
15   Q   And at some point the number of days were
16 beyond budget, and MICROS asked Sagent to basically
17 make a concession on the number of days that Sanjay had
18 spent on that consulting work, right?
19   A   We did.
20   Q   And ultimately there was an agreement on
21 the number of days that would be credited back to

67

1 MICROS, correct?
2   A   Correct.
3   Q   If MICROS was to receive a written price
4 quote from a vendor and you didn't agree with all of
5 the terms as set forth in that quote, how would you
6 convey your disagreement and request the changes back
7 to that vendor?
8   A   That would have been through direct contact
9 with either Dan VanVeelen or Matt Comstock.
10   Q   Would that have been in writing?
11   A   More often than not it was at least
12 preceded by a phone call with an agreement to -- the
13 idea that was put forth, and in probably most
14 situations but not all, follow-up with a formal e-mail.
15   Q   At any time did you write to either
16 Mr. Comstock or Mr. VanVeelen expressing the notion
17 that, "Wait a minute, guys, there is something that is
18 not reflected here, and that is your agreement to
19 accept for a full refund the software package in return
20 if we, MICROS, couldn't resell or relicense it"?
21   A   The question one more time.

68

1   Q   At any point during this transaction, did
2 you write, in either a letter or e-mail, to
3 Mr. Comstock, Mr. VanVeelen, or anybody else at Sagent
4 expressing the idea that there was an agreement here
5 that was not expressed previously in writing, and that
6 agreement was that Sagent would accept the software
7 package and the analytical calculator in return for a
8 full refund to MICROS if MICROS couldn't relicense or
9 resell that?
10   A   I never sent any e-mails that -- to that
11 extent in that language.
12   Q   Did you send any e-mails or correspondence
13 that had similar language to it? I don't mean to box
14 you in with my specific verbiage.
15   A   No. With regard to the returning of the
16 software, I don't think that I had any correspondence
17 with Matt or with Dan.
18   Q   The software, the records will reflect, I
19 think, was returned in December of 2001, and the date
20 of Exhibit Number 1 is June 30th, 2000. So we are
21 talking about an eighteen-month gap there. I mean from

69

1 any time, let's say from May 2000 forward, did you
2 express in writing the sentiment that there are -- had
3 yet to be reflected in writing the agreement between
4 MICROS and Sagent that Sagent would accept the software
5 in return for a full credit back to MICROS if MICROS
6 couldn't relicense or resell its software?
7       MR. TOW: Objection. Asked and answered.
8 Answer it again.
9       MR. PHILLIPS: I don't think it has been
10 answered, but it has been asked.
11   A   No. I didn't send any correspondence with
12 any language to that extent.
13   Q   Are you aware of anyone within MICROS who
14 did send such a correspondence or e-mail?
15   A   I am not aware of. I don't remember seeing
16 such a correspondence or being perhaps copied on
17 correspondence with that request, but I would only
18 speculate that that was done.
19   Q   As the initial contact on the MICROS end
20 for this transaction, would you typically be copied on
21 any such correspondence if it existed?

Page 70

1  A   In the earlier part of the talks about this
2 transaction, yes, but not necessarily the sixteen,
3 eighteen months later when it wrapped up.
4  Q   The earlier part would include the June
5 6th, 2000 time frame when you attended the meeting,
6 right?
7  A   Uh-huh.
8  Q   So if there was any correspondence going
9 back from anyone at MICROS to Sagent expressing the
10 notion that you and I are talking about now, in that
11 early part of the deal, you typically would have been
12 copied on that, right?
13  A   Likely.
14  Q   Are you aware of any documents either to or
15 from Sagent which reflects that it was Sagent's
16 understanding that its sale of this software package
17 and analytical calculator to MICROS was conditional
18 upon anything?
19  A   Am I aware of any correspondences to that
20 extent?
21  Q   Any document, and I mean to include

Page 71

1 document, correspondence, e-mails, or handwritten notes
2 that were provided to Sagent.
3  A   I'm not aware of anything in writing to
4 that extent.
5  Q   Again, let me just ask for your sort of
6 technical expertise in this area. We talked about the
7 concept of data warehousing, and you may have answered
8 this. I may have already previously asked you. Can
9 you give me an idea of what that is, and is that what
10 you mentioned early on about collecting point of sale
11 information and analyzing or providing it in raw data?
12     MR. TOW:  Objection as to form. You can
13 answer.
14  Q   It is a poorly formed question. I'm trying
15 to learn what data warehousing is.
16  A   But I think your summary was correct.
17  Q   Do I understand that the Insight product
18 was a jointly developed product between Sagent and
19 MICROS?
20  A   That's right.
21  Q   Do I understand correctly that the

Page 72

1 Insight -- that part and parcel the Insight product was
2 the software package that is the issue of this
3 particular transaction?
4  A   Part of the original invoice in question is
5 involved with it. The data movement is absolutely
6 necessary to that product as it existed. The reporting
7 aspect of it would be an option, not necessarily
8 automatically included in it.
9  Q   Let me hand you the next exhibit, and we
10 are up to 6.
11     (Callnin Deposition Exhibit Number 6 was
12 marked by the reporter.)
13     MR. PHILLIPS:  This bears MICROS Bates
14 numbers 161 through 163. Let's go off the record.
15     (A recess was taken.)
16  Q   Easy question. Is it your handwriting?
17  A   No, it is not.
18  Q   On none of these three pages?
19  A   Correct.
20  Q   Do you recognize whose handwriting it is?
21  A   I do not.

Page 73

1  Q   Let me ask you a little bit more about the
2 June 6th, 2000 meeting that we talked about earlier.
3 Do you know who called that meeting?
4  A   I was the contact on putting it together
5 through Dan VanVeelen. I believe may have had Gene
6 Garrett contact Peter Rogers at that point, and that
7 was called between Gene and Peter.
8  Q   And I think earlier you testified that
9 generally the purpose of the meeting was to discuss
10 future prospect for this product, what the two
11 companies could do with it; isn't that right?
12  A   Uh-huh. That's right.
13  Q   Were there other items on the agenda, if
14 you will?
15  A   No. I think that was the sole purpose of
16 that visit. They were -- Sagent, that is, particularly
17 Gene, was very concerned with missing some numbers in
18 there at the end of the quarter, and the primary, if
19 not sole, concern of that meeting was to get some
20 prepurchased software on the records by the end of the
21 quarter.